UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ROOSEVELT ROAD RE, LTD.;
TRADESMAN PROGRAM MANAGERS, LLC; and
IONIAN RE, LLC,

Case _____

Plaintiffs,

v.

LIAKAS LAW, P.C.; DEAN N. LIAKAS; JOHN DOE
NOS. 1-25; XYZ CORPORATION NOS. 1-25;
BROOKLYN MEDICAL PRACTICE, P.C.;
SAYEEDUS S. SALEHIN, M.D.; ADVANCED
ORTHOPEDICS AND JOINT PRESERVATION P.C.;
STAN AVSHALUMOV, D.O.; COMMUNITY
MEDICAL IMAGING OF BROOKLYN P.C.;
ANDREW J. MCDONNELL, M.D.; ORTHOPAEDICS
SPINE & SPORTS MEDICINE, LLC, s/d/b/a TOTAL
ORTHOPAEDICS & SPORTS MEDICINE; VADIM
LERMAN, D.O.; ABHISHEK KUMAR, M.D.;
SHIVEINDRA JEYAMOHAN, M.D.; BIG APPLE
PAIN MANAGEMENT, P.L.L.C.; RICHARD APPLE,
M.D.; NORTH SHORE FAMILY CHIROPRACTIC,
P.C.; TODD LAWRENCE LEBSON, D.C.; UNICORN
ACUPUNCTURE, P.C.; DEKUN WANG, L.Ac;
ENGLINTON MEDICAL, P.C.; SHIARREE
EVARISTO, P.T.; ARKADIY SHUSTERMAN, D.O.;
COUNTER POINT MEDICAL, P.C.; UPWARD
MEDICAL, P.C.; MARK KOSTIN, M.D.; BROOKLYN
PREMIER ORTHOPEDICS AND PAIN
MANAGEMENT P.L.L.C.; FJ ORTHOPAEDICS AND
PAIN MANAGEMENT P.L.L.C.; VAGMIN VORA,
M.D.; JONATHAN SIMHAEE, M.D.; STEVEN
HOROWITZ, M.D.; BL PAIN MANAGEMENT,
P.L.L.C. d/b/a PAIN MANAGEMENT NYC; PAIN
PHYSICIANS NY, P.L.L.C.; BOLESLAV
KOSHARSKYY, M.D.; ROMAN SHULKIN, M.D.;
LEONID REYFMAN, M.D.; MCCULLOCH
ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.
s/d/b/a NEW YORK SPORTS AND JOINTS
ORTHOPAEDIC SPECIALISTS; KENNETH
McCULLOCH-OTERO, M.D.; DAVID R. CAPIOLA,

COMPLAINT                                                                                    1

**M.D.; GOTHAM NEUROSURGERY, P.L.L.C.;
ANDERS COHEN, D.O.; GARDEN STATE
ORTHOCARE LLC, d/b/a ORTHOCARE SURGICAL;
RANDALL EHRLICH, M.D.; PRECISION PAIN
MANAGEMENT, P.C.; and ARI BENJAMIN LERNER
M.D.,**

**Defendants.**

---

## COMPLAINT

---

Plaintiffs ROOSEVELT ROAD RE, LTD. (hereinafter referred to as "Roosevelt") TRADESMAN PROGRAM MANAGERS, LLC (hereinafter referred to as "Tradesman"), and IONIAN RE, LLC (hereinafter referred to as "Ionian") (collectively referred to hereinafter as "Plaintiffs") by and through their attorneys THE WILLIS LAW GROUP, PLLC, allege as follows:

**I.      JURISDICTION AND VENUE**

1.      This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside in this District.

II.    **PARTIES**

A.    **Plaintiffs**

3.    Plaintiff Roosevelt Road Re, Ltd. is a foreign limited company duly organized and existing under the laws of Bermuda. At all times relevant herein, Roosevelt was authorized to conduct business in New York.

4.    Plaintiff Tradesman Program Managers, LLC is a limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Tradesman maintained its principal place of business in the State of New York and is authorized to conduct business in New York.

5.    Plaintiff Ionian is a limited liability company organized under the laws of the State of Vermont, with a place of business located in the County of Queens, State of New York, and is registered to do business in New York

B.    **Defendants**

i.    Legal Service Defendants

6.    Defendant LIAKAS LAW P.C. ("Liakas Firm") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Liakas Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

7.    Upon information and belief, Defendant DEAN N. LIAKAS ("Dean Liakas") resides in and is a citizen of the State of New York. He is also the managing partner of Liakas Firm. At all times relevant, Dean Liakas was licensed or otherwise authorized to practice law in the State of New York.

8.    Liakas Firm and Dean Liakas are collectively referred to herein as the "Liakas Defendants" or the "Legal Service Defendants."

COMPLAINT                                                                                    3

ii.  Runner Defendants

9.     Defendants JOHN DOE NOS. 1-25 (collectively "Runner Defendants") are persons of unknown citizenship who participated in the fraudulent scheme described below by recruiting construction workers into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

10.    Similar to the scheme set forth in *United States v. Rainford et al.*, 110 F.4th 455 (2d Cir. 2024), Runner Defendants typically have their own claims, which may be presented before, after, or in conjunction with their recruiting activities.

11.    Upon information and belief, defendant Liakas Firm further employs or has employed at least two individuals purportedly as "paralegals" or employees retained to perform "client relations" who were in fact tasked with recruiting construction workers and other potential claimants in order to further the fraudulent scheme.

iii.  Funding Defendants

12.    Defendants XYZ CORPORATION NOS. 1-25 (collectively, the "Funding Defendants") are business entities of unknown organization that participated in the fraudulent scheme described below by providing funds directly and/or indirectly to the Legal Service Defendants, the Runner Defendants, the Claimants (defined below) and/or the Medical Provider Defendants.

iv.  Medical Provider Defendants

13.    Defendant BROOKLYN MEDICAL PRACTICE, P.C. ("Brooklyn Med") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein. Brooklyn Med maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Brooklyn Med maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

COMPLAINT                                                                                                4

14.    Defendant SAYEEDUS S. SALEHIN, M.D. ("Salehin" and together with Brooklyn Med, the "Brooklyn Med Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Salehin has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Brooklyn Med.

15.    Defendant ADVANCED ORTHOPEDICS AND JOINT PRESERVATION P.C. ("Advanced Ortho") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein. Advanced Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Advanced Ortho also maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

16.    Defendant STAN AVSHALUMOV, D.O. ("Avshalumov" and together with Advanced Ortho, the "Advanced Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Avshalumov has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Advanced Ortho.

17.    Defendant COMMUNITY MEDICAL IMAGING OF BROOKLYN P.C. ("Community Imaging") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Community Imaging maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

18.    Defendant ANDREW J. MCDONNELL, M.D. ("McDonnell" and together with Community Imaging, the "Community Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, McDonnell has been licensed or otherwise authorized to practice

medicine in the State of New York and was the owner, operator, officer, director and/or employee of Community Imaging.

19.     Defendant ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC a/k/a Total Orthopaedics & Sports Medicine ("Total Ortho") is a limited liability company apparently organized and existing under the laws of the State of New York in conjunction with Total Ortho Management Services, LLC and possibly as a successor to the defunct Total Orthopaedics & Sports Medicine LLP whose authorization was revoked in 2013. At all times relevant herein, Total Ortho maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

20.     Defendant VADIM LERMAN, D.O. ("Lerman") resides in and is a citizen of the State of New York. At all relevant times herein, Lerman has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho.

21.     Defendant ABHISHEK KUMAR, M.D. ("Kumar") resides in and is a citizen of the State of New York. At all relevant times herein, Kumar has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho.

22.     Defendant SHIVEINDRA JEYAMOHAN, M.D. ("Jeyamohan" and together with Total Ortho, Lerman and Kumar, the "Total Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Jeyamohan has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho.

23.     Defendant BIG APPLE PAIN MANAGEMENT, P.L.L.C. ("Big Apple") is a professional limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Big Apple maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Big Apple also maintained an office at 410 Ditmas Avenue, Brooklyn, New York

24.     Defendant RICHARD APPLE, M.D. ("Apple" and together with Big Apple, the "Apple Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Apple has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Big Apple.

25.     Defendant NORTH SHORE FAMILY CHIROPRACTIC, P.C. ("North Shore") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, North Shore maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. North Shore also maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

26.     Defendant TODD LAWRENCE LEBSON, D.C. ("Lebson" and together with North Shore, the "North Shore Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Lebson has been licensed or otherwise authorized to provide chiropractic services in the State of New York and was the owner, operator, officer, director and/or employee of North Shore.

27.     Defendant UNICORN ACUPUNCTURE, P.C. ("Unicorn") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Unicorn maintained its principal place of business in the State of New York and is

authorized to and does conduct business in New York. Unicorn also maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

28.    Defendant DEKUN WANG, L.Ac. ("Wang" and together with Unicorn, the "Unicorn Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Wang has been licensed or otherwise authorized to practice acupuncture in the State of New York and was the owner, operator, officer, director and/or employee of Unicorn.

29.    Defendant ENGLINTON MEDICAL, P.C. ("Englinton Med") is a professional service corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Englinton Med maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Englinton Med maintained an office at 95-25 Jamaica Avenue, Woodhaven, New York.

30.    Defendant SHIARREE EVARISTO, P.T. ("Evaristo") resides in and is a citizen of the State of New York. At all relevant times herein, Evaristo has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Englinton Med.

31.    Defendant ARKADIY SHUSTERMAN, D.O. ("Shusterman" and together with Englinton Med and Evaristo, the "Englinton Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Shusterman has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Englinton Med.

32.    Defendant COUNTER POINT MEDICAL, P.C. ("Counter Point") is a professional corporation duly organized and existing under the laws of the State of New York. At all times

relevant herein, Counter Point maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

33.    Defendant UPWARD MEDICAL, P.C. ("Upward Med") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Upward Med maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Upward Med performed alleged services at 92-25 Jamaica Avenue, Woodhaven, New York.

34.    Defendant MARK KOSTIN, M.D. ("Kostin" and together with Counter Point and Upward Med the "Kostin Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Kostin has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Counter Point and Upward Med. Kostin also provided medical service as part of Englinton Med.

35.    Defendant BROOKLYN PREMIER ORTHOPEDICS AND PAIN MANAGEMENT P.L.L.C. ("Brooklyn Premier") is a professional limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Brooklyn Premier maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Brooklyn Premier maintained an office at 1414 Newkirk Avenue, Brooklyn, New York.

36.    Defendant FJ ORTHOPAEDICS AND PAIN MANAGEMENT P.L.L.C. ("FJ Ortho"). is a professional limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, FJ Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

COMPLAINT                                                                                              9

37.     Defendant VAGMIN VORA, M.D. ("Vora") resides in and is a citizen of the State of New York. At all relevant times herein, Vora has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Brooklyn Premier.

38.     Defendant JONATHAN SIMHAEE, M.D. ("Simhaee") resides in and is a citizen of the State of New York. At all relevant times herein, Simhaee has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Brooklyn Premier and FJ Ortho.

39.     Defendant STEVEN HOROWITZ, M.D. ("Horowitz" and together with Brooklyn Premier, FJ Ortho, Vora and Simhaee, the "Brooklyn Premier Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Horowitz has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Brooklyn Premier. S. Horowitz is the founder of the pain management department of Brooklyn Premier.

40.     Defendant BL PAIN MANAGEMENT, P.L.L.C. d/b/a Pain Management NYC ("BL Pain") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, BL Pain maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. BL Pain also maintained an office at 95-27 Jamaica Avenue, Woodhaven, New York.

41.     Defendant PAIN PHYSICIANS NY, P.L.L.C. ("Pain Physicians") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Pain Physicians maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

COMPLAINT                                                                                              10

42.     Defendant LR MEDICAL, P.L.L.C. ("LR Med") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, LR Medical maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

43.     Defendant BOLESLAV KOSHARSKYY, M.D. ("Kosharskyy") resides in and is a citizen of the State of New York. At all relevant times herein, Kosharskyy has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of BL Pain and Pain Physicians.

44.     Defendant ROMAN SHULKIN, M.D. ("Shulkin") resides in and is a citizen of the State of New York. At all relevant times herein, Shulkin has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of BL Pain, Pain Physicians and LR Med.

45.     Defendant LEONID REYFMAN, M.D. ("Reyfman" and together with BL Pain, Pain Physicians, LR Med, Kosharskyy and Shulkin, the "BL Pain Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Reyfman has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of BL Pain, Pain Physicians and LR Med.

46.     Defendant MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS ("McCulloch Ortho" or "NY S&J" when utilizing the alias) is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, McCulloch Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

COMPLAINT                                                                                          11

47.     Defendant KENNETH McCULLOCH-OTERO, M.D. ("McCulloch") resides in and is a citizen of the State of New York. At all relevant times herein, McCulloch has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

48.     Defendant DAVID R. CAPIOLA, M.D. ("Capiola" and together with McCulloch Ortho and McCulloch, the "McCulloch Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Capiola has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

49.     Defendant GOTHAM NEUROSURGERY, P.L.L.C. ("Gotham Neurosurgery") is a professional service corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Gotham Neurosurgery maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

50.     Defendant ANDERS COHEN, D.O. ("Cohen" and together with Gotham Neurosurgery, the "Gotham Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Cohen has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Gotham Neurosurgery.

51.     Defendant GARDEN STATE ORTHOCARE LLC, d/b/a ORTHOCARE SURGICAL ("OrthoCare Surgical") is a professional service corporation duly organized and existing under the laws of the State of New Jersey. At all times relevant herein, OrthoCare Surgical maintained its principal place of business in the State of New York and is authorized to and does

COMPLAINT                                                                                    12

conduct business in New York. OrthoCare Surgical also performed alleged services at 95-25 and 95-27 Jamaica Avenue, Woodhaven, New York.

52.     Defendant RANDALL EHRLICH, M.D. ("Ehrlich" and together with OrthoCare Surgical, the "OrthoCare Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Ehrlich has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of OrthoCare Surgical.

53.     Defendant PRECISION PAIN MANAGEMENT, P.C. ("Precision Pain") is a professional service corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Precision Pain maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

54.     Defendant ARI BENJAMIN LERNER M.D. ("Lerner" and together with Precision Pain, the "Precision Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Lerner has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Precision Pain.

55.     The Brooklyn Med Defendants, the Advanced Defendants, the Community Defendants, the Total Defendants, the Apple Defendants, the North Shore Defendants, the Unicorn Defendants, the Englinton Defendants, the Kostin Defendants, the Brooklyn Premier Defendants, the BL Pain Defendants, McCulloch Defendants, the Gotham Defendants, the OrthoCare Defendants, and the Precision Defendants are collectively referred to herein as the "Medical Provider Defendants."

COMPLAINT                                                                                    13

56.    The Legal Service Defendants, the Runner Defendants, the Funding Defendants, and the Medical Provider Defendants are collectively referred to herein as "Defendants."

## III.    FACTUAL BACKGROUND

### A.  <u>Fraud Scheme</u>

57.    From at least 2018 to the present, with a marked escalation since 2020, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others by (i) unlawfully grooming and recruiting construction workers into staging and perpetuating fake construction accidents that occurred in New York and/or transforming legitimate minor or localized injuries into lucrative full-body claims; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent workers' compensation claims and personal injury lawsuits on behalf of such construction workers; (iii) providing or alleging to have provided medically unnecessary and excessive healthcare services to such construction workers; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate settlement value (the "Fraud Scheme").

58.    The conspiracy shares many structural elements similar to those found in *United States v. Rainford*, *supra*, as summarized by the Second Circuit Court of Appeals in its recent decision affirming criminal convictions:

> The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment—sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.

COMPLAINT                                                                14

*United States v. Rainford et al.*, 110 F.4th at 468 (2d Cir. 2024)

59.    The Defendants together constituted an association-in-fact enterprise generally structured as depicted below in Figure 1.

**Figure 1.**



**Figure 2.**

**Medical Provider Defendants** – provide and seek reimbursement for fraudulent medical services to Claimants, which also inflates settlement value
**Gatekeeper Clinics**
**Brooklyn Premier Defs-** Evaluations and physical therapy for Claimants.
**Englinton Defs-** Evaluations and physical therapy for Claimants.
**Brooklyn Med Defs-** Evaluations and PT for Claimants.
**Community Defs-** Radiographic reports for Claimants.
**Unicorn Defs-** Acupuncture treatment for Claimants.
**North Shore Defs-** Chiropractic treatment for Claimants.
**Kostin Defs-** Evaluations, Gatekeeper.
**BL Pain Defs-** Evaluations, injections, and 'shockwave' therapy for Claimants
**Precision Defs-** Evaluations and injections for Claimants. Additional Gatekeeper.
**Orthocare Defs-** Evaluations and surgeries for Claimants.
**Gotham Defs-** Evaluations and surgeries for Claimants.
**McCulloch Defs.** Evaluations and surgeries for Claimants.
**Advanced Defs-** Evaluations and surgeries for claimants.
**Apple Defs-** Evaluations and injections for Claimants.
**Total Defs-** Evaluations and surgeries for Claimants.



60.     Generally, as part of the Fraud Scheme, individuals known as "runners" ("Runners"), including the Runner Defendants, under the direction of the Liakas Defendants and in furtherance of and as a necessary step for the execution of the Fraud Scheme, recruited construction workers ("Claimants") into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

61.     Upon information and belief, as part of the recruitment process, Claimants were told that they would be paid workers' compensation benefits for not working if they had a work-place injury and that they would receive money in addition to workers' compensation benefits in order to cover any theoretical gap in pay, in the form of litigation funding loans arranged by Liakas Defendants in conjunction with Funding Defendants.

62.     Upon information and belief, Claimants were also told that the amount of their ultimate economic recoveries would increase if they had surgeries or rehabilitation, and that the economic benefits could continue for weeks or more so long as they continued to participate in the treatment protocol predetermined by Defendants.

63.     Regardless of any actual bodily injury stemming from the purported construction accidents, these Claimants were instructed by the Runners, under the direction of the Legal Service Defendants and on behalf of the Defendants, to fake and claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment from providers who would provide treatment in furtherance of the scheme.

64.     The Runners then referred and/or transported these Claimants to Liakas Firm, where attorneys and/or other employees of Liakas Firm met with these Claimants.

65.     The Liakas Defendants represented the Claimants in personal injury lawsuits and workers' compensation claims made to the New York State Workers' Compensation Board ("NY

WCB") against the various parties involved with the construction project (*e.g.*, owner, general contractor, construction manager, etc.) for purported injuries that resulted from alleged accidents on the construction projects.

66.     For most Claimants, both personal injury lawsuits and workers' compensation claims were initiated and proceeded in parallel to maximize profit for the Defendants.

67.     In order to inflate settlement value and workers' compensation benefits and thereby effectuate higher profit for the Defendants, Liakas Defendants, directly and/or indirectly through the Runner Defendants and/or others under their control, directed the Claimants to seek medical diagnosis and treatment from certain associated medical providers with which the Defendants had an agreement or understanding as to the fraud scheme, including the Medical Provider Defendants, who provide a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at facilities located in or to patients from multiple states, including New York and New Jersey.

68.     In this respect, the scheme bears striking similarity not only to *Rainford, supra*, but to the scheme as set forth in *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59 (2d Cir. 2024), in which certain medical service providers "conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions, but rather are predetermined to find various injuries requiring extensive treatment." *Id* at 73.

69.     Here too, following initial evaluation of the Claimants by gatekeeper clinic personnel, the associated medical service providers (usually internists) referred Claimants to physical therapy, chiropractic treatment, and acupuncture treatment and to orthopedic and neurology consultations from associated medical service providers, including the Medical

COMPLAINT                                                                                              18

Provider Defendants, involved in the fraudulent scheme, many of which also practiced out of the same buildings/addresses.

70.     In addition to shared buildings/addresses, a number of Medical Provider Defendants have utilized different corporate identities to at least partially hide what amounts to circles of self-referrals, such as wherein personnel from McCulloch will selectively use the NY S&J identity, or when personnel from Pain Physicians will bill for services through LR Med and/or BL Pain to achieve the same purpose. *See also, e.g.,* ¶ 180 below.

71.     As in *State Farm v. Tri-Borough*, implementation of the fraudulent treatment protocol requires that Medical Provider Defendants "routinely order unnecessary diagnostic tests for patients that do not affect their treatment, and that some of those tests are duplicative of information already obtained…" 120 F.4th at 74.

72.     Here, the associated medical service providers routinely ordered a variety of imaging services in every single case – MRIs of cervical and lumbar spine, shoulder, knees, ankles, hands – from certain radiologists involved in the fraudulent scheme, whose reports contain findings that routinely deviate from the claimants' conditions as set forth by the imaging studies themselves. For example, as demonstrated more particularly below, although Claimant A initially reported injuries to his right thumb and wrist, for which he received wound care and a wrist brace, the Claimant was referred for imaging also of his right shoulder and neck, bodily areas that were not indicated for any injury based on the alleged accident and complaints initially reported in the emergency room. Despite the lack of any apparent injury to the right shoulder and neck, Community Imaging in its reports noted a purported tendon tear of Claimant A's right shoulder and disc bulges and herniation of Claimant A's neck.

COMPLAINT                                                                                    19

73.     Then, the associated medical service providers used these fraudulent imaging reports, but not the underlying imaging studies that either show degenerative conditions or fail to show any evidence of an acute injury, to help justify months of physical therapy sessions, chiropractic treatments, and acupuncture treatments for Claimants, which were then represented as being a course of allegedly failed conservative treatment in order to justify back and neck surgeries, shoulder surgeries, knee arthroscopies, etc.

74.     Despite the fact that the New York State Surgical and Invasive Procedure Protocol has long provided that "[t]he surgeon is responsible for assessing what films/images are appropriate for viewing before and during the surgery" (September 2006, at 8, available online at https://www.health.ny.gov/professionals/protocols_and_guidelines/surgical_and_invasive_procedure/docs/protocol.pdf, last accessed January 13, 2025), the associated medical service providers routinely did not consult the MRI films themselves, but relied upon reports calculated to misrepresent the claimants' conditions as causally related to the alleged incidents, so that the otherwise unnecessary procedures would present with the patina of legitimacy. While the specific body parts at issue may vary amongst the claimants, the underlying scheme remained the same.

75.     Upon information and belief, Liakas Defendants would provide personnel that sometimes consisted of Runners, employees, or outside personnel to accompany the Claimants to all independent medical examinations under the guise of protecting the Claimants' interests, but who in reality were positioned to ensure that Claimants presented their injuries, treatment and even their residences to comport with the protocol and the narrative crafted by Defendants to justify same.

76.     Many of the Claimants are undocumented immigrants who do not speak English, and the Claimants, as part of the Fraud Scheme, were instructed by the Runner Defendants to fake

their injuries and to receive a myriad of healthcare services that were unnecessary, excessive, unwarranted and costly and/or not causally related to the alleged workplace accident. The Liakas Defendants knew or reasonably should have known that the Claimants were faking their injuries and receiving medical services that were unnecessary, excessive, unwarranted and costly and/or not causally related to the alleged workplace accident.

77.    Upon information and belief, as an incentive to attest to fraudulent accidents and injuries and to undergo unnecessary surgery and/or surgery not causally related to the alleged workplace accident, the Liakas Defendants connected the Claimants to the Funding Defendants who offered high-interest litigation funding loans to Claimants. The Claimants received a portion of the high-interest funding loan proceeds and the high-interest funding loans were secured by the settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits.

78.    Upon information and belief, the Runners, including the Runner Defendants, also received a portion of the Claimants' high-interest funding loan proceeds, some of which may have further been diverted to recompense organized criminal elements for arranging the unlawful immigration of claimants, whom they transported to the New York-New Jersey metropolitan area.

79.    The Medical Provider Defendants provided false diagnoses, the use of their facilities and resources, and unnecessary, excessive, unwarranted, and costly medical services and/or medical services that were not causally related to the alleged workplace accident, for which the Medical Provider Defendants received compensation from workers' compensation insurance.

80.    Moreover, the New York Workers' Compensation Board Medical Treatment Guidelines (collectively, "Guidelines") require patients to fail conservative treatment before

escalating to more significant or aggressive procedures such as injections, arthroscopies, or other surgeries.

81.     Specifically, the Mid and Low Back Injury Guidelines and the Neck Injury Guidelines both hold that "[t]herapeutic spinal injections may be used after initial conservative treatments, such as physical and occupational therapy, medication, manual therapy, exercise, acupuncture, have been undertaken." Sections D.6.a and D.3.a., respectively, available online at https://www.wcb.ny.gov/content/main/hcpp/MedicalTreatmentGuidelines/MidandLowBackInjur yMTG2021.pdf                                              and https://www.wcb.ny.gov/content/main/hcpp/MedicalTreatmentGuidelines/NeckInjuryMTG2021. pdf, last accessed January 13, 2025 (Hereinafter "Low Back Guidelines" and "Neck Guidelines," respectively).

82.     Both Guidelines further specify that patients must in fact have active therapy prior to injections or any other invasive procedures, yet in all of these representative cases, the claimants were diverted to courses of largely passive treatment in order to justify invasive – and lucrative – procedures.

83.     The Medical Provider Defendants understood and agreed that in turn for providing the false medical documentation needed for lengthier and more significant and invasive Workers' Compensation treatment and thereafter correspondingly higher settlement values, the Liakas Defendants would continue to funnel patients to their offices, with, upon information and belief, the ongoing assistance of the Runner Defendants.

84.     The designed inflation of ultimate recovery in the tort action was twofold.

85.     First, the existence of a significant Workers' Compensation lien for the moneys paid out by that carrier would form a key component in any settlement demand, since "the

compensation carrier shall have a lien on the proceeds of any recovery by the claimant to the extent of compensation and medical expenses awarded."." *Granger v. Urda*, 44 N.Y.2d 91, 96 (1978), referencing WCL § 29(1).

86.    For example, irrespective of other factors, when a Workers' Compensation lien would be asserted for $500,000.00 paid by that carrier, Liakas Defendants would seek a correspondingly higher amount in settlement demands and/or judgment.

87.    Second, claims on which injections and surgeries were performed are conservatively calculated to result in an average recovery of $1.5 million on the low settlement side with the median settlement calculated to average $2 million per claim, thereby inflating the facial value of the claims.

88.    As a further incentive to provide the false medical documentation, upon information and belief, at least some Medical Provider Defendants received under the guise of payment for providing courtroom testimony a portion of the loan proceeds that the Funding Defendants provided to Claimants or maintained otherwise unnecessary liens against said recoveries in excess of the New York State Workers' Compensation Medical Fee Schedule.

89.    This additional pre-distribution of funds that would be taken out of the claimant's eventual recovery is often – but not exclusively – made under the guise of soliciting courtroom testimony from the same providers who were paid for their services during the Workers' Compensation phase of the Fraud Scheme. Regardless, the exorbitant compounded interest incurred through the involvement of Funding Defendants would continue to accrue, thereby eating away at the claimant's actual recovery.

90.    Armed with the fraudulently documented medical diagnoses and medical services allegedly related to the workplace accident, the Liakas Defendants fraudulently inflated the

settlement values of personal injury lawsuits in order to extract greater settlements from general liability carriers, including from Plaintiffs Roosevelt and Ionian.

91.    Similarly, the Liakas Defendants fraudulently inflated the settlement values of workers' compensation claims in order to obtain payments to Medical Provider Defendants for unnecessary and/or unperformed services and thereafter to extract greater settlement from workers' compensation carriers, for which Plaintiff Tradesman and others provide administrative, investigative and support services.

92.    After settlement and payment of settlement proceeds in the personal injury action context, based on the high-interest funding loans provided to Claimants, the Funding Defendants expect to receive the bulk of such settlement proceeds, otherwise concerned only with giving the Claimants just enough so that they are content to stay with Liakas Defendants until the proceeds can be obtained and overwhelmingly divided between these Defendants alone.

**B.    Fraudulent Accident, Treatment and Claim/Lawsuit in Furtherance of Fraud Scheme**

93.    Defendants engaged in the Fraud Scheme resulting in a significant number of fraudulent claims being filed. For example, on behalf of Defendants and in furtherance of and as a necessary step for the execution of the Fraud Scheme, the Liakas Defendants represented the following individuals who were recruited by Runner Defendants and staged an accident and/or claimed injuries unrelated to the alleged accident in claims and lawsuits the Liakas Defendants knew were fraudulent, the Medical Provider Defendants provided unnecessary and excessive treatment unrelated to the claimed accident, and the Funding Defendants provided high-interest funding loans, the proceeds of which were redistributed to Defendants. The following individuals are just a fraction of the individuals who participated in the Fraud Scheme between 2018 and the

present perpetrated by the Defendants and engaged in numerous predicate acts in connection with such individuals.

    i.  <u>Claimant A</u>

94. Claimant A was allegedly injured on August 2, 2022, when he reportedly tripped and fell forward on a roof that was under construction. He went to New York Presbyterian Brooklyn Methodist Hospital, where he received wound care for his right thumb and a brace for right wrist. He was discharged home the same day with pain medication.

95. The very next day, on August 3, 2022, Liakas Firm completed the Notice of Retainer and Appearance and an Employee Claim on behalf of Claimant A before the NY WCB. Shortly thereafter, Defendant Dean Liakas of Liakas Firm also filed a lawsuit on behalf of Claimant A alleging personal injuries and damages stemming from negligence at the construction site.

96. Thereafter, Liakas Defendants directed the aggressive and unnecessary medical treatment of Claimant A. Under the direction of the Liakas Defendants and the care of the Medical Provider Defendants, what started out as wound care for a thumb and a wrist brace expanded to complaints of neck and back pain as well as right knee pain that resulted in months of physical therapy, chiropractic adjustments and acupuncture treatment and multiple back steroid injections.

97. One day after the alleged accident, the same day Liakas Firm completed Claimant A's workers' compensation claim form, Claimant A presented to Defendant Salehin of Brooklyn Med where he was examined and referred for a variety of services, including, physiotherapist evaluation, physical therapy, pain management, and neurology consultation.

98. From there, Defendant Salehin of Brooklyn Med referred Claimant A to a) Defendant McDonnell of Community Imaging, who at the request of Defendant Salehin provided various imaging services and noted a cartilage tear in Claimant A's right wrist, purported herniation of the C5-C6 level, purported disc bulges at C4-5 and C5-6 and purported tendon tear of the right

shoulder; b) Advanced Ortho (located within the same building as Brooklyn Med, at 410 Ditmas Avenue), where Defendant Avshalumov falsely noted total disability causally related to the alleged construction accident and recommended physical therapy for the wrist and shoulder surgery for the torn rotator cuff; and c) Total Ortho, where Defendants Lerman and Kumar recommended spine surgery.

99.    In the meantime, Defendant Salehin of Brooklyn Med provided physical therapy sessions to Claimant A and also referred Claimant A to a host of medical providers located within the same building (410 Ditmas Avenue):  a) Big Apple, where Defendant Apple provided multiple steroid injections; b) North Shore, where Defendant Lebson provided multiple chiropractic adjustments; and c) Unicorn, where Defendant Wang provided acupuncture treatments.

100.    Based on Claimant A's medical and workers' compensation records, many of the medical services provided to Claimant A were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident. For example, Claimant A's cervical injections and surgeries, recommended by Defendants Lerman and Kumar, were unnecessary and not causally related to the alleged work place accident because his initial reported injuries were to his right thumb and wrist without reference to any alleged neck injuries until Defendants implemented the fraudulent treatment protocol, which in turn necessitated changes to his account of alleged injury to justify additional procedures to various bodily regions not discernably connected to his initial account of a slip and fall.

101.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant A, the proceeds of which were then redistributed to Claimant A, the Runner Defendants who recruited Claimant A, the Medical Provider Defendants who treated Claimant A and the Legal Service Defendants.

COMPLAINT                                                                26

102.    The Medical Provider Defendants and/or Liakas Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant A, which were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

103.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

104.    Liakas Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant A's workers' compensation claim, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant A's workers' compensation claim.

105.    Liakas Defendants also provided by mail or by electronic service to the Kings County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant A's construction accident, the existence of and the extent of Claimant A's injuries, and the necessity of medical treatment that Claimant A required in connection with the construction accident, in order to falsely bolster and add value to Claimant A's personal injury lawsuit, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant A's personal injury lawsuit.

106.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant A for the release of Claimant A's medical records that Liakas Defendants knew or reasonably should have known were false,

including the Power of Attorney to execute HIPAA authorizations dated August 3, 2022, signed by Defendant Dean Liakas.

ii.  <u>Claimant B</u>

107.    Claimant B was allegedly injured on January 13, 2022, while carrying a roll of cable (spool) up some wooden stairs at a construction site in New York when he lost balance and fell backwards, hitting his head and right side of the body. However, according to the incident report, the spool hit the overhead formwork and caused his alleged lower back pain. Claimant B did not report any fall in the incident report.

108.    Claimant B also did not seek medical attention until the next day when he allegedly began to experience body pain. He was evaluated at Brooklyn Methodist Hospital and discharged the same day. Imaging (x-rays) showed no evidence of acute injury. Although he initially denied any loss of consciousness, he later alleged that his helmet fell off and that he had a brief loss of consciousness.

109.    Claimant B retained Liakas Firm and the Liakas Defendants directed the aggressive and unnecessary medical treatment of Claimant B and Dean Liakas of Liakas Firm filed a lawsuit on behalf of Claimant B, less than two weeks after the alleged accident, alleging personal injuries and damages stemming from negligence at the construction site. Claimant B also retained Liakas Firm to represent him before the NY WCB.

110.    Under the direction of the Liakas Defendants and the care of the Medical Provider Defendants, and irrespective of his previous account of injury and complaints, Claimant B was falsely diagnosed with cervical radiculopathy, lumbar sprain/strain, right hip tear, and bilateral shoulder contusion following various imaging services by Defendant McDonnell of Community Imaging.

COMPLAINT                                                                                              28

111.    Defendant Salehin of Brooklyn Med referred Claimant B to Defendant Avshalumov of Advanced Ortho, who recommended physical therapy and follow up with pain management specialists. Defendants Jeyamohan and Kumar of Total Ortho performed cervical fusion surgery on October 5, 2022, and Defendant Lerman of Total Ortho recommended lower back surgery.

112.    Defendant Salehin of Brooklyn Med provided physical therapy to Claimant B and referred Claimant B to other providers within the same building (410 Ditmas Avenue) for acupuncture session (from Defendant Wang of Unicorn); chiropractic treatment (from Defendant Lebson of North Shore); and pain management and steroid injections (from Defendant Apple of Big Apple), where less than a month after the alleged accident, on February 8, 2022, Claimant B received his first of three cervical steroid injections, followed by a second injection on March 3, 2022 and a third injection on March 31, 2022.

113.    The Neck Guidelines expressly state that "[t]he purpose of spinal injections is to facilitate active therapy by providing short-term relief through reduction of pain and inflammation" (D.3.a.iii) and should follow active treatment (D.3.a.v).

114.    Claimant B did not receive even allegedly active treatment in the three weeks before his unnecessary and premature first cervical epidural steroid injection. Defendant Salehin's own billing forms and supporting Subjective, Objective, Assessment and Plan, or SOAP notes, reflect that Claimant B was provided only passive modalities in the form of hot/cold packs and TENS electrical stimulation.

115.    Based on Claimant B's medical and workers' compensation records, many of the medical services provided to Claimant B were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident. For example, Claimant B's right hip

COMPLAINT                                                                                                      29

surgery, performed by Defendant Avshalumov, was unnecessary and not causally related to the alleged work place accident because despite his report indicating that Claimant B's right hip condition was intolerable, Claimant B's physical therapy notes prior to the surgery indicate that the Claimant B was a) not complaining of any alleged hip pain, b) was diagnosed with alleged sprains to his cervical, lumbar, and thoracic spine along with his right shoulder but not his right hip, and b) was being treated solely with hot/cold packs and electrical stimulation to the other allegedly injured areas. Far from demonstrating that the invasive hip surgery was necessitated by the failure of conservative treatment, the incident report and other medical records did not indicate any injury to Claimant A's right hip in the first instance, and the treatment notes fail to indicate any active conservative therapy to that area at any time.

116.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant B, the proceeds of which were then redistributed to Claimant B, the Runner Defendants who recruited Claimant B, the Medical Provider Defendants who treated Claimant B and the Legal Service Defendants.

117.    The Medical Provider Defendants and/or Liakas Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant B, which were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

118.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

119.    Liakas Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant B's workers' compensation claim, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant B's workers' compensation claim.

120.    Liakas Defendants also provided by mail or by electronic service to the Kings County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant B's construction accident, the existence of and the extent of Claimant B's injuries, and the necessity of medical treatment that Claimant B required in connection with the construction accident, in order to falsely bolster and add value to Claimant B's personal injury lawsuit, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant B's personal injury lawsuit.

121.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant B for the release of Claimant B's medical records that Liakas Defendants knew or reasonably should have known were false, including the Power of Attorney to execute HIPAA authorizations dated February 9, 2022, signed by Defendant Dean Liakas.

### iii. Claimant C

122.    Claimant C was allegedly injured on February 10, 2022, while working on a construction project in New York when she tripped over some netting on the floor and fell on all fours. According to employment records, on the day of the alleged injury, Claimant C was not employed by any contractor working on the construction project nor at the job site. She presented to New York Presbyterian emergency room later that day complaining of bilateral knee pain and back pain. She denied any loss of consciousness or head injuries. X-rays were performed and she was evaluated and discharged.

123.    Claimant C retained Liakas Firm and the Liakas Defendants directed the aggressive and unnecessary medical treatment of Claimant C. Only five days after the alleged workplace accident, Defendant Dean Liakas, of Liakas Firm, filed a lawsuit on behalf of Claimant C alleging personal injuries and damages stemming from negligence at the construction site. Claimant C also retained Liakas Firm to represent her before the NY WCB.

124.    Thereafter, under the direction of the Liakas Defendants and the care of the Medical Provider Defendants, Claimant C received a host of medical services from the Medical Provider Defendants, including imaging services, surgeries, acupuncture, and physical therapies. However, because Claimant C was neither employed by any contractor working on the construction project nor at the job site for the alleged accident to have occurred in the first instance, Claimant C did not sustain any injuries for the Medical Provider Defendants to find, diagnose or treat.

125.    Defendant Kostin of Counter Point examined Claimant C on February 16, 2022, and referred Claimant C for acupuncture treatment, physical therapy, chiropractic treatment and orthopedic examination. Defendant Vora of Brooklyn Premier saw Claimant C on February 24, 2022 and ordered MRI of cervical lumbar spine. Although the MRI did not show any evidence of neural compression, Defendants Kosharskyy and Shulkin of BL Pain and Pain Physicians diagnosed Claimant C with cervical disc displacement and muscle spasms and administered SI joint injection on September 9, 2022, and epidural steroid injection on October 17, 2022. Dante Leven, D.O. of Total Ortho performed cervical surgery on December 15, 2022, assisted by Defendant Total Ortho's director of orthopedic spine surgery Karen Avanesov, D.O. and lumbar surgery on January 19, 2023. Defendant Capiola of McCulloch Ortho diagnosed Claimant C with bilateral knee tears and prematurely recommended left and right knee arthroscopy.

126.    Based on Claimant C's medical and workers' compensation records, many of the medical services provided to Claimant C were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident. For example, Claimant C's back surgery, performed by Defendant Total Ortho's employee Leven at Nassau University Medical Center, was unnecessary and not causally related to the alleged workplace accident because the alleged 'worsening' lumbosacral pain claimed by Total Ortho's employee to justify the procedure is inconsistent with the conservative treatment notes, which consistently and uniformly stated that the claimant tolerated treatment well.

127.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant C, the proceeds of which were then redistributed to Claimant C, the Runner Defendants who recruited Claimant C, the Medical Provider Defendants who treated Claimant C and the Legal Service Defendants.

128.    The Medical Provider Defendants and/or Liakas Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant C, which were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

129.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

130.    Liakas Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value

to Claimant C's workers' compensation claim, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant C's workers' compensation claim.

131.    Liakas Defendants also provided by mail or by electronic service to the Kings County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant C's construction accident, the existence of and the extent of Claimant C's injuries, and the necessity of medical treatment that Claimant C required in connection with the construction accident, in order to falsely bolster and add value to Claimant C's personal injury lawsuit, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant C's personal injury lawsuit.

132.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant C for the release of Claimant C's medical records that Liakas Defendants knew or reasonably should have known were false.

iv.  Claimant D

133.    Claimant D was allegedly injured on June 3, 2022, while standing on a scaffold which allegedly started to sway and moved suddenly, causing him to lose his balance, fall back striking the window frame, and then falling forward against the scaffold. He did not fall to the floor of the scaffold and did not go to a hospital but claimed an injury to his left ring finger.

134.    Claimant D retained Richard Zaberto, Esquire, of Panzer Law, to represent him before the NY WCB. According to Attorney Zaberto's LinkedIn profile, prior to, and apparently concurrent with, joining Panzer Law in October 2021, Attorney Zaberto worked at Liakas Firm from January 2021 to December 2021.

135.    Claimant D also retained Liakas Firm to represent Claimant D in a personal injury lawsuit alleging personal injuries and damages stemming from negligence at the construction site.

136.    Thereafter, under the direction of the Liakas Defendants and the care of the Medical Provider Defendants, Claimant D received a host of medical services from the Medical Provider Defendants, including imaging services, surgeries, and physical therapies. Lenox Hill Radiology, at the request of Douglas Schwartz, D.O., took numerous MRIs of Claimant D's back, hips and left ring finger. Dr. Schwartz also evaluated Claimant D for physical therapy. Defendant Simhaee of Brooklyn Premier diagnosed Claimant D with radiculopathy and provided steroid injections in October 2022, August 2023, and September 2023. Michael Horowitz, M.D. of Brooklyn Premier also diagnosed Claimant D with ligament partial tear of this left ring finger.

137.    Based on Claimant D's medical and workers' compensation records, many of the medical services provided to Claimant D were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident. For example, Claimant D's lumbar posterior spinal fusion L4/L5 surgery, performed by Defendant Total Ortho's employees Mitchell Long, DO and Jeffrey Thompson, DO at Nassau University Medical Center on April 18, 2024, was unnecessary and not causally related to the alleged work place accident because there is no evidence of any failure of conservative care considering that the claimant's physical therapy progress notes uniformly stated that the claimant tolerated treatment well, even up until three days before the surgery. The April 18th surgery generally claims some unspecified and undocumented failure of conservative care, yet Dr. Long of Total Ortho makes no reference to the alleged left-sided L5/S1 decompression and diskectomy performed by Total Ortho's principal Jonathan Lewin MD along with Defendant Vora assisting at Bergenfield Surgery Center, a procedure for which the ambulatory surgery center sought $78,122.00 in facility fees alone.

138.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant D, the proceeds of which were then redistributed to Claimant

D, the Runner Defendants who recruited Claimant D, the Medical Provider Defendants who treated Claimant D and the Legal Service Defendants.

139.    The Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant D, which were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

140.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

141.    Liakas Defendants provided by mail or by electronic service to the Kings County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant D's construction accident, the existence of and the extent of Claimant D's injuries, and the necessity of medical treatment that Claimant D required in connection with the construction accident, in order to falsely bolster and add value to Claimant D's personal injury lawsuit, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant D's personal injury lawsuit.

142.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Defendant Dean Liakas, pursuant to a power of attorney to execute HIPAA releases on behalf of Claimant D, for the release of Claimant D's medical records that Liakas Defendants knew or reasonably should have known were false.

v.    <u>Claimant E</u>

143.    Claimant E was allegedly injured on September 27, 2021, when he tripped on some rebar while carrying 7-feet long moldings and fell down, with the moldings falling on top of him. According to the Supervisor Incident Report, Claimant E neither tripped nor fell; rather Claimant

COMPLAINT                                                                                          36

E complained of back pain after he improperly lifted a form for stairs to place it into its position. Although he initially stated that he was fine and returned to work, an hour later, he complained of lower back and right knee pain and went to the Woodhull Hospital emergency room where he was treated and released.

144.    Claimant E retained Liakas Firm and the Liakas Defendants directed the aggressive and unnecessary medical treatment of Claimant E. On November 4, 2021, Defendant Dean Liakas, of Liakas Firm, filed a lawsuit on behalf of Claimant E alleging personal injuries and damages stemming from negligence at the construction site. Claimant E also retained Liakas Firm to represent him before the NY WCB.

145.    Thereafter, under the direction of the Liakas Defendants and the care of the Medical Provider Defendants, Claimant E claimed injuries to his right ankle, left shoulder, left knee, back and neck and received a host of medical services from the Medical Provider Defendants, including imaging services, surgeries, acupuncture and physical therapies. Among other things, Claimant E received physical therapy after evaluation by Defendant Kostin of Counter Point and also from Defendant Evaristo of Englinton Med. Defendants Reyfman and Shulkin of BL Pain and Pain Physicians administered four epidural injections within a six-month span (Feb. to June 2022) for low back pain and Defendant Cohen of Gotham Neurosurgery performed back surgery. Then, Claimant E saw Siddhartha Sharma, D.P.M. of McCulloch Ortho and Dr. Sharma recommended surgery for the right ankle and claimed that Claimant E was 100% disabled.

146.    Based on Claimant E's medical and workers' compensation records, many of the medical services provided to Claimant E were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident. For example, Claimant E's lower back surgery, performed by Defendant Cohen at Hudson Regional Hospital, was unnecessary and not

causally related to the alleged work place accident because his alleged severe, longstanding and progressive low back pain falsely attributed to the purported workplace incident was not reflected in any of the physical therapy records or billing for the six weeks prior to the procedure, which a) consisted of treatment related to a diagnosis of "M24.812" which refers to the left shoulder, and b) uniformly claimed that the claimant tolerated treatment well at all relevant times.

147.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant E, the proceeds of which were then redistributed to Claimant E, the Runner Defendants who recruited Claimant E, the Medical Provider Defendants who treated Claimant E and the Legal Service Defendants.

148.    The Medical Provider Defendants and/or Liakas Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant E, which were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

149.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

150.    Liakas Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant E's workers' compensation claim, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant E's workers' compensation claim.

151.    Liakas Defendants also provided by mail or by electronic service to the Kings County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent

COMPLAINT                                                                              38

documents containing false assertions regarding Claimant E's construction accident, the existence of and the extent of Claimant E's injuries, and the necessity of medical treatment that Claimant E required in connection with the construction accident, in order to falsely bolster and add value to Claimant E's personal injury lawsuit, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant E's personal injury lawsuit.

152.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant E for the release of Claimant E's medical records that Liakas Defendants knew or reasonably should have known were false, including the Power of Attorney to execute HIPAA authorizations dated October 4, 2021, signed by Defendant Dean Liakas.

vi.  Claimant F

153.    Claimant F was allegedly injured on March 16, 2020, while working on a water tower on a construction project in New York when he lost his balance while trying to step down from a wall approximately 4 feet, tripping over a vacuum hose that he was carrying or while trying to reach a bucket, injuring his left shoulder and other minor complaints. Claimant F was taken to St. Barnabas Hospital where he was evaluated in the emergency room, denied loss of consciousness, and was determined to be fully alert and oriented. As later determined by unrelated medical providers, Claimant F had existing underlying kidney disease and was admitted for a further workup of what appeared to be acute kidney disease, which was subsequently misrepresented as due to the alleged accident. He further presented with a history of open reduction and internal fixation to his left elbow, as well as right knee surgery and right hand surgery due to injuries he sustained in combat operations prior to his emigration. Admitted due to a worsening blood urea/creatinine ratio and not due to physical injury, he was discharged four days later after an MRI showed herniations and a mild kyphotic deformity at C4-5 but no acute fracture.

COMPLAINT                                                                                         39

154.    Claimant F retained Liakas Firm and the Liakas Defendants directed the aggressive and unnecessary medical treatment of Claimant F and filed a lawsuit on behalf of Claimant F alleging personal injuries and damages stemming from negligence at the construction site. Claimant F also retained Liakas Firm to represent him before the NY WCB.

155.    Under the direction of the Liakas Defendants and the care of the Medical Provider Defendants, Claimant F received a host of medical services from the Medical Provider Defendants, including imaging services, numerous surgeries, epidural injections, and physical therapy. Defendant Shusterman of Englinton Med initially evaluated Claimant F on March 27, 2020. He started Claimant F on physical therapy with Defendant Evaristo of Englinton Med and referred Claimant F for a variety of MRIs and evaluations by a neurologist, orthopedist, chiropractor and acupuncturist.

156.    Notably, Claimant F's fall without any reported loss of consciousness and hospitalization for acute kidney injury quickly transformed into a) a slip and fall suffered while reaching for a bucket, b) fell and hit his back against a metal ladder which was standing against the opposite wall, and still later c) metamorphized into an alleged incident in which he was allegedly "cutting concrete floor and lost consciousness and fell down backward." The conveniently changing accounts of injury, coupled with the misrepresentations as to the reason for his admission to the hospital spurred review that uncovered the application of the fraudulent treatment protocol.

157.    Among other things, Defendant Simhaee of Brooklyn Premier diagnosed Claimant F with cervical and lumbar radiculopathy; Defendant Cohen of Gotham Neurosurgery performed cervical surgery on October 16, 2020 and another surgery on January 27, 2023; Defendant Capiola of McCulloch Ortho performed right knee arthroscopy on April 28, 2023, and left knee arthroscopy

on August 25, 2023; Defendant Reyfman of BL Pain/Pain Physicians evaluated and recommended steroid injection; Lenox Hill Radiology, at the request of Defendants Capiola and Cohen, performed numerous MRIs, ultrasound and CT scans.

158.    Based on Claimant F's medical and workers' compensation records, many of the medical services provided to Claimant F were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident. For example, Claimant F's right knee surgery, performed by Defendant Capiola, was unnecessary and not causally related to the alleged work place accident because despite his subjective alleged claim of right knee pain, there is no evidence that the claimant ever received conservative treatment to that limb in the three years between the initial complaint and the surgery, much less any "failed" such course as alleged. Physical therapy bills fail to include any diagnosis relating to knee pain at any point, and even handwritten progress notes at most mention the word "knee" in the subjective complaints sections thereof.

159.    The Funding Defendants provided high-interest litigation funding loan(s) to Claimant F, the proceeds of which were then redistributed to Claimant F, the Runner Defendants who recruited Claimant F, the Medical Provider Defendants who treated Claimant F and the Legal Service Defendants.

160.    The Medical Provider Defendants and/or Liakas Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant F, which were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

COMPLAINT                                                                    41

161.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

162.    Liakas Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant F's workers' compensation claim, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant F's workers' compensation claim.

163.    Liakas Defendants also provided by mail or by electronic service to the Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant F's construction accident, the existence of and the extent of Claimant F's injuries, and the necessity of medical treatment that Claimant F required in connection with the construction accident, in order to falsely bolster and add value to Claimant F's personal injury lawsuit, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant F's personal injury lawsuit.

164.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant F for the release of Claimant F's medical records that Liakas Defendants knew or reasonably should have known were false. Defendant Dean Liakas obtained and signed a power of attorney to execute HIPAA releases on behalf of Claimant F on March 21, 2020.

vii. Claimant G

165.    Claimant G was allegedly injured on October 6, 2020, while working on a ladder at a construction project in New York when the ladder tripped, causing him to fall and sustain injuries to what he later claimed to be his neck, back, both shoulders, both knees and right ankle. Initially, however, Claimant G claims to have fallen down a flight of stairs (roughly 8 feet) and

landing on his back, reportedly on November 6, 2020. Claimant G did not go to the hospital until a month later, when he went to New York Presbyterian Hospital emergency room on November 8, 2020, where he was evaluated, medicated and released in under three hours. No radiological testing was performed at that time.

166.    At least as of the following day, November 9, 2020, Claimant G retained Liakas Firm and the Liakas Defendants directed the aggressive and unnecessary medical treatment of Claimant G. Defendant Dean Liakas, of Liakas Firm, filed a lawsuit on behalf of Claimant G alleging personal injuries and damages stemming from negligence at the construction site. Claimant G also retained Liakas Firm to represent him before the NY WCB.

167.    Thereafter, under the direction of the Liakas Defendants and the care of the Medical Provider Defendants, Claimant G received a host of medical services from the Medical Provider Defendants, including imaging services, surgeries and physical therapies.

168.    Claimant G was initially evaluated by Defendant Shusterman of Englinton Med on November 11, 2020, who ordered a host of MRIs, started Claimant G on physical therapy and referred Claimant G to be evaluated by neurologist, chiropractor and acupuncturist. Defendant Shusterman diagnosed Claimant G with right ankle sprain and found Claimant G 100% disabled. Defendant Kostin of Counter Point then evaluated Claimant G and diagnosed him with unspecified right ankle sprain and provided numerous acupuncture treatments for right ankle. Defendant Evaristo of Englinton Med also evaluated Claimant G and provided physical therapy for his right ankle. In addition, Claimant G underwent spine surgery from Defendants Jeyamohan and Kumar of Total Ortho; alleged 'extracorporeal shockwave therapy' from Demetrios Koutsospyros of Defendant BL Pain and Pain Physicians; multiple steroid injections from Defendant Reyfman of

BL Pain and Pain Physicians; and bilateral knee surgery from Defendant Ehrlich of OrthoCare Surgical.

169.    Based on Claimant G's medical and workers' compensation records, many of the medical services provided to Claimant G were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident. For example, Claimant G's left knee surgery, performed by Defendant Ehrlich, was unnecessary and not causally related to the alleged workplace accident because there was no contemporaneous account of alleged injury to that joint. Only after he began seeing Medical Provider Defendants did the alleged mechanism of injury change to justify treatment and eventually surgery to his left knee.

170.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant G, the proceeds of which were then redistributed to Claimant G, the Runner Defendants who recruited Claimant G, the Medical Provider Defendants who treated Claimant G and the Legal Service Defendants.

171.    The Medical Provider Defendants and/or Liakas Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant G, which were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

172.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

173.    Liakas Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value

to Claimant G's workers' compensation claim, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant G's workers' compensation claim.

174.    Liakas Defendants also provided by mail or by electronic service to the Queens County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant G's construction accident, the existence of and the extent of Claimant G's injuries, and the necessity of medical treatment that Claimant G required in connection with the construction accident, in order to falsely bolster and add value to Claimant G's personal injury lawsuit, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant G's personal injury lawsuit.

175.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant B for the release of Claimant B's medical records that Liakas Defendants knew or reasonably should have known were false, including the Power of Attorney to execute HIPAA authorizations dated November 9, 2020, signed by Defendant Dean Liakas.

viii.    <u>Claimant H</u>

176.    Claimant H was allegedly injured on February 15, 2021, while working on a construction project in New York when a metal door frame hit his knee area. He went to Flushing Hospital Medical Center emergency room where he was examined and found to have mild swelling of his left knee. Following x-rays of his left knee, the orthopedic consult noted irregularity involving the tibial tuberosity, consistent with Osgood-Schlatter's disease and possible thickening of the patellar tendon/ligament. There was no evidence of dislocation or discrete acute fracture. It was also noted that follow-up MRI can be considered. He was discharged the same day.

177.    Claimant H retained Liakas Firm, and the Liakas Defendants directed the aggressive and unnecessary medical treatment of Claimant H. Within days of the alleged accident,

COMPLAINT                                                                    45

Attorney Zaberto of Liakas Firm filed a workers' compensation claim on behalf of Claimant H. Shortly thereafter, Defendant Dean Liakas of Liakas Firm filed a lawsuit on behalf of Claimant H alleging personal injuries and damages stemming from negligence at the construction site.

178.    Under the direction of the Liakas Defendants and the care of the Medical Provider Defendants, Claimant H's description of the alleged accident evolved and expanded. Claimant H claimed to have been thrown backwards injuring his left shoulder in addition to being struck in the left knee and sought treatment for his head, neck, back, his entire left side and also his right knee.

179.    Claimant H saw Defendant Lerner of Precision Pain who started Claimant with chiropractic care with Theodore Xenos, D.C. of TXO Chiropractic and physical therapy.

180.    Thereafter, Claimant H received a host of medical services from the Medical Provider Defendants, including imaging services, numerous surgeries, epidural injections, and physical therapy. Among other things, at Defendant Lerner's request, Lenox Hill Radiology performed numerous MRIs and Defendants Lerner and Pennise with Precision Pain administered numerous cervical and lumbar steroid injections. At OrthoCare Surgical, Defendant Ehrlich prescribed physical therapy and performed shoulder arthroscopy. At Brooklyn Premier, Defendant Vora performed back surgery and Dr. Daniel Popowitz performed left ankle steroid injection and surgery. Defendant Ehrlich of OrthoCare Surgical referred Claimant H to Defendant Kostin, this time as part of Englinton Medical, for consultation related to the then upcoming surgery of the left knee. Englinton Med also performed an x-ray examination of Claimant H's chest.

181.    Based on Claimant H's medical and workers' compensation records, many of the medical services provided to Claimant H were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident. Perhaps most glaringly, Claimant H's shoulder arthroscopic surgery, performed by Defendant Ehrlich was unnecessary and not causally

related to the alleged workplace accident because it bore no relationship to either the claimant's complaints to Emergency Room personnel or to the results of the examinations and diagnostic testing performed by ER personnel.

182.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan(s) to Claimant H, the proceeds of which were then redistributed to Claimant H, the Runner Defendants who recruited Claimant H, the Medical Provider Defendants who treated Claimant H and the Legal Service Defendants.

183.    The Medical Provider Defendants and/or Liakas Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant H, which were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

184.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

185.    Liakas Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant H's workers' compensation claim, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant H's workers' compensation claim.

186.    Liakas Defendants also provided by mail or by electronic service to the Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant H's construction accident, the existence of and the extent of Claimant H's injuries, and the necessity of medical treatment that Claimant H

COMPLAINT                                                                                          47

required in connection with the construction accident, in order to falsely bolster and add value to Claimant H's personal injury lawsuit, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from Claimant H's personal injury lawsuit.

187.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant H for the release of Claimant H's medical records that Liakas Defendants knew or reasonably should have known were false.

C.    **Defendants' Participation in the Fraud Scheme**

188.    At all relevant times, Defendants constituted an association-in-fact enterprise and were engaged in, and the activities of which affected, interstate commerce, and each of the Defendants participated in the operation or management of the enterprise.

i.    Legal Service Defendants' Participation in the Fraud Scheme

189.    Since at least 2018, the Liakas Firm has been involved in thousands of lawsuits, the majority of which involved purported construction work injuries, covered by various insurers and reinsurers, including Plaintiffs Roosevelt and Ionian, as well as those serviced by Plaintiffs Tradesman and others, in furtherance of and as a necessary step for the execution of the Fraud Scheme.

190.    At all times relevant. Liakas Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runner to recruit construction workers (*i.e.*, Claimants) to stage workplace accidents and/or falsely claim injuries unrelated to the alleged accidents.

191.    At all times relevant, Liakas Defendants represented Claimants in personal injury lawsuits and workers' compensation claims (except for Claimant D's workers' compensation claim) and directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigning duties and responsibilities to attorneys/employees of Liakas Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and

COMPLAINT                                                                                                    48

medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit.

192.    Liakas Defendants directed the Claimants to seek medical treatment from the Medical Provider Defendants, knowing and understanding that the Medical Provider Defendants would provide the kind of false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants.

193.    Liakas Defendants intentionally submitted or caused the filing of and submission of fraudulent assertions and medical documentation to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims.

194.    Liakas Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate construction accidents, the existence of injuries, and the necessity of medical treatment that Liakas Defendants knew or reasonably should have known were false.

195.    Based on such fraudulent medical documentation submitted to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment to Liakas Firm for distribution to the Claimants.

196.    This unlawful conduct worked to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Liakas Defendants' financial gain from the claims and lawsuits.

ii.    Runner Defendants' Participation in the Fraud Scheme

197.    Upon information and belief, since at least 2018, the Runner Defendants have been involved in recruiting Claimants into stating and/or perpetuating fake construction accidents at various construction sites throughout New York.

COMPLAINT                                                                                          49

198.    Upon information and belief, the Runner Defendants communicated with the Claimants and Liakas Defendant through telephone calls, texts, emails and mail.

199.    The Runner Defendants, engaged in numerous acts in furtherance of and as a necessary step for the execution of the Fraud Scheme. Among other things, the Runner Defendants referred and/or transported Claimants to Liakas Defendants so that Claimants could retain Liakas Defendants to a) direct Claimants' medical treatment from Medical Provider Defendants; b) direct Claimants to obtain high-interest funding loans from Funding Defendants; c) direct, authorize, coordinate and control the prosecution of Claimants' personal injury lawsuit; and d) direct, authorize, coordinate and control the prosecution of Claimants' workers' compensation claims.

200.    Upon information and belief, the Runner Defendants participated in meetings with Claimants and Liakas Defendants in furtherance of and as a necessary step for the execution of the Fraud Scheme.

201.    Upon information and belief, Runner Defendants would typically be internally referred to as "investigators" or "brokers" for their roles in bringing in claimants and facilitating the initial phases of the Fraud Scheme, though other known descriptors include "paralegal" and "client services liaison", potentially in recognition of roles they serve in later phases of the Fraud Scheme.

202.    The Runner Defendants received a portion of the proceeds from the high-interest funding loans provided by the Funding Defendants.

### iii.  Funding Defendants' Participation in the Fraud Scheme

203.    Upon information and belief, since at least 2018, the Funding Defendants have been involved in providing high-interest funding loans to Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                              50

204.    To incentivize Claimants to attest to fraudulent accidents and injuries and to undergo unnecessary surgery and/or surgery not causally related to the alleged workplace accident, the Funding Defendants offered high-interest litigation funding loans to Claimants to be secured by the settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits, and paid Claimants a portion of the high-interest funding loan proceeds.

205.    The Funding Defendants distributed the remaining proceeds of the high-interest funding loan directly, and/or indirectly through the Liakas Defendants, to the Runner Defendants, the Medical Provider Defendants, and the Liakas Defendants.

206.    Upon information and belief, the Funding Defendants communicated distribution of the proceeds of the funding loan through email and/or text message as well as via use of the telephone.

207.    Upon information and belief, the Funding Defendants have received or have the right to receive the majority of or significant part of the Claimants' portion of the settlement proceeds from Claimants' workers' compensation claims and/or personal injury lawsuits.

iv.    Brooklyn Med Defendants' Participation in the Fraud Scheme

208.    Since at least 2018, Brooklyn Med has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

209.    Defendant Salehin, as an internist and a principal of Brooklyn Med, located at the Medical & Wellness Center on 410 Ditmas Avenue, Brooklyn, New York, controlled and directed the medical services provided to Claimants by Brooklyn Med, including evaluating, diagnosing and referring Claimants for a variety of services, including physiotherapist evaluation, physical therapy, pain management, and neurology consultation, that were not indicated and/or inconsistent

with the initial report of the alleged accident and complaints initially reported in the emergency room.

210.    Brooklyn Med Defendants referred Claimants to Community Defendants for imaging services and radiographic reports and used or relied upon such medical documentation from Community Defendants, which were fraudulent, to render and recommend additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

211.    Brooklyn Med Defendants not only provided physical therapy at its location, they also referred Claimants to other medical providers located in the same building at the Medical & Wellness Center on 410 Ditmas Avenue: a) North Shore Defendants for chiropractic adjustments; b) Unicorn Defendants for acupuncture treatment; c) Advanced Defendants for orthopedic evaluations and surgeries; and d) Apple Defendants for pain management and injections. These services were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident.

212.    Brooklyn Med also referred Claimants to Total Defendants for evaluations and surgeries that were not medically necessary and/or not causally related to the alleged workplace accident.

213.    As part of the Fraud Scheme, Brooklyn Med Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

COMPLAINT                                                                                                52

214.    As part of the Fraud Scheme, Brooklyn Med Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

215.    As part of the Fraud Scheme, Brooklyn Med Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

216.    Brooklyn Med Defendants knowingly profited from reimbursements for the alleged medical and physical therapy services rendered by Defendant Salehin and/or any other employee/agent of Brooklyn Med, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

217.    Brooklyn Med Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Salehin and/or any other employee/agent of Brooklyn Med provided medical and physical therapy services and received reimbursement for such services.

v.  Community Defendants

218.    Since at least 2018, Community Imaging has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                                    53

219.    Defendant McDonnell, as a radiologist and a principal of Community Imaging, controlled and directed the medical services provided to Claimants, who were referred to Community Imaging by Brooklyn Med, by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings that are thereafter relied upon by treating providers to justify procedures irrespective of the fact that so-called "abnormal" findings are to be expected by the age of 40 and should not be the focus of treatment. Low Back Guidelines at B.2.

220.    As part of the Fraud Scheme, Community Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

221.    As part of the Fraud Scheme, Community Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

222.    As part of the Fraud Scheme, Community Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

223.    Community Defendants knowingly profited from reimbursements for the alleged imaging and diagnostic services rendered by Defendant McDonnell and/or any other

COMPLAINT                                                                                                      54

employee/agent of Community Imaging, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

224.    Community Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant McDonnell and/or any other employee/agent of Community Imaging provided imaging and diagnostic services and received reimbursement for such services.

vi.  North Shore Defendants' Participation in the Fraud Scheme

225.    Since at least 2018, North Shore has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

226.    Defendant Lebson, as a chiropractor and a principal of North Shore, controlled and directed the chiropractic adjustments provided to Claimants, who were referred to him by Brooklyn Med, with which North Shore shared the same building and address (410 Ditmas Avenue, Brooklyn, New York). The chiropractic adjustments were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were ordered to further the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries.

227.    As part of the Fraud Scheme, North Shore Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted, and/or costly, and were not causally related to the alleged workplace accident.

COMPLAINT                                                                              55

228.    As part of the Fraud Scheme, North Shore Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

229.    As part of the Fraud Scheme, North Shore Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

230.    North Shore Defendants knowingly profited from reimbursements for the alleged chiropractic adjustments rendered by Defendant Lebson and/or any other employee/agent of North Shore, that were that were unnecessary, excessive, unwarranted, and/or costly, and were not causally related to the alleged workplace accident but were rendered, if rendered, in furtherance of and as a necessary step for the execution of the Fraud Scheme.

231.    North Shore Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Lebson and/or any other employee/agent of North Shore provided chiropractic adjustments and received reimbursement for such services.

vii. Unicorn Defendants' Participation in the Fraud Scheme

232.    Since at least 2018, Unicorn Acupuncture has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                    56

233.    Defendant Wang, as an acupuncturist and a principal of Unicorn Acupuncture, controlled and directed the acupuncture treatments provided to Claimants, who were referred to him by Brooklyn Med, with which Unicorn Acupuncture shared the same building and address (410 Ditmas Avenue, Brooklyn, New York). The acupuncture treatments were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident.

234.    In contrast to the rote prescription of acupuncture and near-identical treatment notes, it is not recommended for either routine use or "for treatment of acute, subacute, radicular, or postoperative low back pain" but "may be recommended as treatment of non- acute back pain as a limited course during which time there are clear objective and functional goals that are to be achieved." Low Back Guidelines at D.1.

235.    As part of the Fraud Scheme, Unicorn Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

236.    As part of the Fraud Scheme, Unicorn Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

237.    As part of the Fraud Scheme, Unicorn Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers'

compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

238.    Unicorn Defendants knowingly profited from reimbursements for the alleged acupuncture treatments rendered by Defendant Wang and/or any other employee/agent of Unicorn Acupuncture, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

239.    Unicorn Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Wang and/or any other employee/agent of Unicorn Acupuncture provided acupuncture treatments and received reimbursement for such services.

viii.    Advanced Defendants' Participation in the Fraud Scheme

240.    Since at least 2018, Advanced Ortho has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

241.    Defendant Avshalumov, as an orthopedic surgeon and a principal of Advanced Ortho, controlled and directed the medical services provided to Claimants by Advanced Ortho, including evaluating and performing surgeries were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident. Claimants were referred to him by Brooklyn Med, with which Advanced Ortho shared the same building and address (410 Ditmas Avenue, Brooklyn, New York).

242.    As part of the Fraud Scheme, Advanced Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for

COMPLAINT                                                                                          58

authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

243.    As part of the Fraud Scheme, Advanced Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

244.    As part of the Fraud Scheme, Advanced Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

245.    Advanced Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendant Avshalumov and/or any other employee/agent of Advanced Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

246.    Advanced Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Avshalumov and/or any other employee/agent of Advanced Ortho provided medical and diagnostic services and received reimbursement for such services.

COMPLAINT                                                                                                    59

ix. <u>Apple Defendants' Participation in the Fraud Scheme</u>

247.    Since at least 2018, Big Apple has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

248.    Defendant Apple, as a pain management specialist and a principal of Big Apple, controlled and directed the medical services provided to Claimants by Big Apple, including evaluating and providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident. Claimants were referred to him by Brooklyn Med, with which Big Apple shared the same building and address (410 Ditmas Avenue, Brooklyn, New York).

249.    As part of the Fraud Scheme, Apple Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

250.    As part of the Fraud Scheme, Apple Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

251.    As part of the Fraud Scheme, Apple Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers'

compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

252.    Apple Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendant Apple and/or any other employee/agent of Big Apple, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

253.    Apple Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Apple and/or any other employee/agent of Big Apple provided medical and diagnostic services and received reimbursement for such services.

x.    Total Defendants' Participation in the Fraud Scheme

254.    Since at least 2018, Total Ortho has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

255.    Defendant Lerman, as an orthopedic surgeon and associate director of spine surgery of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating and recommending surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident. *See, e.g.,* ¶ 100, *supra*.

256.    Defendant Kumar, as an orthopedic surgeon and a member of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating, recommending and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident. *See, e.g.,* ¶ 169 *supra*.

COMPLAINT                                                                                                     61

257.    Defendant Jeyamohan, as an orthopedic surgeon and a director of neurosciences of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating, recommending and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident. *See, e.g.,* ¶ 169, *supra*.

258.    As part of the Fraud Scheme, Total Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

259.    As part of the Fraud Scheme, Total Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

260.    As part of the Fraud Scheme, Total Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

261.    Total Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendants Lerman, Kumar, Jeyamohan, and/or any other employee/agent of Total Ortho, that were unnecessary, excessive, unwarranted and/or costly, and

were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

262.    Total Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Lerman, Kumar, Jeyamohan, Leven and/or any other employee/agent of Total Ortho provided medical and diagnostic services and received reimbursement for such services.

xi.  Englinton Defendants' Participation in the Fraud Scheme

263.    Since at least 2018, Englinton Med has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

264.    Defendant Shusterman, as an internist and a principal of Englinton Med, controlled and directed the medical services provided to Claimants by Englinton Med, including evaluating, diagnosing and referring Claimants to other Medical Provider Defendants for a variety of medical services, including acupuncture treatment, physical therapy, chiropractic treatment and orthopedic examination that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident.

265.    Defendant Evaristo, as physical therapist at Englinton Med, controlled and directed the physical therapy provided to Claimants. The physical therapy sessions were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident.

266.    As part of the Fraud Scheme, Englinton Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

COMPLAINT                                                                                                   63

267.    As part of the Fraud Scheme, Englinton Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

268.    As part of the Fraud Scheme, Englinton Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

269.    Englinton Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendants Shusterman, Evaristo and/or any other employee/agent of Englinton Med, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

270.    Englinton Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Shusterman, Evaristo and/or any other employee/agent of Englinton Med provided medical and diagnostic services and received reimbursement for such services.

xii. Brooklyn Premier Defendants' Participation in the Fraud Scheme

271.    Since at least 2018, Brooklyn Premier has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme. Brooklyn Premier provides a variety of

medical services, including diagnostic, neurological evaluations and treatment, orthopedic surgery and pain management.

272.    Since at least 2018, FJ Ortho has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme. FJ Ortho provides a variety of medical services, including diagnostic, neurological evaluations and treatment, orthopedic surgery and pain management.

273.    Defendant Simhaee, as a pain management specialist at Brooklyn Premier and/or FJ Ortho, controlled and directed the medical services provided to Claimants by Brooklyn Premier and/or FJ Ortho, including evaluating and providing steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. *See, e.g.,* ¶ 136, *supra*.

274.    Defendant Vora, as an orthopedic surgeon at Brooklyn Premier and/or FJ Ortho, controlled and directed the medical services provided to Claimants by Brooklyn Premier and/or FJ Ortho, including evaluating and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident. *See, e.g.,* ¶ 180, *supra*.

275.    Defendant Horowitz, as a pain management specialist, the founder of the pain management department of Brooklyn Premier and a principal of Brooklyn Premier and FJ Ortho, controlled and directed the medical services provided to Claimants by Brooklyn Premier and FJ Ortho, including oversight of physicians and others evaluating and providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to

the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

276.    As part of the Fraud Scheme, Brooklyn Premier Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

277.    As part of the Fraud Scheme, Brooklyn Premier Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

278.    As part of the Fraud Scheme, Brooklyn Premier Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

279.    Brooklyn Premier Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendants Simhaee, Vora, Horowitz, and/or any other employee/agent of Brooklyn Premier and/or FJ Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

280.    Brooklyn Premier Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Simhaee, Vora, Horowitz, and/or any other employee/agent of Brooklyn Premier and/or FJ Ortho provided medical and diagnostic services and received reimbursement for such services.

xiii.    Kostin Defendants' Participation in the Fraud Scheme

281.    Since at least 2019, Counter Point has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

282.    Since at least 2019, Upward Med has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

283.    Defendant Kostin, as an internist and a principal of Counter Point and Upward Med, controlled and directed the medical services provided to Claimants by Counter Point and Upward Med, including evaluating, diagnosing and referring Claimants to other Medical Provider Defendants for a variety of medical services, including acupuncture treatment, physical therapy, chiropractic treatment and orthopedic examination.

284.    As part of the Fraud Scheme, Kostin Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

285.    As part of the Fraud Scheme, Kostin Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical

COMPLAINT                                                                            67

services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

286.    As part of the Fraud Scheme, Kostin Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

287.    Kostin Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendant Kostin and/or any other employee/agent of Counter Point and/or Upward Med, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

288.    Kostin Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Kostin and/or any other employee/agent of Counter Point and/or Upward Med provided medical and diagnostic services and received reimbursement for such services.

### xiv.    BL Pain Defendants' Participation in the Fraud Scheme

289.    Since at least 2018, BL Pain has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

290.    Since at least 2018, Pain Physicians has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

291.    Since at least 2018, LR Med has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

292.    Defendant Kosharskyy, as an anesthesiologist and interventional pain management and a principal of BL Pain and Pain Physicians, controlled and directed the medical services provided to Claimants by BL Pain and Pain Physicians, including evaluating, diagnosing and serially providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. *See, e.g.,* ¶ 125, *supra.*

293.    Defendant Shulkin, as an anesthesiologist and interventional pain management and employee of BL Pain, Pain Physicians and/or LR Med, controlled and directed the medical services provided to Claimants by BL Pain, Pain Physicians and LR Med, including evaluating, diagnosing and serially providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. *See, e.g.,* ¶ 125, *supra.*

294.    Defendant Reyfman, as an anesthesiologist and interventional pain management and a principal of BL Pain, Pain Physicians and LR Med, controlled and directed the medical services provided to Claimants by BL Pain, Pain Physicians and LR Med, including evaluating, diagnosing and serially providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. *See, e.g.,* ¶ 168, *supra.*

295.    As part of the Fraud Scheme, BL Pain Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman,

the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

296.    As part of the Fraud Scheme, BL Pain Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

297.    As part of the Fraud Scheme, BL Pain Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

298.    BL Pain Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendants Kosharskyy, Shulkin, Reyfman, and/or any other employee/agent of BL Pain, Pain Physicians and/or LR Med, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

299.    Apple Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Kosharskyy, Shulkin, Reyfman, and/or any other employee/agent of BL Pain, Pain Physicians and/or LR Med provided medical and diagnostic services and received reimbursement for such services.

COMPLAINT                                                                                                    70

xv. <u>McCulloch Defendants' Participation in the Fraud Scheme</u>

300.    Since at least 2018, McCulloch Ortho has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

301.    Since at least 2019, McCulloch Ortho, through selective use of NY S&J has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

302.    Defendant McCulloch, as an orthopedic surgeon and a principal of McCulloch Ortho and/or NY S&J, controlled and directed the medical services provided to Claimants by McCulloch Ortho and/or the NY S&J name, including overseeing his employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

303.    Defendant Capiola, as an orthopedic surgeon and employee of McCulloch Ortho and/or NY S&J, controlled and directed the medical services provided to Claimants by McCulloch Ortho and/or NY S&J, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. *See, e.g.,* ¶¶ 157, 158, *supra.*

304.    As part of the Fraud Scheme, McCulloch Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

COMPLAINT                                                                                                      71

305.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

306.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

307.    McCulloch Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendants McCulloch, Capiola, and/or any other employee/agent of McCulloch Ortho or NY S&J, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

308.    McCulloch Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants McCulloch, Capiola, and/or any other employee/agent of McCulloch Ortho or NY S&J provided medical and diagnostic services and received reimbursement for such services.

xvi.        Gotham Defendants' Participation in the Fraud Scheme

309.    Since at least 2018, Gotham Neurosurgery has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                              72

310.    Defendant Cohen, as a neurosurgeon and a principal of Gotham Neurosurgery, controlled and directed the medical services provided to Claimants by Gotham Neurosurgery, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. *See, e.g.,* ¶ 146, *supra.*

311.    As part of the Fraud Scheme, Gotham Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

312.    As part of the Fraud Scheme, Gotham Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

313.    As part of the Fraud Scheme, Gotham Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

314.    Gotham Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendant Cohen and/or any other employee/agent of Gotham Neurosurgery, that were unnecessary, excessive, unwarranted and/or costly, and were

COMPLAINT                                                                                                73

not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

315.    Gotham Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Cohen and/or any other employee/agent of Gotham Neurosurgery provided medical and diagnostic services and received reimbursement for such services.

xvii.    OrthoCare Defendants' Participation in the Fraud Scheme

316.    Since at least 2018, OrthoCare Surgical has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

317.    Defendant Ehrlich, as an orthopedic surgeon and a principal of OrthoCare Surgical, controlled and directed the medical services provided to Claimants by OrthoCare Surgical, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. *See, e.g.,* ¶¶ 169, 180, *supra.*

318.    As part of the Fraud Scheme, OrthoCare Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

319.    As part of the Fraud Scheme, OrthoCare Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical

COMPLAINT                                                                                          74

services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

320.    As part of the Fraud Scheme, OrthoCare Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

321.    OrthoCare Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendant Ehrlich and/or any other employee/agent of OrthoCare Surgical, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

322.    OrthoCare Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Ehrlich and/or any other employee/agent of OrthoCare Surgical provided medical and diagnostic services and received reimbursement for such services.

xviii.    Precision Defendants' Participation in the Fraud Scheme

323.    Since at least 2018, Precision Pain has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

324.    Defendant Lerner, as a pain management specialist and a principal of Precision Pain, controlled and directed the medical services provided to Claimants by Precision Pain, including evaluating, diagnosing and providing steroid injections that were unnecessary, excessive,

COMPLAINT                                                                                      75

unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. *See, e.g.,* ¶ 180, *supra*.

325.    As part of the Fraud Scheme, Precision Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

326.    As part of the Fraud Scheme, Precision Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

327.    As part of the Fraud Scheme, Precision Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

328.    Precision Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Defendant Lerner and/or any other employee/agent of Precision Pain, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                                  76

329.    Precision Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Lerner and/or any other employee/agent of Precision Pain provided medical and diagnostic services and received reimbursement for such services.

D.    **Defendants' Pattern of Racketeering Activity**

330.    The pattern of racketeering engaged in by Defendants involving a scheme to defraud and steal from Plaintiffs and others, began on or before 2018, and continues to the present day, and includes among others the following specific predicate acts:

i.    Claimant A

1.    As stated above, (Section III.B.i), many of the medical services provided to Claimant A were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because the claimant's initial complaints of minor-appearing injuries to his right thumb and wrist do not correlate to any of the subsequent treatment rendered as part of the fraudulent treatment protocol, which further necessitated material revisions to his account of alleged injury to justify the additional lucrative areas treated. As such, each of the below identified medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

2.    On or about August 10, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343 and NY Penal Code § 215, the **Liakas Firm**, at the direction of **Dean Liakas**, offered to represent Claimant A before the NY WCB to claim fraudulent workers' compensation benefits for Claimant A, and

COMPLAINT                                                                                                            77

caused to be emailed an Employee Claim to the NY WCB on behalf of Claimant A, which was signed by both Claimant A and an employee/agent of the Liakas Firm on August 3, 2022, falsely attesting to the construction accident, the existence and/or extent of Claimant A's injuries, and the necessity of Claimant A's medical treatment.

3.      On or about June 5, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, emailed an Application for a Fee related to Claimant A's fraudulent workers' compensation claim.

4.      On or about January 10, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, emailed to defense counsel a form C-3.3 for limited release of health information and HIPAA release for Claimant A's fraudulent medical records.

5.      On or about August 3, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Salehin**, or an employee of **Brooklyn Med**, at the direction of Salehin, caused to be transmitted by mail, facsimile or email to NY WCB, report of his August 3, 2022 initial comprehensive medical examination of Claimant A recommending MRIs of right shoulder, knee, wrist and hand and referring Claimant A for physical therapy. Recommendations for imaging service and treatment for right shoulder and knee were not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records a day earlier, which were available to Salehin, such that Salehin knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Salehin provided such medical services in order to increase the services for which Brooklyn Med Defendants

COMPLAINT                                                                 78

received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Salehin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

6.      On or about November 16, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Salehin**, or an employee of **Brooklyn Med**, at the direction of Salehin, caused to be transmitted by mail to NY WCB, a claim form and reports of physical therapy session for Claimant A's neck, back and shoulder for the month of October 2022. Physical therapy for Claimant A's neck, back and shoulder was not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records, which were available to Salehin, such that Salehin knew or should have known that the physical therapy sessions were unnecessary and/or not causally related to the alleged accident. However, Salehin provided such physical therapy sessions in order to increase the medical services for which Brooklyn Med Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Salehin caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

7.      On or about January 30, 2024, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Salehin**, or an employee of **Brooklyn Med**, at the direction of Salehin, caused to be

COMPLAINT                                                                                              79

transmitted by mail, facsimile or email to NY WCB, a claim form  and reports of physical therapy

session for Claimant A's neck, back and shoulder for the month of January 2024. Physical therapy

for Claimant A's neck, back and shoulder was not supported by the alleged accident as initially

described and reported by Claimant A in the emergency room records, which were available to

Salehin, such that Salehin knew or should have known that the physical therapy sessions were

unnecessary and/or not causally related to the alleged accident. However, Salehin provided such

physical therapy sessions in order to increase the medical services for which Brooklyn Med

Defendants received reimbursement and to increase workers' compensation claim and personal

injury lawsuit settlement value. Upon information and belief, Salehin caused his reports to be

transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers'

compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the

execution of the scheme to defraud.

       8.     On or about August 17, 2022, in furtherance of and as a necessary

step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343,

Defendant **McDonnell**, or an employee/agent of **Community Imaging**, at the direction of

McDonnell, caused to be transmitted by mail, facsimile or email to NY WCB, a report of Claimant

A's MRI-Cervical Spine on August 17, 2022 as requested by **Brooklyn Med** noting purported disc

bulges at C4-5 and C5-6 levels, herniation at C5-6 level and back spasm. Imaging of Claimant A's

spine was not supported by the alleged accident as initially described and reported by Claimant A

in the emergency room, such that the imaging was unnecessary and/or not causally related to the

alleged accident. Moreover, because an injury to Claimant A's spine was not consistent with the

accident as initially reported and because Claimant A did not complain of any injuries to his spine

when he presented to the emergency room, Claimant A likely did not sustain any injuries to his

spine and imaging likely did not show any indication of an acute injury consistent with the accident as initially reported. Upon information and belief, McDonnell caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

9.      On or about October 18, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **McDonnell**, or an employee/agent of **Community Imaging**, at the direction of McDonnell, caused to be emailed to NY WCB, a claim form and report of August 9, 2022 MRI of Claimant A's right wrist as requested by Defendant **Salehin** of **Brooklyn Med** noting a purported focal tear, but failing to note Claimant A's pre-existing carpal tunnel syndrome that had not been adequately treated in order to misrepresent the nature and extent of injury. Upon information and belief, McDonnell caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

10.     On or about October 18, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **McDonnell**, or an employee/agent of **Community Imaging**, at the direction of McDonnell, caused to be emailed to NY WCB, a claim form and report of August 17, 2022 MRI of Claimant A's cervical spine as requested by **Brooklyn Med**, noting purported herniation at C5-C6 and disc bulges at C4-5 and C5-6. Imaging of Claimant A's neck and back was not supported by the alleged accident as initially described and reported by Claimant A in the emergency room, such that the imaging was unnecessary and/or not causally related to the alleged accident. Moreover, because

an injury to Claimant A's spine was not consistent with the accident as initially reported and because Claimant A did not complain of any injuries to his spine when he presented to the emergency room, Claimant A likely did not sustain any injuries to his spine and imaging likely did not show any indication of an acute injury consistent with the accident as initially reported. However, McDonnell noted purported spine conditions in order to increase the medical services for which Community Imaging received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, McDonnell caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

11.     On or about October 17, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Avshalumov**, or an employee/agent of **Advanced Ortho**, at the direction of Avshalumov, caused to be transmitted  by mail, facsimile or email to NY WCB a claim form and progress note of August 17, 2022 examination of Claimant A for his right wrist who was referred by Defendant **Salehin** of **Brooklyn Med**, falsely determining "temporary total determined functional loss due to injury." The medical services were provided in order to increase the medical services for which Advanced Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value irrespective of prior unrelated carpal tunnel syndrome injury. Upon information and belief, Avshalumov caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

12.     On or about November 8, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Avshalumov**, or an employee/agent of **Advanced Ortho**, at the direction of Avshalumov, caused to be transmitted  by mail, facsimile or email to NY WCB a prior authorization request for right shoulder arthroscopy and a report of November 2, 2022 examination of Claimant A recommending arthroscopy to address impingement syndrome of right shoulder. Recommendation for right shoulder arthroscopy was not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records a day earlier, which were available to Avshalumov, such that Avshalumov knew or should have known that the right shoulder arthroscopy was unnecessary and/or not causally related to the alleged accident. However, Avshalumov evaluated Claimant A and recommended right should arthroscopy in order to increase the medical services for which Advanced Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Avshalumov caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

13.     On or about December 14, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kumar**, or an employee/agent of **Total Ortho**, at the direction of Kumar, caused to be electronically transmitted to NY WCB a claim form and report of his December 6, 2022 examination of Claimant A falsely diagnosing Claimant A with disc herniation at C5/6 and recommended surgery. Recommendation for spine surgery was not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records, which

were available to Kumar, such that Kumar knew or should have known that spine surgery was unnecessary and/or not causally related to the alleged accident. However, Kumar evaluated Claimant A and recommended spine surgery in order to increase the medical services for which Total Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kumar caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

14.     On or about June 7, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Lerman**, or an employee/agent of **Total Ortho**, at the direction of Lerman, caused to be electronically transmitted to NY WCB, a prior authorization request for cervical fusion and report of his June 7, 2023 examination of Claimant A as requested by Defendant **Apple** of **Big Apple**. Lerman's evaluation and recommendation for spine surgery were not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records, which were available to Lerman, such that Lerman knew or should have known that spine surgery was unnecessary and/or not causally related to the alleged accident. However, Lerman evaluated Claimant A and recommended spine surgery in order to increase the medical services for which Total Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lerman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

15.     On or about April 14, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Lerman**, or an employee/agent of **Total Ortho**, at the direction of Lerman, caused to be electronically transmitted to NY WCB, a claim form and report of his February 6, 2023 examination of Claimant A for a second opinion as requested by Defendant **Salehin** of **Brooklyn Med**, falsely diagnosing Claimant A with disc herniation at C5/6 and recommending surgery. Lerman's evaluation and recommendation for spine surgery were not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records, which were available to Lerman, such that Lerman knew or should have known that spine surgery was unnecessary and/or not causally related to the alleged accident. However, Lerman evaluated Claimant A and recommended spine surgery in order to increase the medical services for which Total Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lerman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

16.     On or about August 18, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Apple**, or an employee/agent of **Big Apple**, at the direction of Apple, caused to be transmitted by mail, facsimile or email to NY WCB a claim form and report of his August 18, 2022 initial evaluation of Claimant A who had been referred by Defendant **Salehin** of **Brooklyn Med** as well as a report of his August 18, 2022 cervical steroid injection provided to Claimant A. Apple's evaluation and cervical steroid injection were not supported by the alleged accident as initially

described and reported by Claimant A in the emergency room records, which were available to Apple, such that Apple knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Moreover, Apple provided a steroid injection less than three (3) weeks after the alleged accident and without any evidence of any prior failure of conservative treatment. However, Apple evaluated Claimant A and provided the steroid injection in order to increase the medical services for which Apple Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Apple caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

17.     On or about September 8, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Apple**, or an employee/agent of **Big Apple**, at the direction of Apple, caused to be transmitted by mail, facsimile or email to NY WCB a claim form and report of the September 8, 2022 cervical steroid injection provided to Claimant A. Apple's evaluation and cervical steroid injection were not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records, which were available to Apple, such that Apple knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Moreover, Apple provided the steroid injection only three (3) weeks after providing the first steroid injection, again without any evidence of any prior failure of conservative treatment. However, Apple evaluated Claimant A and provided steroid injection in order to increase the medical services for which Apple Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Apple caused his report

COMPLAINT                                                                                          86

to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

18.     On or about November 10, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Apple**, or an employee/agent of **Big Apple**, at the direction of Apple, caused to be transmitted by mail, facsimile or email to NY WCB a claim form and report of the November 10, 2022 lumbar steroid injection provided to Claimant A. Apple's evaluation and lumbar steroid injection were not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records, which were available to Apple, such that Apple knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Moreover, Apple provided the lumber steroid injection without any evidence of any prior failure of conservative treatment. However, Apple evaluated Claimant A and provided steroid injection in order to increase the medical services for which Apple Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Apple caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

19.     On or about October 17, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Lebson**, or an employee/agent of **North Shore**, at the direction of Lebson, caused to be mailed to NY WCB a claim form and chiropractic treatment notes during the month of September 2022. The chiropractic treatments were not supported by the alleged accident as initially described and

reported by Claimant A in the emergency room records, which were available to Lebson, such that Lebson knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. However, Lebson provided chiropractic treatments in order to document the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries and to increase the medical services for which North Shore Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lebson caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

20.     On or about September 6, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **North Shore**, at the direction of **Lebson**, caused to be transmitted by mail, facsimile or email to NY WCB a claim form and report of September 6, 2022 electrodiagnostic testing of Claimant A performed at the request of Lebson, claiming that the study reveals evidence of bilateral C6 radiculopathies and of right motor ulnar nerve neuropathy at the elbow, along with carpal tunnel syndrome on the right which does not appear to have been adequately treated. The medical services provided were unnecessary and/or not causally related to the alleged accident, but were provided in order to increase the medical services for which North Shore Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lebson caused this report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

21.    On or about September 30, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Wang**, or an employee/agent of **Unicorn**, at the direction of Wang, transmitted by mail, facsimile or email to NY WCB a claim form and report of acupuncture treatments provided to Claimant A for his shoulder, knee wrist and spine in September 2022. The treatments were not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records, which were available to Wang, such that Wang knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. However, Wang provided acupuncture in order to document the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries and in order to increase the medical services for which Unicorn Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Wang caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

22.    On or about March 16, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Wang**, or an employee/agent of **Unicorn**, at the direction of Wang, caused to be mailed to NY WCB a claim form and report of acupuncture treatments provided to Claimant A for his shoulder, knee wrist and spine in February 2023. The treatments were not supported by the alleged accident as initially described and reported by Claimant A in the emergency room records, which were available to Wang, such that Wang knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. However, Wang provided

COMPLAINT                                                                                                    89

acupuncture in order to document the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries and in order to increase the medical services for which Unicorn Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Wang caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant A's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

      ii.  <u>Claimant B</u>

      1.    As stated above, (Section III.B.ii), many of the medical services provided to Claimant B were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because despite his varied accounts of alleged injury, when he presented to the hospital a day later, imaging studies did not show any evidence of acute injury and his subsequent treatment is materially similar to the others utilizing the fraudulent treatment protocol rather than any internally consistent account of injury and treatment. As such, each of the below identified medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

      2.    On or about January 26, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, **Dean Liakas** of the **Liakas Firm** offered to represent Claimant B in a personal injury lawsuit and electronically filed the verified complaint with the Kings County Supreme Court of the State of New York, dated

COMPLAINT                                                      90

January 26, 2022 falsely attesting to the construction accident, the existence and/or extent of Claimant B's injuries, and the necessity of Claimant B's medical treatment.

3.    On or about January 26, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343 and NY Penal Code § 215, the **Liakas Firm**, at the direction of **Dean Liakas**, offered to represent Claimant A before the NY WCB to claim fraudulent workers' compensation benefits for Claimant B, and caused to be emailed to the NY WCB a C-3 Employee Claim on behalf of Claimant B, which was signed by both Claimant B and an employee/agent of the Liakas Firm on January 14, 2022 falsely attesting to the construction accident, the existence and/or extent of Claimant B's injuries, and the necessity of Claimant B's medical treatment.

4.    On or about March 7, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be faxed to the NY WCB a C-4 Doctor's Initial Report form completed and signed by Defendant **Salehin** of **Brooklyn Med** dated January 17, 2022 falsely attesting to the existence and/or extent of Claimant B's injuries and the necessity of Claimant B's medical treatment. The report's findings and recommendations were not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Salehin, such that Salehin knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Salehin provided his evaluation findings in order to increase the services for which Brooklyn Med Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Salehin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers'

compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

5.    On or about December 8, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to the NY WCB report of the cervical fusion surgery that Defendant **Kumar** performed on Claimant B on October 5, 2022. The spine surgery was not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Kumar, such that Liakas Defendants and Kumar knew or should have known that spine surgery was unnecessary and/or not causally related to the alleged accident. The spine surgery did not comply with the Guidelines, but was performed in order to increase the medical services for which Total Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value for Liakas Defendants, to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

6.    On or about March 2, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **McDonnell**, or an employee/agent of **Community Imaging**, at the direction of McDonnell, caused to be emailed to the NY WCB a C-4 Ancillary Medical Report form and report of January 21, 2022 MRI of Claimant B's right hip noting a purported tear at the posterior labrum at the mid aspect. Imaging of Claimant B's hip was not supported by the alleged accident as initially described and reported by Claimant B in the emergency room, such that the imaging was unnecessary and/or not causally related to the alleged accident. Moreover, because an injury to Claimant B's hip was not consistent with the accident as initially reported and because Claimant B did not complain of any

injuries to his spine when he presented to the emergency room, Claimant B likely did not sustain any injuries to his spine and imaging likely did not show any indication of an acute injury consistent with the accident as initially reported. Upon information and belief, McDonnell caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

7.     On or about January 17, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Salehin**, or an employee/agent of **Brooklyn Med**, at the direction of Salehin, caused to be transmitted by mail, email or facsimile, a C-4 Doctor's Initial Report form dated January 17, 2022 falsely attesting to the existence and/or extent of Claimant B's injuries and the necessity of Claimant B's medical treatment. The report's findings and recommendations were not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Salehin, such that Salehin knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Salehin provided his evaluation findings in order to increase the services for which Brooklyn Med Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Salehin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

8.     On or about August 16, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343,

COMPLAINT                                                                                          93

Defendant **Salehin**, or an employee/agent of **Brooklyn Med**, at the direction of Salehin, caused to be transmitted by mail, email or facsimile, a Doctor's Progress Report and notes of physical therapy sessions provided to Claimant B in July 2022. The purported physical therapy for Claimant was not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Salehin, such that Salehin knew or should have known that the physical therapy sessions were unnecessary and/or not causally related to the alleged accident. However, Salehin provided such physical therapy sessions in order to increase the medical services for which Brooklyn Med Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Salehin caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

9.     On or about March 11, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, **Unicorn** caused to be mailed to Arch Insurance Group, **Unicorn's** acupuncturist's Progress Report form and notes of acupuncture treatment and cupping treatment provided to Claimant B in February 2022. The treatments were not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Wang, such that Wang knew or should have known that the treatments were not in compliance with the Guidelines, unnecessary and/or not causally related to the alleged accident. However, Wang provided acupuncture in order to document the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries and in order to increase the medical services for which Unicorn Defendants received reimbursement and to increase workers' compensation claim and personal

injury lawsuit settlement value. Upon information and belief, Wang caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

10.     On or about July 18, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Wang**, or an employee/agent of **Unicorn**, at the direction of Wang, caused to be mailed to the NY WCB a Doctor's Progress Report and notes of acupuncture treatment provided to Claimant B in June 2022. The treatments were not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Wang, such that Wang knew or should have known that the treatments were not in compliance with the Guidelines, unnecessary and/or not causally related to the alleged accident. However, Wang provided acupuncture in order to document the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries and in order to increase the medical services for which Unicorn Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Wang caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

11.     On or about August 15, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Wang**, or an employee/agent of **Unicorn**, at the direction of Wang, caused to be mailed to the NY WCB a Doctor's Progress Report and notes of acupuncture treatment provided to Claimant B in July

2022. The treatments were not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Wang, such that Wang knew or should have known that the treatments were not in compliance with the Guidelines, unnecessary and/or not causally related to the alleged accident. However, Wang provided acupuncture in order to document the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries and in order to increase the medical services for which Unicorn Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Wang caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

12. On or about March 14, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Lebson**, or an employee/agent of **North Shore**, at the direction of Defendant **Lebson**, caused to be mailed to NY WCB a claim form and notes of chiropractic sessions provided to Claimant B in February 2022. The chiropractic treatments were not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Lebson, such that Lebson knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. However, Lebson provided chiropractic treatments in order to document the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries and to increase the medical services for which North Shore Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lebson caused his reports to be

COMPLAINT                                                                                              96

transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

13.     On or about August 15, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Lebson**, or an employee/agent of **North Shore**, at the direction of Defendant **Lebson**, caused to be mailed to NY WCB a claim form and notes of chiropractic sessions provided to Claimant B in July 2022. The chiropractic treatments were not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Lebson, such that Lebson knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. However, Lebson provided chiropractic treatments in order to document the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries and to increase the medical services for which North Shore Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lebson caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

14.     On or about September 23, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, **North Shore**, at the direction of Defendant **Lebson**, caused to be mailed to Arch Insurance Group a claim form and report of August 12, 2022 electrodiagnostic study and nerve conduction study (EMG/NCS) performed on Claimant B. The EMG/NCV was not supported by the alleged accident

as initially described and reported by Claimant B in the emergency room records, which were available to Lebson, such that Lebson knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. Moreover, Lebson directed his employees to perform the EMG/NCV despite the absence of any alleged equivocal MRI results as required by C.2.a.o. of the Low Back Guidelines, in order to increase the medical services for which North Shore Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lebson caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

15.    On or about March 25, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Apple**, or an employee/agent of **Big Apple**, at the direction of Defendant Apple, caused to be mailed to Arch Insurance Group a Doctor's Progress Report and report of his February 8, 2022 initial evaluation of Claimant B referred to him by Defendant **Salehin** recommending cervical and lumbar steroid injections. Apple's evaluation and steroid injections were not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Apple, such that Apple knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Moreover, Apple provided a steroid injection less than three (3) weeks after the alleged accident and without any evidence of any prior failure of conservative treatment. However, Apple evaluated Claimant B and provided steroid injections in order to increase the medical services for which Apple Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit

COMPLAINT                                                                    98

settlement value. Upon information and belief, Apple caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.in furtherance of and

16.     On or about May 16, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Apple**, or an employee/agent of **Big Apple**, at the direction of Defendant Apple, caused to be mailed to Arch Insurance Group a form C-4.2 Doctor's Progress Report and report of Claimant B's post procedure visit of March 31, 2022, recommending continued physical therapy, acupuncture and chiropractic treatment and a third cervical epidural steroid injection. The recommended third epidural steroid injection was unnecessary and/or not causally related to the alleged accident as it was not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Apple, such that Apple knew or should have known it was causally unrelated, inconsistent with the continued conservative treatment of physical therapy, acupuncture and chiropractic treatment, and did not comport with the Medical Treatment Guidelines. However, Apple recommended the injection in order to increase the medical services for which Apple Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Apple caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

17.     On or about April 23, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Lerman**,

or an employee/agent of **Total Ortho**, at the direction of Lerman, caused to be electronically transmitted to the NY WCB a claim form and report of his April 6, 2022 examination of Claimant B recommending spine surgery. The recommended surgery was unnecessary and/or not causally related to the alleged accident as there was no evidence of any prior failure of conservative treatment to support surgery. However, Lerman evaluated Claimant B and recommended surgery in furtherance of and The surgery was not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Apple, such that Apple knew or should have known though he knew or should have known that the spine surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the conservative treatment records. However, Lerman recommended the spinal surgery in order to increase the medical services for which Total Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lerman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

18.     On or about November 9, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Lerman**, or an employee/agent of **Total Ortho**, at the direction of Lerman, caused to be electronically transmitted to the NY WCB a claim form and report of his April 6, 2022 post-op evaluation of Claimant B falsely stating that the "accident is the competent producing cause of the injuries and causal relationship does exist." The medical services provided were unnecessary and/or not causally related to the alleged accident. Lerman's evaluation was not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records,

COMPLAINT                                                                                          100

which were available to Lerman, such that Lerman knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Lerman authored the post-operative report in order to increase the medical services for which Total Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lerman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

19.      On or about October 5, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Kumar**, or an employee/agent of **Total Ortho**, at the direction of Kumar, caused to be transmitted to **Liakas Firm** by facsimile, email or mail, a report of Claimant B's October 5, 2022 cervical fusion. The surgery was not supported by the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Kumar, such that Kumar knew or should have known that the surgical procedure was unnecessary and/or not causally related to the alleged accident. The procedure was further unnecessary as there was no evidence of any prior failure of conservative treatment. However, Kumar performed the surgery in order to increase the medical services for which Total Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kumar caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

COMPLAINT                                                                                    101

20.     On or about November 2, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kumar**, or an employee/agent of **Total Ortho**, at the direction of Kumar, caused to be electronically transmitted to the NY WCB a claim form and report of Claimant B's October 5, 2022 cervical fusion. The surgery was unnecessary and/or not causally related to the alleged accident as initially described and reported by Claimant B in the emergency room records, which were available to Kumar, such that Kumar knew or should have known that the procedure was unnecessary and/or not causally related to the alleged accident. And further unnecessary as there was no evidence of any prior failure of conservative treatment. However, Kumar performed the surgery though he knew or should have known that the spine surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the conservative treatment records. Kumar performed the spinal surgery in order to increase the medical services for which Total Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kumar caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud..

21.     On or about November 2, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Jeyamohan**, or an employee/agent of **Total Ortho**, at the direction of Jeyamohan, caused to be electronically transmitted to the NY WCB a claim form and report of Claimant B's October 5, 2022 cervical fusion. The surgery was unnecessary and/or not causally related to the alleged accident, as initially described and reported by Claimant B in the emergency room records, which

COMPLAINT                                                                                    102

were available to Jeyamohan, such that Jeyamohan knew or should have known that the procedure was unnecessary and/or not causally related to the alleged accident. And further unnecessary as there was no evidence of any prior failure of conservative treatment. However, Jeyamohan performed the surgery though he knew or should have known that the spine surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the conservative treatment records. Jeyamohan performed the spinal surgery in order to increase the medical services for which Total Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Jeyamohan caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud..

22.    On or about November 9, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Jeyamohan**, or an employee/agent of **Total Ortho**, at the direction of Jeyamohan, caused to be transmitted by mail, email or facsimile to the NY WCB, a claim form and report of Claimant B's October 11, 2022 post-surgical examination. The medical services provided were unnecessary and/or not causally related to the alleged accident, as initially described and reported by Claimant B in the emergency room records, which were available to Jeyamohan, such that Jeyamohan knew or should have known that the procedure was unnecessary and/or not causally related to the alleged accident, and further unnecessary as there was no evidence of any prior failure of conservative treatment. Jeyamohan knew or should have known that the spinal surgery was unnecessary and/or not causally related to the alleged accident. However, Jeyamohan authored the post-operative report in order to increase the medical services for which Total Defendants

COMPLAINT                                                                                          103

received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Jeyamohan caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud..

        23.     On or about March 16, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, **Avshalumov**, or an employee/agent of **Advanced Ortho**, at the direction of Avshalumov, caused to be emailed to the NY WCB a Request For Authorization to perform right hip surgery based on a diagnosis of post traumatic tear of acetabular labrum falsely ascribed to the incident at issue. The requested surgery was unnecessary and/or not causally related to the alleged accident, as initially described and reported by Claimant B in the emergency room records, his C-3 Employee Claim, or Salehin's initial evaluation dated January 17, 2022 which prematurely ordered bilateral hip MRIs in the absence of complaints and did not diagnose same, all of which were available to Avshalumov, such that Avshalumov knew or should have known that the procedure was unnecessary and/or not causally related to the alleged accident. Avshalumov requested the procedure in order to increase the medical services for which Advanced Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Avshalumov caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

        24.     On or about March 16, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, **Avshalumov**, or

COMPLAINT                                                    104

an employee/agent of **Advanced Ortho**, at the direction of Avshalumov, caused to be faxed to the NY WCB a report of his March 7, 2022 examination of Claimant B, who had been referred to him by Defendant **Salehin**, falsely stating that right hip arthroscopy is medically necessary. The requested surgery was unnecessary and/or not causally related to the alleged accident, as initially described and reported by Claimant B in the emergency room records, his C-3 Employee Claim, or Salehin's initial evaluation dated January 17, 2022 which prematurely ordered bilateral hip MRIs in the absence of complaints and did not diagnose same, and no physical therapy was performed to the hip, all of which were available to Avshalumov, such that Avshalumov knew or should have known that the procedure was unnecessary and/or not causally related to the alleged accident. Avshalumov requested the surgical procedure in order to increase the medical services for which Advanced Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Avshalumov caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

25.    On or about May 26, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Avshalumov**, or an employee/agent of **Advanced Ortho**, at the direction of Avshalumov, caused to be mailed to Gallagher Basset a claim form dated May 16, 2022, a C-4.2 Doctor's Progress Report dated May 16, 2022, and a progress note electronically signed by Avshalumov on March 7, 2022, falsely noting a tear of the right hip joint and concluding that "there is a temporary total determined functional loss due to injury" solely ascribed to the alleged right hip tear never diagnosed by any provider prior to Salehin's checked-off report which included bilateral hip MRIs

without any complaints or diagnosis relating thereto. The findings were unnecessary and/or not causally related to the alleged accident, as initially described and reported by Claimant B in the emergency room records, his C-3 Employee Claim, or Salehin's initial evaluation dated January 17, 2022 which prematurely ordered bilateral hip MRIs in the absence of complaints and did not diagnose same, and no physical therapy was performed to the hip, all of which were available to Avshalumov, such that Avshalumov knew or should have known that there was no disability, that any alleged disability was not referrable to the hip and/or not causally related to the alleged accident as reported. However, Avshalumov provided such an evaluation in order to increase the medical services for which Advanced Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Avshalumov caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant B's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

iii. Claimant C

1. As stated above, (Section III.B.iii), many of the medical services provided to Claimant C were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain, yet her treatment was not localized to her knees and lower back and was materially similar to the other representative claimants herein in accordance with the fraudulent treatment protocol rather than indicative of the slip and fall due to unspecified netting she initially claimed. As such, each of the below medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of

COMPLAINT                                                                                                        106

the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

2.     On or about February 10, 2022, **Runner Defendants** recruited and/or introduced Claimant C to **Liakas Defendants** who referred Claimant C to the Medical Provider Defendants for purported diagnosis and treatment of medical conditions allegedly caused by a purported injury of that date during the course of Claimant C's employment with a construction company. Claimant C, subsequently, was assisted by the Defendants to undergo diagnostic and treatment protocols that were unnecessary and were unrelated to the alleged accident for which Claimant C was compensated. Upon information and belief, the acts and conducts of the Defendants were effectuated, in part by means of telephone calls, texts, emails and use of the mails, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud,) and NY Penal Code § 215 (bribery).

3.     On or about February 15, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, **Dean Liakas** of the **Liakas Firm**, verified the complaint which was electronically filed with the Kings County Supreme Court of the State of New York, dated February 15, 2022, falsely attesting to the construction accident, the existence and/or extent of Claimant C's injuries, and the necessity of Claimant C's medical treatment.

4.     On or about February 15, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to the NY WCB a C-3 Employee Claim on behalf of Claimant C falsely attesting to the construction accident, the existence and/or extent of Claimant C's injuries, and the necessity of Claimant C's medical treatment.

COMPLAINT                                                                                          107

5.     On or about March 10, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be faxed to the NY WCB Defendant **Vora's** report of his February 24, 2022 initial examination of Claimant C. The evaluation and findings therein were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain. The emergency room records were available to Vora, such that Vora knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Vora provided such medical services in order to increase the services for which Brooklyn Med Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Vora caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

6.     On or about March 15, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be faxed to the NY WCB a report of Defendant **Capiola's** February 28, 2022 initial examination of Claimant C and referring Claimant C to Lenox Hill Radiology for MRI for bilateral knees. The evaluation and findings therein were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain. The emergency room records were available to Capiola, such that Capiola knew or should have known that the medical services were unnecessary and/or not causally related to the

alleged accident. However, Capiola provided such medical services in order to increase the services for which the McCulloch Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Liakas Defendants caused Capiola's report to be transmitted by mail, facsimile or email in order to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

7.      On or about September 1, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to the NY WCB an application for a fee based on Claimant C's fraudulent workers' compensation claim.

8.      On or about May 2, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kostin**, or an employee/agent of **Counter Point**, at the direction of Defendant Kostin, electronically transmitted to NY WCB a Doctor's Initial Report of his February 16, 2022 examination of Claimant C referring Claimant C to acupuncturist, chiropractor and orthopedist for evaluation and ordering various MRIs. The evaluation and findings therein were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain. The emergency room records were available to Kostin, such that Kostin knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Kostin provided such medical services in order to increase the services for which the Counter Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief,

COMPLAINT                                                                      109

Kostin caused his report to be transmitted by mail, facsimile or email in order to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

9.      On or about May 2, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kostin**, or an employee/agent of **Counter Point**, at the direction of Defendant Kostin, electronically transmitted to NY WCB a Doctor's Progress Report of his April 6, 2022 examination of Claimant C referring Claimant C to additional physical therapy. The evaluation and recommendation for physical therapy therein were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain. The emergency room records were available to Kostin, such that Kostin knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Kostin provided such medical services in order to increase the services for which the Counter Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused his report to be transmitted by mail, facsimile or email in order to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

10.      On or about May 5, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, **Counter Point**, at the direction of Defendant **Kostin**, electronically transmitted to NY WCB a claim form and reports of physical therapy and electric stimulation provided to Claimant C in March and April of 2022 as referred by Defendant Kostin. The reports and treatments described therein were not supported by

the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain. The emergency room records were available to Kostin, such that Kostin knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Kostin and his employees provided such medical services in order to increase the services for which the Counter Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused his report to be transmitted by mail, facsimile or email in order to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

11.     On or about March 10, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Vora**, or an employee/agent of **Brooklyn Premier**, at the direction of Defendant Vora, caused to be transmitted by mail, facsimile or email to **Liakas Firm** a report of his February 24, 2022 initial examination of Claimant C recommending cervical and lumbar MRIs and finding Claimant C 100% disabled. The evaluation, and specifically the finding that Claimant C was completely disabled were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain. The emergency room records were available to Vora, such that Vora knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Vora provided such medical services and provided the disability determination in order to increase the services for which Brooklyn Med Defendants received reimbursement and to increase workers' compensation

COMPLAINT                                                                                       111

claim and personal injury lawsuit settlement value. Upon information and belief, Vora caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

12.    On or about July 5, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Vora**, or an employee/agent of **FJ Ortho** or **Brooklyn Premier**, at the direction of Defendant Vora, caused to be electronically transmitted to the NY WCB a claim form and report of June 9, 2022 examination of Claimant C recommending follow up with pain management. The evaluation and recommendation therein were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain. The emergency room records were available to Vora, such that Vora knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Vora provided such medical services in order to increase the services for which FJ Ortho and/or Brooklyn Med Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Vora caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

13.    On or around May 12, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Kosharskyy**, or an employee/agent of **BL Pain** or **Pain Physician**, at the direction of Kosharskyy,

COMPLAINT                                                                                              112

caused to be mailed to the NY WCB a Doctor's Initial Report and report of March 30, 2022 examination of Claimant C, diagnosing Claimant C with lumbar disc displacement and muscle spasms and recommending epidural injections. The evaluation and recommendation of lumbar epidural steroid injection were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain, which were available to Kosharskyy, such that Kosharskyy knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Moreover, Kosharskyy recommended steroid injection without any evidence of any prior failure of conservative treatment, but did so in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kosharskyy caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

14.     On or around November 30, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kosharskyy**, or an employee/agent of **BL Pain** or **Pain Physician**, at the direction of Kosharskyy, caused to be electronically transmitted to the NY WCB a claim form and report of October 17, 2022 steroid injection for Claimant C. The epidural steroid injection was not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain, which were available to Kosharskyy, such that Kosharskyy knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Moreover,

COMPLAINT                                                                                          113

Kosharskyy recommended steroid injection without any evidence of any prior failure of conservative treatment, but did so in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kosharskyy caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

        15.     On or about December 6, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Kosharskyy**, or an employee/agent of **BL Pain** or **Pain Physician**, at the direction of Kosharskyy, caused to be transmitted by mail, facsimile or email to NY WCB a claim form and report of his November 17, 2022 examination of Claimant C recommending an epidural steroid injection. The evaluation and recommendation of epidural steroid injection were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain, which were available to Kosharskyy, such that Kosharskyy knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Moreover, Kosharskyy recommended steroid injection without any evidence of any prior failure of conservative treatment, but did so in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kosharskyy caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

16.     On or about October 7, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shulkin**, or an employee/agent of **BL Pain** or **Pain Physician**, at the direction of Shulkin, caused to be electronically transmitted to the NY WCB a claim form and Doctor's Progress Report of his September 9, 2022 epidural steroid injection for Claimant C. The epidural steroid injection was not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain, which were available to Shulkin, such that Shulkin knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Moreover, his colleague had recommended steroid injection(s) without any evidence of any prior failure of conservative treatment, and did so in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shulkin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

17.     On or about May 25, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Capiola**, or an employee/agent of **McCulloch Ortho**, at the direction of Capiola, caused to be electronically transmitted to the NY WCB a claim form and report of his May 9, 2022 examination of Claimant C recommending left knee arthroscopy. The evaluation and recommendation of surgery were not supported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain, which were available to Capiola, such that Capiola knew or should have

COMPLAINT                                                                       

known that the surgical recommendation was unnecessary and/or not causally related to the alleged accident. Capiola should have further known that there was no alleged failure of conservative care, as Counter Point Medical reported at all relevant times that the claimant tolerated treatment well. Upon information and belief, Capiola caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

18.     On or about September 7, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Capiola**, or an employee/agent of **McCulloch Ortho**, at the direction of Capiola, caused to be electronically transmitted to the NY WCB a claim form and report of his August 25, 2022 examination of Claimant C re-requesting authorization for left knee arthroscopy. The request for surgical authorization remained unsupported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain, which were available to Capiola, such that Capiola knew or should have known that the surgical recommendation was unnecessary and/or not causally related to the alleged accident. Capiola should have further known that there was no alleged failure of conservative care, as Counter Point Medical reported at all relevant times that the claimant tolerated treatment well. Upon information and belief, Capiola caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

19.     On or about February 13, 2024, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Capiola**, or an employee/agent of **McCulloch Ortho**, at the direction of Capiola, caused to be

COMPLAINT                                                                                      116

electronically transmitted to the NY WCB a prior authorization request for right knee arthroscopy and a report of his February 5, 2024 examination of Claimant C recommending arthroscopy surgery for left and right knee. The requests for what was not bilateral knee surgery remained unsupported by the alleged accident as stated in the emergency room records which documented that her alleged slip and fall did not result in any discernible injuries beyond her claims of bilateral knee and lower back pain, which were available to Capiola, such that Capiola knew or should have known that the surgical recommendation was unnecessary and/or not causally related to the alleged accident. Capiola should have further known that there was no alleged failure of conservative care, as Counter Point Medical reported at all relevant times that the claimant tolerated treatment well. Upon information and belief, Capiola caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

iv.  Claimant D

1.    As stated above, (Section III.B.iv), many of the medical services provided to Claimant D were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because the claimant suffered an injury to his left finger that he himself did not believe required evaluation and continued working, yet Medical Provider Defendants claimed that he was between 25% and 50% disabled and ordered the standard protocol suite of services from imaging studies to injections despite the minimal attention paid to the single body part that may have been injured to any appreciable degree. As such, each of the below medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of

COMPLAINT                                                                                                    117

the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

2. On or about June 3, 2022, **Runner Defendants** recruited and/or introduced Claimant D to Liakas Defendants who referred Claimant D to the Medical Provider Defendants for purported diagnosis and treatment of medical conditions allegedly caused by a purported injury of that date during the course of Claimant D's employment with a construction company. Claimant D, subsequently, was assisted by the Defendants to undergo diagnostic and treatment protocols that were unnecessary and were unrelated to the alleged accident for which Claimant D was compensated. Upon information and belief, the acts and conducts of the Defendants were effectuated, in part by means of telephone calls, texts, emails and use of the mails, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud,) and NY Penal Code § 215 (bribery).

3. On or about March 24, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Anthony Deliso of the **Liakas Firm** verified the complaint which was electronically filed with the New York County Supreme Court of the State of New York, dated March 17, 2023 falsely attesting to the construction accident, the existence and/or extent of Claimant D's injuries, and the necessity of Claimant D's medical treatment.

4. On or about August 9, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be transmitted by mail, email or facsimile to counsel in the workers' compensation claim Claimant D's power of attorney signed by Dean Liakas appointing the Liakas Firm to execute HIPAA releases on behalf of Claimant D for the

release of Claimant D's medical records that Liakas Defendants knew or reasonably should have known were false.

5.       On or about December 7, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Simhaee**, or an employee/agent of **FJ Ortho** or **Brooklyn Premier**, at the direction of Defendant Simhaee, caused to be electronically transmitted to the NY WCB a claim form and report of his October 21, 2022 examination of Claimant D during which he administered an epidural steroid injection. The injection was unnecessary and/or not causally related to the alleged accident, in which the claimant suffered an injury to his left finger that he himself did not believe required evaluation and continued working, records of which were available to Simhaee, such that Simhaee knew or should have known that the steroid injections were unnecessary and/or not causally related to the alleged accident. However, Simhaee provided such medical services in order to increase the services for which FJ Ortho and/or Brooklyn Premier Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Simhaee caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant D's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

6.       On or about August 4, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Simhaee**, or an employee/agent of **FJ Ortho** or **Brooklyn Premier**, at the direction of Defendant Simhaee, caused to be electronically transmitted to the NY WCB a claim form and report of his July 7, 2023 examination of Claimant D recommending continued physical therapy and injection. The recommended physical therapy and proposed injection were unnecessary and/or not causally

related to the alleged accident,, in which the claimant suffered an injury to his left finger that he himself did not believe required evaluation and continued working, records of which were available to Simhaee, such that Simhaee knew or should have known that the steroid injections were unnecessary and/or not causally related to the alleged accident. However, Simhaee provided such medical services in order to increase the services for which FJ Ortho and/or Brooklyn Premier Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Simhaee caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant D's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

       7.     On or about October 14, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Simhaee**, or an employee/agent of **Brooklyn Premier**, at the direction of Defendant Simhaee, caused to be electronically transmitted to the NY WCB a claim form and report of his September 27, 2023 examination of Claimant D during which he provided lumbar epidural injection. The injection was unnecessary and/or not causally related to the alleged accident,, in which the claimant suffered an injury to his left finger that he himself did not believe required evaluation and continued working, records of which were available to Simhaee, such that Simhaee knew or should have known that the steroid injections were unnecessary and/or not causally related to the alleged accident. However, Simhaee provided such medical services in order to increase the services for which FJ Ortho and/or Brooklyn Premier Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Simhaee caused his report to be transmitted by mail, facsimile or email to Liakas

Defendants to support Claimant D's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

    v.  <u>Claimant E</u>

    1.    As stated above, (Section III.B.v), many of the medical services provided to Claimant E were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because there was no "slip and fall" as subsequently alleged by the claimant in the papers filed by Liakas Defendants and Medical Provider Defendants, but rather an alleged injury suffered while attempting to lift a heavy object, with subsequent complaints of pain localized to the lower back. However, lifting injuries do not receive the deference paid to alleged elevation-related injuries, so the account of injury was altered in order to implement the fraudulent treatment protocol. As such, each of the below medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

    2.    On or about September 27, 2021, **Runner Defendants** recruited and/or introduced Claimant E to **Liakas Defendants** who referred Claimant E to the Medical Provider Defendants for purported diagnosis and treatment of medical conditions allegedly caused by a purported injury of that date during the course of Claimant E's employment with a construction company. Claimant E, subsequently, was assisted by the Defendants to undergo diagnostic and treatment protocols that were unnecessary and were unrelated to the alleged accident for which Claimant E was compensated. Upon information and belief, the acts and conducts of the Defendants were effectuated, in part by means of telephone calls, texts, emails and

use of the mails, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud,) and NY Penal Code § 215 (bribery).

3.      On or about November 4, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, **Dean Liakas** of the **Liakas Firm** verified the complaint which was electronically filed with the Kings County Supreme Court of the State of New York, dated November 4, 2021 falsely attesting to the construction accident, the existence and/or extent of Claimant E's injuries, and the necessity of Claimant E's medical treatment.

4.      On or about November 4, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to the NY WCB a C-3 Employee Claim on behalf of Claimant E dated November 4, 2021 falsely attesting to the construction accident, the existence and/or extent of Claimant E's injuries, and the necessity of Claimant E's medical treatment.

5.      On or about December 22, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be faxed to the NY WCB a report of Defendant **Cohen's** December 1, 2021 examination of Claimant E, diagnosing Claimant E with disc bulge at C6-C7 and disc herniation at L5-S1 and recommending physical therapy and pain management. Cohen and the Liakas Defendants knew or reasonably should have known that the diagnosis was false and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available

COMPLAINT                                                                                              122

to Liakas Defendants, such that Liakas Defendants knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. but was diagnosed in order to increase the medical services for which Cohen received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Liakas Defendants caused Cohen's report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

6.      On or about August 3, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to NY WCB a request approving Defendant **Cohen's** July 18, 2022 prior authorization request to perform back surgery on Claimant E. The diagnosis was false and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Cohen and Liakas Defendants, such that Cohen and Liakas Defendants knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident as alleged but was diagnosed in order to increase the medical services for which Cohen received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value Upon information and belief, Liakas Defendants caused Cohen's report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud.

COMPLAINT                                                                                      123

7.        On or about September 13, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be transmitted by mail, email or facsimile to defense counsel Claimant E's authorization to disclose workers' compensation records along with a power of attorney signed by Dean Liakas appointing the Liakas Firm to execute HIPAA releases on behalf of Claimant E for the release of Claimant E's medical records that Dean Liakas/Liakas Firm knew or reasonably should have known were false.

8.        On or about June 30, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kostin**, or an employee/agent of **Upward Med**, at the direction of Kostin, caused to be electronically transmitted to the NY WCB, a Doctor's Progress Report (Form C-4.2) of his May 3, 2022 acupuncture evaluation and treatment of Claimant E. The acupuncture evaluation and treatment were false and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Kostin, such that Kostin knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident as alleged but was diagnosed in order to increase the medical services for which Upward Med received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

9.      On or about February 13, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kostin**, or an employee/agent of **Upward Med**, at the direction of Kostin, caused to be electronically transmitted to the NY WCB a claim form, reports of the acupuncture treatment provided to Claimant E in December 2022 and January 2023 and a report of his re-evaluation of Claimant E on January 10, 2023 recommending continued course of acupuncture treatments. The acupuncture treatment was false and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Kostin, such that Kostin knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident as alleged but was diagnosed in order to increase the medical services for which Upward Med received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

10.      On or about August 30, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Kostin**, or an employee/agent of **Upward Med**, at the direction of Kostin, caused to be transmitted by mail, facsimile or email to the NY WCB a prior authorization request for acupuncture treatment in conjunction with physical therapy to target Claimant E's back. The acupuncture treatment so requested was false and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered

COMPLAINT                                                                                        125

while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Kostin, such that Kostin knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident as alleged but was diagnosed in order to increase the medical services for which Kostin received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

11.     On or about March 17, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be faxed to NY WCB a Doctor's Initial Report (Form C-4) and a report of his October 18, 2021 evaluation of Claimant E, falsely diagnosing Claimant E with back sprain/strain, left knee sprain/strain and right ankle sprain/strain, ordering MRIs of spine, left shoulder, left knee and right ankle, referring Claimant E to physical therapy, high voltage electrical stimulation, referring Claimant E to be evaluated by neurologist, chiropractor and acupuncturist, and finding Claimant E to be "totally disabled from his occupation at this time" as a result of the alleged workplace accident. The evaluation was false as there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Kostin, such that Kostin knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident as alleged but was diagnosed in order to increase the medical services for which Kostin received reimbursement and to increase workers' compensation claim and personal

COMPLAINT                                                                              126

injury lawsuit settlement value Upon information and belief, Shusterman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

12.    On or about April 13, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be electronically transmitted to NY WCB a prior authorization request dated April 13, 2023 for physical therapy to the left shoulder for Claimant E. The requested therapy sessions were unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Shusterman, such that Shusterman knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident, and not in compliance with the Guidelines as they were purportedly based on left shoulder surgery that had occurred six months prior, but were requested in order to increase the medical services for which Englinton Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Moreover, on or before April 13, 2023, Shusterman knew or should have known that the claimant underwent lumbar facetectomy and laminectomy on March 31, 2023, performed by defendant Cohen at Hudson Regional Hospital, which would necessarily impact Claimant E's ability to perform active therapy as facially requested. However, Shusterman provided such a request in order to increase the medical services for which Upward Med Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shusterman caused his report to be

COMPLAINT                                                                                          127

transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

13.    On or about April 18, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be electronically transmitted to NY WCB a claim form and reports of his January 23, 2023 follow-up examination and March 6, 2023 follow-up examination of Claimant E falsely noting that Claimant E is "totally disabled at 100%" and recommending continued physical therapy and pain management. The requested therapy sessions were unnecessary and/or not causally related to the alleged accident with its initial complaints of pain localized to the lower back, and not in compliance with the Guidelines as they were purportedly based on left shoulder surgery that had occurred six months prior, but were requested in order to increase the medical services for which Englinton Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. However, Shusterman provided such a request in order to increase the medical services for which Upward Med Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shusterman caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

14.    On or about May 18, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Evaristo**, or an employee/agent of **Englinton Med**, at the direction of Evaristo, caused to be faxed to the NY WCB a Doctor's Progress Report (Form C-4.2) and notes of the numerous physical therapy

sessions provided to Claimant E from March 21, 2022 to April 4, 2022 for low back pain and sprain of unspecified ligament of right ankle. The medical services were unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Evaristo, such that Evaristo knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. However, Evaristo purportedly provided physical therapy in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Evaristo caused his notes to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

15.    On or about June 24, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Evaristo**, or an employee/agent of **Englinton Med**, at the direction of Evaristo, caused to be faxed to the NY WCB a Doctor's Progress Report (Form C-4.2) and notes of the physical therapy sessions provided to Claimant E from April 20, 2022 to May 11, 2022 for low back pain and sprain of unspecified ligament of right ankle. The medical services were unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Evaristo, such that Evaristo knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. However, Evaristo purportedly provided physical therapy in order to increase

COMPLAINT                                                                                    129

the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Evaristo caused his notes to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

16.     On or about July 14, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dr. **Sharma**, another employee/agent of **McCulloch Ortho**, at the direction of Sharma, caused to be electronically transmitted to the NY WCB a prior authorization request dated July 14, 2023, requesting authorization for Claimant E's right ankle surgery. The requested surgery was unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Sharma, such that McCulloch's employee knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. However, Sharma requested authorization to perform right ankle surgery in order to increase the medical services for which McCulloch Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Sharma caused his request to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

17.     On or about August 25, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dr. **Sharma**, or another employee/agent of **McCulloch Ortho**, at the direction of Sharma, caused to be

COMPLAINT                                                                    130

electronically transmitted to the NY WCB a claim form and report of the August 11, 2023 surgery performed on Claimant E's right ankle. The surgery was unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Sharma, such that McCulloch's employee knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident. The surgery was further unnecessary because the physical therapy provided for at least five weeks prior to the date of surgery did not even include any purported treatment to the right ankle, while the reported physical therapy diagnoses for at least two months prior were limited to left shoulder and lumbosacral complaints. However, Sharma performed right ankle surgery in order to increase the medical services for which McCulloch Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Sharma caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

18.     On or about February 11, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Cohen**, or an employee/agent of **Gotham Neurosurgery**, at the direction of Cohen, caused to be faxed to the NY WCB a Doctor's Initial Report (Form C-4) and a report of his October 20, 2021 evaluation of Claimant E, falsely noting neck pain and low back pain "status post work-related accident." The medical services were unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the

COMPLAINT                                                                                    131

lower back, records of which were available to Cohen, such that Cohen knew or should have known that the evaluation and ensuing treatment were unnecessary and/or not causally related to the alleged accident. However, Cohen claimed to evaluate Claimant E and diagnosed him according to the protocol in order to increase the medical services for which Gotham Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Cohen caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

19.     On or about March 26, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Cohen**, or an employee/agent of **Gotham Neurosurgery**, at the direction of Cohen, caused to be faxed to NY WCB a report of his March 2, 2022 evaluation of Claimant E diagnosing Claimant E with disc herniation of L5-S1. The medical services were unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Cohen, such that Cohen knew or should have known that the treatments were unnecessary and/or not causally related to the alleged accident at all relevant times. However, Cohen diagnosed Claimant E pursuant to the treatment protocol in order to increase the medical services for which Gotham Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Cohen caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

COMPLAINT                                                                                     132

20.    On or about January 25, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Cohen**, or an employee/agent of **Gotham Neurosurgery**, at the direction of Cohen, caused to be transmitted by mail, facsimile or email to the NY WCB a prior authorization request dated January 25, 2023 to perform L5-S1 back surgery on Claimant E. The requested surgery was unnecessary and/or not causally related to the alleged accident as presented by Cohen, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Cohen, such that Cohen knew or should have known that the surgery was unnecessary and/or not causally related to the alleged accident. However, Cohen diagnosed Claimant E pursuant to the treatment protocol in order to increase the medical services for which Gotham Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Cohen caused his request to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

21.    On or about June 5, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Cohen**, or an employee/agent of **Gotham Neurosurgery**, at the direction of Cohen, caused to be mailed to the NY WCB an invoice and report of the March 31, 2023 L5-S1 spine fusion he performed on Claimant E. The surgery was unnecessary and/or not causally related to the alleged accident, as presented by Cohen, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain

localized to the lower back, records of which were available to Cohen, such that Cohen knew or should have known that the surgery was unnecessary and/or not causally related to the alleged accident. However, Cohen recommended fusion surgery on December 29, 2022 despite physical therapy treatment notes proximate to that date failed to indicate any alleged neurogenic claudication and did not demonstrate any responses to conservative treatment, which may not have been provided to the lumbar spine. Cohen therefore performed the procedure despite the Guidelines, in order to increase the medical services for which Gotham Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Cohen caused his request to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

22.     On or about March 14, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Reyfman**, or an employee/agent of **LR Medical** or **Pain Physicians**, at the direction of Reyfman, caused to be mailed to the NY WCB a Doctor's Initial Report (form C-4.2) and a report of his February 28, 2022 examination of Claimant E diagnosing Claimant E with lumbar radiculitis secondary to disc displacement and recommending steroid injections. The medical services were unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Reyfman, such that Reyfman knew or should have known that the surgery was unnecessary and/or not causally related to the alleged accident. Reyfman prematurely diagnosed and referred Claimant E despite a lack of conservative treatment but pursuant to the fraudulent

COMPLAINT                                                                                            134

treatment protocol in order to increase the medical services for which BL Pain Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

        23.     Also on or about March 14, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Shulkin**, or an employee/agent of **LR Medical** or **Pain Physicians**, at the direction of Shulkin, caused to be mailed to the NY WCB a Doctor's Progress Report and a report of his February 28, 2022 examination of Claimant E during which he administered epidural steroid injection. The injection was premature, unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Shulkin, such that Shulkin knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Shulkin's employer Reyfman had prematurely diagnosed and referred Claimant E for the injection despite a lack of conservative treatment but pursuant to the fraudulent treatment protocol in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shulkin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

COMPLAINT                                           135

24.     On or about August 9, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Reyfman**, or an employee/agent of **LR Medical** or **Pain Physicians**, at the direction of Reyfman, caused to be electronically transmitted to the NY WCB a claim form and report of treatment he performed on July 6, 2022 which he falsely stated was 'extracorporeal shock wave therapy' but which was in fact noninvasive radial pressure wave treatment for Claimant E. The misreported therapy was unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Reyfman, such that Reyfman knew or should have known that the alleged procedure was unnecessary and/or not causally related to the alleged accident. However, Reyfman performed the mislabeled service to present the impression of invasive treatment, to improperly bill under CPT code 0101T, and ultimately in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

25.     On or about January 6, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shulkin**, or an employee/agent of **LR Medical** or **Pain Physicians**, at the direction of Shulkin, caused to be electronically transmitted to the NY WCB a report of his December 15, 2022 report recommending steroid injection for Claimant E's back. The recommended injection was unnecessary and/or not causally related to the alleged accident, because there was no "slip and

fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Shulkin, such that Shulkin knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident. Shulkin's employer Reyfman had prematurely diagnosed and referred Claimant E for the injection despite a lack of conservative treatment but pursuant to the fraudulent treatment protocol in order to increase the medical services for which BL Pain Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shulkin caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

26.    On or about February 14, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Reyfman**, or an employee/agent of **LR Medical** or **Pain Physicians**, at the direction of Reyfman, caused to be electronically transmitted to the NY WCB a claim form and report of his January 26, 2023 x-ray of Claimant E's sacroiliac joint, which came back normal. Defendant Reyfman knew or reasonably should have known that this imaging service was not unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back without sacroiliac complaint, records of which were available to Reyfman, such that Reyfman knew or should have known that the x-ray was unnecessary and/or not causally related to the alleged accident. However, Reyfman sou in order to increase the medical services for which Reyfman, LR Medical, and/or Pain Physicians received reimbursement and to

COMPLAINT                                                                         137

increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

27.    Also on or about February 14, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Reyfman**, or an employee/agent of **LR Medical** or **Pain Physicians**, at the direction of Reyfman, caused to be electronically transmitted to the NY WCB a claim form and report of his January 26, 2023 evaluation of Claimant E recommending steroid injection for Claimant E's back. The recommended injection was unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Reyfman, such that Reyfman knew or should have known that the injection was unnecessary and/or not causally related to the alleged accident, and further that the conservative treatment records did not in fact support such a procedure. However, Reyfman had previously prematurely diagnosed and referred Claimant E for the injection pursuant to the fraudulent treatment protocol in order to increase the medical services for which BL Pain Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

28.    The very next day, on or about February 15, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§

1341 or 1343, Defendant **Reyfman**, or an employee/agent of **LR Medical** or **Pain Physicians**, at the direction of Reyfman, caused to be transmitted by mail, email or facsimile to the NY WCB a claim form and report of his January 27, 2023 report recommending outcome assessment tests to determine Claimant E's pain. The recommended assessment was unnecessary and/or not causally related to the alleged accident, because there was no "slip and fall" as subsequently alleged, but rather an alleged injury suffered while attempting to lift a heavy object with subsequent complaints of pain localized to the lower back, records of which were available to Reyfman, such that Reyfman knew or should have known that the outcome assessment was unnecessary and/or not causally related to the alleged accident. However, Reyfman made the recommendation in order to increase the medical services for which BL Pain Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant E's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

vi.     Claimant F

1.     As stated above, (Section III.B.vi), many of the medical services provided to Claimant F were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident in which he first claimed to have fallen when he lost his balance while reaching for a bucket, and fell approximately 4 feet, without any acute injury noted on imaging. Contrary to the misrepresentations of Medical Provider Defendants, he was not admitted due to any acute injury but for a further workup of what appeared to be acute kidney disease. Even at the initial stages of treatment, his alleged injuries and course of treatment were materially inconsistent in that Claimant F's fall without any reported loss of consciousness and hospitalization for acute kidney injury quickly transformed into a) a slip and fall suffered while

COMPLAINT                                                                                                    139

reaching for a bucket, b) fell and hit his back against a metal ladder which was standing against the opposite wall, and still later c) metamorphized into an alleged incident in which he was allegedly "cutting concrete floor and lost consciousness and fell down backward." Upon information and belief, these deliberate alterations were made to further the fraudulent treatment protocol while presenting the claim as not only legitimate but severe. As such, each of the below medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent.

2. On or about April 1, 2020, **Runner Defendants** recruited and/or introduced Claimant F to **Liakas Defendants** who referred Claimant F to the Medical Provider Defendants for purported diagnosis and treatment of medical conditions allegedly caused by a purported injury of March 16, 2020 during the course of Claimant F's employment with a construction company. Claimant F, subsequently, was assisted by the Defendants to undergo diagnostic and treatment protocols that were unnecessary and were unrelated to the alleged accident for which Claimant F was compensated. Upon information and belief, the acts and conducts of the Defendants were effectuated, in part by means of telephone calls, texts, emails and use of the mails, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud,) and NY Penal Code § 215 (bribery).

3. On or about December 11, 2020 in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, **Dean Liakas** of the **Liakas Firm** verified the complaint which was electronically filed with the Bronx County

Supreme Court of the State of New York, dated December 11, 2020 falsely attesting to the construction accident, the existence and/or extent of Claimant F's injuries, and the necessity of Claimant F's medical treatment.

4.     On or about March 21, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be transmitted by mail, email or facsimile to defense counsel Claimant F's authorization to disclose workers' compensation records along with a power of attorney signed by Dean Liakas appointing the Liakas Firm to execute HIPAA releases on behalf of Claimant F for the release of Claimant F's medical records that Liakas Defendants knew or reasonably should have known were false.

5.     On or about July 27, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to the NY WCB a request to address additional sites (bilateral shoulders and bilateral knees) as requested by Defendant **Capiola** of **NY S&J**, attaching Capiola's July 16, 2020 Initial Examination Report of Claimant F. The Liakas Defendants and Capiola knew or should reasonably have known that the requested medical services for additional sites were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet Capiola misreported that the incident involved a fall from a scaffold. The emergency room records were available to Liakas Defendants and Capiola, such that Liakas Defendants and Capiola knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Capiola provided such medical

services in order to increase the services for which the NYS&J received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Liakas Defendants caused Capiola's report to be transmitted by mail, facsimile or email in order to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud in order to increase the medical services for which McCulloch Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

6.    On or about September 16, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to the NY WCB a request to approve left knee arthroscopy by Defendant **Capiola**. The Liakas Defendants knew or should reasonably have known that the requested surgery was unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging that did not include any complaints of knee pain, and Claimant F was admitted due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet Capiola misreported that the incident involved a fall from a scaffold in order to perform unrelated and causally unnecessary knee surgery. The emergency room records were available to Liakas Defendants and Capiola, such that Liakas Defendants and Capiola knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Capiola provided such medical services in order to increase the services for which NYS&J received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Liakas Defendants

COMPLAINT                                                                                   142

caused Capiola's report to be transmitted by mail, facsimile or email in order to support Claimant C's workers' compensation claim and personal injury lawsuit in furtherance of and as a necessary step for the execution of the scheme to defraud in order to increase the medical services for which McCulloch Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

       7.     On or about July 8, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be faxed to NY WCB a Doctor's Initial Report and a report of his March 27, 2020 initial evaluation of Claimant F recommending various imaging services, course of physical therapy consisting of hot and cold packs, medical massage, ultrasound, high voltage electrical stimulation and special exercise, and referring Claimant F to be evaluated by neurologist, orthopedist, chiropractor and acupuncturist. The medical services were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet Shusterman misreported that during the fall, Claimant F hit his back against a metal ladder which was standing against the opposite wall, he also hit his head entire body against the ground." The emergency room records were available to Shusterman, such that Shusterman knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Shusterman provided such medical services in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shusterman caused his report to be transmitted by mail, facsimile or email

to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

8.      On or about July 9, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be faxed to NY WCB a Doctor's Progress Report stating that he actively supervised the physical therapy treatments provided by Defendant **Evaristo** to Claimant F from May 25, 2020 to June 10, 2020 and providing PT Progress Notes. The physical therapy sessions were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet now allegedly necessitated treatment to both shoulders, on some occasions an unspecified knee and both ankles. The emergency room records were available to Shusterman, such that Shusterman knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Shusterman provided such medical services in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shusterman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

9.      On or about October 1, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be faxed to NY WCB a Doctor's Progress Report stating that he actively supervised the physical

COMPLAINT                                                                                      144

therapy treatments provided by Defendant **Evaristo** to Claimant F from August 3, 2020 to August 17, 2020 and providing PT Progress Notes. The physical therapy sessions were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet now allegedly necessitated treatment to both shoulders, on some occasions an unspecified knee and both ankles. The emergency room records were available to Shusterman, such that Shusterman knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Shusterman supervised Evaristo's provision of physical therapy in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shusterman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

10.     On or about June 9, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be electronically transmitted to NY WCB a request for approval of variance and a report of his June 2, 2021 follow-up examination report of Claimant F, recommending continued post-operative physical therapy and finding Claimant F to be "totally disabled." The medical services were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, and therefore neither the

surgery nor post-surgical physical therapy were necessary or causally related to the incident as truthfully reported by Claimant F to emergency room personnel or to his nephrologist. The emergency room records were available to Shusterman, such that Shusterman knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Shusterman provided such medical services in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shusterman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

11.     On or about July 21, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Evaristo**, or an employee/agent of **Englinton Med**, at the direction of Evaristo, caused to be faxed to the NY WCB a Doctor's Progress Report and PT Progress Notes for physical therapy treatments provided to Claimant F from June 22, 2021 to July 6, 2021. The physical therapy sessions were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet now allegedly necessitated treatment to both shoulders, on some occasions an unspecified knee and both ankles. The emergency room records were available to Evaristo, such that Evaristo knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Shusterman provided such physical therapy services in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers'

COMPLAINT                                                                                            146

compensation claim and personal injury lawsuit settlement value. Upon information and belief, Evaristo caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

12.    On or about September 9, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Evaristo**, or an employee/agent of **Englinton Med**, at the direction of Evaristo, caused to be faxed to NY WCB a Doctor's Progress Report and PT Progress Notes for physical therapy treatments provided to Claimant F from July 12, 2021 to August 4, 2021. The physical therapy sessions were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet now allegedly necessitated treatment to both shoulders, on some occasions an unspecified knee and both ankles. The emergency room records were available to Evaristo, such that Evaristo knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Shusterman provided such physical therapy services in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Evaristo caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

13.    On or about May 4, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Simhaee**,

COMPLAINT                                                                    147

or an employee/agent of **Brooklyn Premier**, at the direction of Simhaee, caused to be faxed to NY WCB a request for approval of variance, physical/occupational therapy referral and April 24, 2020 report of pain management assessment recommending physical therapy and cervical and lumbar steroid injections. The requested therapy and injections were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, and therefore neither physical therapy nor epidural steroid injections were necessary or causally related to the incident as truthfully reported by Claimant F to emergency room personnel or to his nephrologist. The emergency room records were available to Simhaee, such that Simhaee knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Simhaee referred Claimant F for physical therapy and epidural steroid injections that were further not in conformity with the Guidelines  in order to increase the medical services for which Brooklyn Premier Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Simhaee caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

14.    On or about July 15, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Cohen**, or an employee/agent of **Gotham Neurosurgery**, at the direction of Cohen, caused to be faxed to NY WCB a Doctor's Initial Report and a report of his March 26, 2020 neurosurgical consultation of Claimant F. Although Claimant F had previously denied a loss of consciousness, Cohen's report noted that Claimant F had a loss of consciousness at the scene. The medical services were

COMPLAINT                                                                148

unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness. The emergency room records were available to Cohen, such that Cohen knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Cohen falsely alleged that Claimant F suffered a loss of consciousness and claimed that hospitalization was for five days without disclosing that the hospitalization was for acute kidney disease in order to increase the medical services for which Gotham Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Cohen caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

15.     On or about March 17, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Cohen**, or an employee/agent of **Gotham Neurosurgery**, at the direction of Cohen, caused to be faxed to NY WCB a Doctor's Progress Report and a report of his October 7, 2020 neurosurgical pre-operative consultation of Claimant F. The medical services were unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness. The emergency room records were available to Cohen, such that Cohen knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. Further, Cohen falsely stated that Claimant F failed conservative care, though contemporaneous physical therapy notes demonstrate no such failure,

COMPLAINT                                                                149

and even as of October 6, 2020 did not even include complaints of or alleged treatment to the cervical region. However, Cohen provided his consultation report in order to justify an otherwise unnecessary and causally unrelated operation in order to increase the medical services for which Gotham Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Cohen caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

16.    On or about January 27, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Cohen**, or an employee/agent of **Gotham Neurosurgery**, at the direction of Cohen, caused to be transmitted by mail, email or facsimile to the NY WCB a report of the January 27, 2023 operative report of the L5/S1 back surgery he performed on Claimant F. The surgery was unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness. The emergency room records were available to Cohen, such that Cohen knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. Further, Cohen falsely stated that Claimant F failed conservative care, though contemporaneous physical therapy notes demonstrate no such failure, and even as of October 6, 2020 did not even include complaints of or alleged treatment to the cervical region. However, Cohen performed the unnecessary and causally unrelated operation in order to increase the medical services for which Gotham Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Cohen caused his report to be

transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

17.    On or about August 7, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Capiola**, or an employee/agent of **NY S&J** and/or **McCulloch Ortho**, at the direction of Capiola and/or McCulloch, caused to be electronically transmitted to NY WCB a Doctor's Initial Report and a report of his July 16, 2020 initial examination of Claimant F noting that Claimant F's right knee MRI demonstrates a tear, left shoulder MRI demonstrates a rotator cuff tendon tear, and left knee MRI demonstrate synovitis and tear in an attempt to misrepresent those findings as causally related to the alleged injury. The testing and relaying of same was unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness. The emergency room records were available to Capiola, such that Capiola knew or should have known that the imaging studies were unnecessary and/or not causally related to the alleged accident, which he misreported as involving a fall from 'scaffolding,' as well as misrepresenting the basis for Claimant F's hospitalization. However, Capiola provided his report along with imaging study reports in order to increase the services for which NYS&J received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Capiola caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

18.    On or about February 23, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant

**Capiola**, or an employee/agent of **McCulloch Ortho**, at the direction of Capiola and/or McCulloch, caused to be electronically transmitted to NY WCB a Doctor's Progress Report and a report of his February 1, 2021 follow up examination of Claimant F recommending left shoulder arthroscopy and right knee arthroscopy. The recommended surgery was unnecessary and/or not causally related because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness. The emergency room records were available to Capiola, such that Capiola knew or should have known that the imaging studies were unnecessary and/or not causally related to the alleged accident, which he misreported as involving a fall from "scaffolding" and now also "down stairs". However, Capiola recommended surgery despite the lack of any actual failure of conservative care in order to increase the medical services for which McCulloch Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Cohen caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

19.    On or about May 11, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Capiola**, or an employee/agent of **McCulloch Ortho**, at the direction of Capiola and/or McCulloch, caused to be transmitted by mail, email or facsimile to the NY WCB an operative report of the right knee surgery he performed on Claimant F on April 28, 2023. The surgery was unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness. The emergency room

COMPLAINT                                                                                                        152

records were available to Capiola, such that Capiola knew or should have known that the imaging studies were unnecessary and/or not causally related to the alleged accident, which he misreported as involving a fall from "scaffolding" and as "down stairs." However, Capiola performed surgery despite the lack of any contemporaneous failure of conservative care in order to increase the medical services for which McCulloch Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Capiola caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

20.     On or about October 17, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Capiola**, or an employee/agent of **McCulloch Ortho**, at the direction of Capiola and/or McCulloch, caused to be transmitted by mail, email or facsimile to the NY WCB an operative report of the left knee surgery he performed on Claimant F on August 25, 2023. The surgery was unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness. The emergency room records were available to Capiola, such that Capiola knew or should have known that the imaging studies were unnecessary and/or not causally related to the alleged accident, which he misreported as involving a fall from "scaffolding" and as "down stairs." Capiola performed surgery despite the lack of any contemporaneous failure of conservative care, as physical therapy notes reflected not only that the claimant was tolerating treatment well, but that it was being provided to the right knee, not the left. Capiola performed the unnecessary surgery in order to increase the medical

COMPLAINT                                                                                   153

services for which McCulloch Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Capiola caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

21.     On or about August 23, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Reyfman**, or an employee/agent of **BL Pain** and/or **Pain Physicians**, at the direction of Reyfman and/or Kosharskyy, caused to be mailed to NY WCB a Doctor's Initial Report and a report of his July 23, 2021 examination of Claimant F falsely noting a direct causal relationship between the describe accident and current injuries and recommending steroid injections. The report was false because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet Reyfman failed to provide any cognizable account of alleged injury beyond the opaque statement that it was "a result of a work injury." The emergency room records were available to Reyfman, such that Reyfman knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Reyfman and/or Kosharskyy provided such medical services in order to increase the medical services for which McCulloch Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

COMPLAINT                                                                              154

22.     On or about August 23, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Reyfman**, or an employee/agent of **BL Pain** and/or **Pain Physicians**, at the direction of Reyfman and/or Kosharskyy, caused to be mailed to NY WCB a Doctor's Progress Report and a report of his July 23, 2021 examination of Claimant F recommending outcome assessment testing to determine Claimant F's disability and impairment. The recommended testing was unnecessary and/or not causally related to the alleged accident, because the emergency room records documented minor injuries not appearing on imaging, and admission due to acute kidney disease following a reported four-foot fall without loss of consciousness, yet Reyfman failed to provide any cognizable account of alleged injury beyond the opaque statement that it was "a result of a work injury." The emergency room records were available to Reyfman, such that Reyfman knew or should have known that the medical services were unnecessary and/or not causally related to the alleged accident. However, Reyfman and/or Kosharskyy provided such medical services in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant F's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

vii. Claimant G

1.     As stated above, (Section III.B.vii), many of the medical services provided to Claimant G were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because his date and account of alleged injury was completely changed after an alleged fall which he claimed spanned one flight of stairs, which he informed emergency room personnel on November 8, 2020 had happened two days earlier, which

COMPLAINT                                                                                             155

would have been November 6, 2020 rather than either October 6, 2020 or October 16, 2020 as later claimed. While a fall on permanent stairs does not qualify under the applicable section of New York's Labor Law, his later claimed fall off of a ladder would facially qualify. As such, each of the below medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

2.      On or about October 6, 2020, **Runner Defendants** recruited and/or introduced Claimant G to Liakas Defendants who referred Claimant G to the Medical Provider Defendants for purported diagnosis and treatment of medical conditions allegedly caused by a purported injury of that date during the course of Claimant G's employment with a construction company. Claimant G, subsequently, was assisted by the Defendants to undergo diagnostic and treatment protocols that were unnecessary and were unrelated to the alleged accident for which Claimant G was compensated. Upon information and belief, the acts and conducts of the Defendants were effectuated, in part by means of telephone calls, texts, emails and use of the mails, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud,) and NY Penal Code § 215 (bribery).

3.      On or about November 17, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to the NY WCB a C-3 Employee Claim on behalf of Claimant G dated November 9, 2020 falsely attesting to the

construction accident, the existence and/or extent of Claimant G's injuries, and the necessity of Claimant G's medical treatment.

4.    On or about March 17, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, **Dean Liakas** of the **Liakas Firm** verified the complaint which was electronically filed with the Queens County Supreme Court of the State of New York, dated March 17, 2021 falsely attesting to the construction accident, the existence and/or extent of Claimant G's injuries, and the necessity of Claimant G's medical treatment.

5.    On or about September 13, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be transmitted by mail, email or facsimile to defense counsel Claimant G's authorization to disclose workers' compensation records along with a power of attorney signed by Dean Liakas appointing the Liakas Firm to execute HIPAA releases on behalf of Claimant G for the release of Claimant G's medical records that Liakas Defendants knew or reasonably should have known were false.

6.    On or about July 12, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Ehrlich**, or an employee/agent of **OrthoCare Surgical**, at the direction of Ehrlich, caused to be faxed to **Liakas Firm** the operative report of Claimant G's July 12, 2022 left knee surgery. The surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Ehrlich, such that Ehrlich knew or should have known that the left knee surgery was unnecessary and/or not causally related to the alleged accident dated to

COMPLAINT                                                        157

'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, as reported by the hospital, and further that there was a significant gap in conservative treatment prior to that time. However, Ehrlich performed the surgery in order to increase the medical services for which OrthoCare Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Ehrlich caused his report to be transmitted to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

7.      On or about September 13, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Ehrlich**, or an employee/agent of **OrthoCare Surgical**, at the direction of Ehrlich, caused to be transmitted electronically to NY WCB, a claim form and operative report of Claimant G's July 12, 2022 left knee surgery. The surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Ehrlich, such that Ehrlich knew or should have known that the left knee surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, and further that there was a significant gap in conservative treatment prior to that time. However, Ehrlich performed the surgery in order to increase the medical services for which OrthoCare Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

8.      On or about September 1, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kumar**, or an employee/agent of **Total Ortho**, at the direction of Kumar, caused to be

COMPLAINT                                                                                    158

electronically transmitted to NY WCB a claim form and report of the June 22, 2022 back surgery he performed on Claimant G. The surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Kumar, such that Kumar knew or should have known that the back surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, and further that there was a significant gap in conservative treatment prior to the date of surgery. However, Kumar performed the surgery in order to increase the medical services for which Total Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kumar caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

9.    On or about December 7, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kumar**, or an employee/agent of **Total Ortho**, at the direction of Kumar, caused to be electronically transmitted to NY WCB a claim form and report of his November 29, 2022 examination of Claimant G following up on back surgery. The post-operative evaluation which followed an unnecessary surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Kumar, such that Kumar knew or should have known that the back surgery and subsequent post-surgical evaluation was unnecessary and/or not causally related to the alleged accident dated to 'October

6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, and further that there was a significant gap in conservative treatment prior to the date of surgery. However, Kumar performed the surgery in order to increase the medical services for which Total Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kumar caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

10.    On or about July 26, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Jeyamohan**, or an employee/agent of **Total Ortho**, at the direction of Jeyamohan, caused to be electronically transmitted to NY WCB a claim form dated July 19, 2022 and a report of the June 22, 2022 back surgery he and Defendant **Kumar** performed on Claimant G. The surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Jeyamohan, such that Jeyamohan knew or should have known that the back surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, and further that there was a significant gap in conservative treatment prior to the date of surgery. However, Jeyamohan and Kumar performed the surgery in order to increase the medical services for which Total Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Jeyamohan caused his report to be transmitted by mail, facsimile or email

COMPLAINT                                                          160

to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

11.     On or about September 1, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Jeyamohan**, or an employee/agent of **Total Ortho**, at the direction of Jeyamohan, caused to be electronically transmitted to NY WCB a claim form dated August 30, 2022 and a report of the June 22, 2022 back surgery he and Defendant **Kumar** performed on Claimant G. The surgery was unnecessary and/or not causally related to the alleged accident, and was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Jeyamohan, such that Jeyamohan knew or should have known that the back surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,''October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, and further that there was a significant gap in conservative treatment prior to the date of surgery. However, Jeyamohan and Kumar performed the surgery in order to increase the medical services for which Total Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Jeyamohan caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

12.     On or about August 6, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Reyfman**, or an employee/agent of **BL Pain** and **Pain Physicians**, at the direction of Reyfman and/or Kosharskyy, caused to be mailed to NY WCB a Doctor's Initial Report and report of his

June 25, 2021 examination of Claimant G falsely noting that "there is a direct causal relationship between the accident described and the patient's current injuries." The evaluation was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Reyfman, such that Reyfman knew or should have known that the back surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, and further that there was a significant gap in conservative treatment prior to the date of surgery. However, Reyfman performed the evaluation in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

13.    On or about October 21, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Reyfman**, or an employee/agent of **BL Pain** and **Pain Physicians**, at the direction of Reyfman, caused to be faxed to NY WCB a claim form and report of his June 25, 2021 which he falsely stated was 'extracorporeal shock wave therapy' but which was in fact noninvasive radial pressure wave treatment for Claimant G. The misreported therapy was unnecessary and/or not causally related to the alleged accident, because was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Reyfman, such that Reyfman knew or should have known that the back surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October

COMPLAINT                                                                                       162

16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Reyfman performed the mislabeled service to present the impression of invasive treatment, to improperly bill under CPT code 0101T, and ultimately to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Reyfman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

14.     On or about December 16, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kosharskyy**, or an employee/agent of **BL Pain** and **Pain Physicians**, at the direction of Kosharskyy and/or Reyfman, caused to be electronically transmitted to NY WCB a claim form and report of his November 23, 2022 epidural steroid injection provided to Claimant G. The injection was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Kosharskyy, such that Kosharskyy knew or should have known that the back surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,''October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, and further that there was a significant gap in conservative treatment prior to the date of injection. However, Kosharskyy performed the injection in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kosharskyy caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

COMPLAINT                                                                                    163

15.     On or about June 19, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Demetrios Koutsospyros, MD or an employee/agent of **BL Pain** and **Pain Physicians**, at the direction of Kosharskyy and/or Reyfman, caused to be electronically transmitted to NY WCB a claim form and report of his June 6, 2022 which he falsely stated was 'extracorporeal shock wave therapy' but which was in fact noninvasive radial pressure wave treatment for Claimant G. The misreported therapy was unnecessary and/or not causally related to the alleged accident, because was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Koutsospyros, Kosharskyy, and Reyfman, such that Koutsospyros, Kosharskyy, and Reyfman knew or should have known that the back surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Koutsospyros performed the mislabeled service to present the impression of invasive treatment, to improperly bill under CPT code 0101T, and ultimately in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Koutsospyros caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

16.     On or about December 16, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dr. Koutsospyros, or an employee/agent of **BL Pain** and **Pain Physicians**, at the direction of Kosharskyy and/or Reyfman, caused to be electronically transmitted to NY WCB a claim form and report of his

November 21, 2022 ultrasound examination of Claimant G's cervical spine. The ultrasound was not supported by the account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Koutsospyros, Kosharskyy, and Reyfman, such that Koutsospyros, Kosharskyy, and Reyfman knew or should have known that the back surgery was unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,''October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020, and further that there was a significant gap in conservative treatment prior to the date of injection. However, Koutsospyros performed the examination in order to increase the medical services for which BL Pain Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Koutsospyros caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

17.     On or about February 5, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be faxed to NY WCB a Doctor's Initial Report  and a report of his November 11, 2020 initial evaluation of Claimant G, requesting MRIs of cervical and lumbar spine to rule out disc herniation, MRI of right shoulder, bilateral knees and right ankle to rule out internal derangement. He also referred Claimant G for physical therapy and consultation with a neurologist, chiropractor and acupuncturist. The evaluation and recommendations were not supported by the date or account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Shusterman, such that Shusterman knew or should have known

COMPLAINT                                                                          165

that the evaluation and referrals were unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Shusterman performed the evaluation in order to increase the medical services for which Englinton Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shusterman caused his report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

18.     On or about August 31, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Shusterman**, or an employee/agent of **Englinton Med**, at the direction of Shusterman, caused to be faxed to NY WCB a Doctor's Progress Report and a report of his March 15, 2021 examination again requesting MRIs of cervical and lumbar spine to rule out disc herniation, MRI of right shoulder, bilateral knees and right ankle to rule out internal derangement. Thos evaluation and recommendations were not supported by the date or account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Shusterman, such that Shusterman knew or should have known that the evaluation and referrals remained unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Shusterman performed the evaluation and sought referrals in order to increase the medical services for which Englinton Defendants received/would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Shusterman caused his report to be transmitted by mail, facsimile or email

to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

19.    On or about May 31, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Evaristo**, or an employee/agent of **Englinton Med**, at the direction of Evaristo, caused to be faxed to NY WCB a claim form and notes of physical therapy sessions for Claimant G from April 16 to April 21, 2021. The physical therapy sessions were not supported by the date or account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Evaristo, such that Evaristo knew or should have known that the purported treatments were unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,''October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Evaristo provided therapy sessions that allegedly included 25 minutes of active therapy to indeterminate areas in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Evaristo caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

20.    On or about December 24, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Evaristo**, or an employee/agent of **Englinton Med**, at the direction of Evaristo, caused to be faxed to NY WCB a claim form and notes of physical therapy sessions for Claimant G from November 5 to November 9, 2021. The physical therapy sessions were not supported by the date or account of alleged accident as initially described and reported by Claimant G to Columbia University

Hospital, which were available to Evaristo, such that Evaristo knew or should have known that the purported treatments were unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Evaristo provided therapy sessions that allegedly included 25 minutes of active therapy to indeterminate areas in order to increase the medical services for which Englinton Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Evaristo caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

21.     On or about February 11, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kostin**, or an employee/agent of **Upward Med**, at the direction of Kostin, caused to be faxed to NY WCB a Doctor's Progress Report dated February 10, 2021 and note of acupuncture treatment on December 17, 2020. The acupuncture treatment was not supported by the date or account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Kostin, such that Kostin knew or should have known that the purported treatments were unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Kostin allegedly provided acupuncture to the neck, knees, and/or possibly the lower back sin order to increase the medical services for which Kostin Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused his reports to be transmitted by mail,

COMPLAINT                                                                                              168

facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

22.    On or about March 11, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kostin**, or an employee/agent of **Upward Med**, at the direction of Kostin, caused to be faxed to NY WCB, a Doctor's Progress Report dated February 10, 2022, notes of acupuncture treatment from January 12, 2022 to February 3, 2022, and report of his re-evaluation on January 12, 2022, recommending continued course of acupuncture treatment. The acupuncture treatments and evaluation were not supported by the date or account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Kostin, such that Kostin knew or should have known that the purported treatments were unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,' 'October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Kostin allegedly provided acupuncture to either the right ankle as per his bill, or the neck, knees and lower back as per his SOAP notes in order to increase the medical services for which Kostin Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

23.    On or about April 2, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Kostin**, or an employee/agent of **Upward Med**, at the direction of Kostin, caused to be faxed to NY WCB, a Doctor's Progress Report dated March 22, 2022, notes of acupuncture treatment from November

3, 2021 to February 9, 2022, and report of his re-evaluation on February 8, 2022, recommending continued course of acupuncture treatment. The acupuncture treatments and re-evaluation were not supported by the date or account of alleged accident as initially described and reported by Claimant G to Columbia University Hospital, which were available to Kostin, such that Kostin knew or should have known that the purported treatments were unnecessary and/or not causally related to the alleged accident dated to 'October 6, 2020,''October 16, 2020,' but reported to the Columbia University Hospital as November 6, 2020. However, Kostin allegedly provided acupuncture to either the right ankle as per his bill, or the neck, knees and lower back as per his SOAP notes in order to increase the medical services for which Kostin Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused his reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant G's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

viii.    <u>Claimant H</u>

1.    As stated above, (Section III.B.viii), many of the medical services provided to Claimant H were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, yet the claimant's subsequent treatment failed to address that in favor of applying the predetermined fraudulent treatment protocol to various body parts irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures. As such, each of the below medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a

COMPLAINT                                                                                          170

necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

2.      On or about February 15, 2021, **Runner Defendants** recruited and/or introduced Claimant H to Liakas Defendants who referred Claimant H to the Medical Provider Defendants for purported diagnosis and treatment of medical conditions allegedly caused by a purported injury of that date during the course of Claimant H's employment with a construction company. Claimant H, subsequently, was assisted by the Defendants to undergo diagnostic and treatment protocols that were unnecessary and were unrelated to the alleged accident for which Claimant H was compensated. Upon information and belief, the acts and conducts of the Defendants were effectuated, in part by means of telephone calls, texts, emails and use of the mails, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud,) and NY Penal Code § 215 (bribery).

3.      On or about February 23, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be emailed to the NY WCB a C-3 Employee Claim on behalf of Claimant H dated February 19, 2021 falsely attesting to the construction accident, the existence and/or extent of Claimant H's injuries, and the necessity of Claimant H's medical treatment.

4.      On or about February 26, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, **Dean Liakas** of the **Liakas Firm** verified the complaint which was electronically filed with the Bronx County Supreme Court of the State of New York, dated February 26, 2021falsely attesting to the

construction accident, the existence and/or extent of Claimant H's injuries, and the necessity of Claimant H's medical treatment.

5.    On or about September 21, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be faxed to the NY WCB a report of Defendant **Ehrlich's** (of **OrthoCare Surgical**) August 19, 2021 left knee surgery. The left knee surgery was unnecessary and unrelated because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the left knee surgery. The procedure was further unnecessary since it falsely represented that Claimant H failed conservative treatment despite a lack of conservative treatment provided to the left knee prior to the surgery and a significant gap in any conservative treatment allegedly performed prior to the surgery, records of which were available to Liakas Defendants and to Ehrlich, such that Liakas Defendants and Ehrlich knew or should have known that the surgery was unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Ehrlich performed the surgery, and Liakas Defendants transmitted the surgery record in order to increase the medical services for which Brooklyn Premier Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

6.    On or about October 26, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**,

COMPLAINT                                                                                           172

at the direction of **Dean Liakas**, caused to be emailed to NY WCB the fax cover sheet and report received on October 14, 2021 from Defendant **Ehrlich** of **OrthoCare Surgical** of Ehrlich's September 14, 2021 post-op examination of Claimant H following a left shoulder surgery. The left shoulder surgery and its follow-up evaluation were unnecessary and unrelated because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the left shoulder surgery. The procedure was further unnecessary since it falsely represented that Claimant H failed conservative treatment despite a significant gap in any conservative treatment allegedly performed prior to the surgery, records of which were available to Liakas Defendants and to Ehrlich, such that Liakas Defendants and Ehrlich knew or should have known that the surgery and its post-operative report were unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Ehrlich performed the surgery, and Liakas Defendants transmitted the surgery record in order to increase the medical services for which Brooklyn Premier Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

7.      On or about January 27, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be faxed to the NY WCB a report of Claimant H's back surgery performed by Defendant **Vora** of **Brooklyn Premier** on January 25, 2022. The Liakas Defendants knew or should reasonably have known that the surgery was unnecessary and/or not

COMPLAINT                                                                                            173

causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the lower back irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the lower back surgery. The procedure was further unnecessary since it falsely represented that Claimant H "had attempted non-surgical treatment in the form of physical therapy as well as epidural steroid injection without much benefit" despite a gap in any conservative treatment allegedly performed for at least one month prior to the surgery and which were assessed as tolerated well by Claimant H, records of which were available to Liakas Defendants and to Vora, such that Liakas Defendants and Vora knew or should have known that the surgery and its post-operative report were unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Vora performed the surgery, and Liakas Defendants transmitted the surgery record in order to increase the medical services for which Brooklyn Premier Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

8.      On or about April 7, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, the **Liakas Firm**, at the direction of **Dean Liakas**, caused to be faxed to the NY WCB a report of Claimant H's left ankle surgery allegedly performed by Daniel Popowitz, M.D. of **Brooklyn Premier** on April 4, 2022. The Liakas Defendants knew or should reasonably have known that the surgery was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of

COMPLAINT                                                                                    174

preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the left ankle irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the alleged left ankle surgery. The procedure was further questionable since it was not preceded by any conservative treatment to the area prior to the surgery and because physical therapy records and re-evaluation conducted on April 19, 2022 – a mere two weeks after the alleged surgery – failed to note any complaints of pain to either ankle, much less any recent surgery to the ankle. These records were available to Liakas Defendants and to Popowitz, such that Liakas Defendants and Popowitz knew or should have known that the surgery and its post-operative report were unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Popowitz allegedly performed and Brooklyn Premier did bill for the surgery, and Liakas Defendants transmitted the surgery record in order to increase the medical services for which Brooklyn Premier Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

9. On or about November 12, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Vora**, or an employee/agent of **Brooklyn Premier**, at the direction of Defendant Vora, caused to be faxed to the NY WCB a request for authorization for back surgery along with report of Lenox Hill Radiology's March 3, 2021 MRI lumbar spine performed at Defendant **Lerner**'s request and report of his November 11, 2021 initial evaluation of Claimant H. The requested surgery was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely

exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the lower back irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the lower back surgery. The evaluation failed to set forth any sufficient basis for lumbar decompression or lumbar fusion as required by sections E.3 and E.4, respectively, of the Low Back Guideline, and was not supported by contemporaneous conservative care notes, records of which were available to Vora, such that Vora knew or should have known that the surgery was unnecessary and/or not causally related to the alleged accident. However, Vora requested to perform the surgery din order to increase the medical services for which Brooklyn Premier Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Vora caused the reports to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

10.     On or about August 15, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant **Vora**, or an employee/agent of **FJ Ortho** and/or **Brooklyn Premier**, at the direction of Defendant Vora, caused to be electronically transmitted to the NY WCB a claim form and report of his July 28, 2022 examination of Claimant H recommending continued physical therapy for lower back and ordering "fresh x-rays of the lumbar spine." The evaluation and recommendations were false when made because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the lower back irrespective of the initially claimed injury, which was subsequently altered to justify

the additional procedures, including lower back treatment and surgery, records of which were available to Vora, such that Vora knew or should have known that the surgery was unnecessary and/or not causally related to the alleged accident. However, Vora requested further physical therapy and x-rays in order to increase the medical services for which Brooklyn Premier Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Vora caused the report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

11.      On or about January 25, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Vora**, or an employee/agent of **Brooklyn Premier**, at the direction of Defendant Vora, caused to be transmitted by mail, email or facsimile to the **Liakas Firm** a report of the January 25, 2022 surgery Vora performed on Claimant H's back. The surgery was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the lower back irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the lower back surgery. The procedure was further unnecessary since it falsely represented that Claimant H "had attempted non-surgical treatment in the form of physical therapy as well as epidural steroid injection without much benefit" despite a gap in any conservative treatment allegedly performed for at least one month prior to the surgery and which were assessed as tolerated well by Claimant H, records of Vora, such that Vora knew or should have known that the surgery and its post-

COMPLAINT                                                                                                  177

operative report were unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Vora performed the surgery and transmitted the report and bill in order to increase the medical services for which Brooklyn Premier Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

12.    On or about December 20, 2021, **FJ Ortho** and/or **Brooklyn Premier**, at the direction of Defendant **Horowitz**, caused to be transmitted by mail, email or facsimile to the NY WCB claim form and report of Dr. Popowitz's evaluation of Claimant H and the steroid injection administered to Claimant H's left ankle on November 24, 2021. The injection was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the left ankle irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the evaluation and epidural steroid injection performed with remarkable rapidity on the same date as Popowitz' initial evaluation. The procedure was further questionable since the physical therapy notes proximate to the date of the alleged evaluation failed to even note complaints of ankle pain, much less conservative treatment that Popowitz claimed had failed. These records were available to Popowitz, such that Popowitz knew or should have known that the surgery and its post-operative report were unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Popowitz recommended and then performed the injection on his initial evaluation in order to increase the medical services for which Brooklyn Premier Defendants

COMPLAINT                                                                178

received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Popowitz caused the report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

13.    On or about April 6, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Dr. Popowitz, or an employee/agent of **Brooklyn Premier** and/or **FJ Ortho**, at the direction of Defendant Horowitz, caused to be transmitted by mail, email or facsimile to **Liakas Firm** a report of the April 4, 2022 surgery he performed on Claimant H's left ankle. The surgery was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the left ankle irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the alleged left ankle surgery. The procedure was further questionable since it was not preceded by any conservative treatment to the area prior to the surgery and because physical therapy records and re-evaluation conducted on April 19, 2022 – a mere two weeks after the alleged surgery – failed to note any complaints of pain to either ankle, much less any recent surgery to the ankle. These records were available to Popowitz, such that Popowitz knew or should have known that the surgery and its post-operative report were unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Popowitz allegedly performed and Brooklyn Premier did transmit the bill for the surgery in order to increase the medical services for which Brooklyn Premier Defendants received

COMPLAINT                                                                                   179

reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

            14.     On or about April 18, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dr. Popowitz, or an employee/agent of **FJ Ortho** and/or **Brooklyn Premier**, at the direction of Defendant Horowitz, caused to be electronically transmitted to the NY WCB a claim form and report of his March 16, 2022 evaluation of Claimant H's left ankle pain recommending continued physical therapy and arthroscopy surgery. The recommended medical services were unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the left ankle irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the alleged left ankle surgery recommended by Popowitz. The recommended procedure was further questionable since it was not preceded by any conservative treatment to the area at any time proximate to the proposed surgery, records of which were available to Popowitz, such that Popowitz knew or should have known that the proposed surgery was unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Popowitz recommended the surgery in order to increase the medical services for which Brooklyn Premier Defendants would receive reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Popowitz caused the report to be transmitted by mail, facsimile or email to

Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

15.    On or about June 13, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dr. Popowitz, or an employee/agent of **FJ Ortho** and/or **Brooklyn Premier**, at the direction of Defendant Horowitz, caused to be electronically transmitted to the NY WCB a claim form and report of his May 11, 2022 evaluation of left ankle pain finding Claimant H 100% disabled and that his injuries and current disability and need for treatment "are causally and directly related to the work-related accident" that occurred fifteen months earlier. Upon information and belief, Popowitz caused the report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

16.    On or about July 29, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Lerner**, or an employee/agent of **Precision Pain**, at the direction of Defendant Lerner, caused to be mailed to the NY WCB a Doctor's Progress Report dated July 12, 2021 and operative report of April 9, 2021 cervical epidural steroid injection. The injection was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the lower back irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the cervical epidural steroid injection that was performed even as the claimant continued to receive physical therapy without any indication of failure, records  of which were available to Lerner, such that Lerner knew or

should have known that the cervical epidural steroid injection was unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Lerner performed the evaluation and the epidural steroid injection in order to increase the medical services for which Precision Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lerner caused the report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

17.      On or about July 29, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Lerner**, or an employee/agent of **Precision Pain**, at the direction of Defendant Lerner, caused to be mailed to the NY WCB a claim form dated July 12, 2021 and operative report of May 27, 2021 lumbar epidural steroid injection. The injection was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the lower back irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the cervical epidural steroid injection that was performed even as the claimant continued to receive physical therapy without any indication of failure, records  of which were available to Lerner, such that Lerner knew or should have known that the cervical epidural steroid injection was unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Lerner performed the evaluation and the epidural

COMPLAINT                                                                                              182

steroid injection in order to increase the medical services for which Precision Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lerner caused the report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

18.    On or about July 22, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Lerner**, or an employee/agent of **Precision Pain**, at the direction of Defendant Lerner, caused to be transmitted by mail, email or facsimile to the NY WCB a Doctor's Progress Report and operative report of July 22, 2021 cervical epidural steroid injection. The injection was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts including the lower back irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the cervical epidural steroid injection that was performed even as the claimant continued to receive physical therapy without any indication of failure, records of which were available to Lerner, such that Lerner knew or should have known that the cervical epidural steroid injection was unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Lerner performed the evaluation and the epidural steroid injection in order to increase the medical services for which Precision Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Lerner caused the report to be

COMPLAINT                                                                                      183

transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

19.    On or about September 10, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendant **Ehrlich**, or an employee/agent of **OrthoCare Surgical**, at the direction of Defendant Ehrlich, caused to be transmitted by mail, email or facsimile to the NY WCB a claim form and report of the August 19, 2021 left knee surgery performed on Claimant H. The left shoulder surgery and its follow-up evaluation were unnecessary and unrelated because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the left shoulder surgery. The procedure was further unnecessary since it falsely represented that Claimant H failed conservative treatment despite a significant gap in any conservative treatment allegedly performed prior to the surgery, records of which were available to Ehrlich, such that Ehrlich knew or should have known that the surgery and its post-operative report were unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Ehrlich performed the surgery in order to increase the medical services for which OrthoCare Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

20.    On or about October 14, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Defendant

COMPLAINT                                                                184

**Ehrlich**, or an employee/agent of **OrthoCare Surgical**, at the direction of Defendant Ehrlich, caused to be faxed to Nicholas Liakas of **Liakas Firm** a report of September 13, 2021 evaluation of Claimant H post-op left knee and left shoulder. The left shoulder and left knee surgeries and their follow-up evaluation were unnecessary and unrelated because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the left shoulder and left knee surgeries. The procedures were further unnecessary as set forth above and as reflected in the contemporaneous treatment records, records of which were available to Ehrlich, such that Ehrlich knew or should have known that the surgeries and its post-operative report were unnecessary and/or not causally related to the alleged accident, as well as predicated on false statements regarding alleged failures of conservative care that did not exist. However, Ehrlich performed the surgeries and their follow-up evaluation report in order to increase the medical services for which OrthoCare Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value.

21.     On or about October 26, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Ehrlich**, or an employee/agent of **OrthoCare Surgical**, at the direction of Defendant Ehrlich, caused to be mailed to the NY WCB a report of the September 23, 2021 left shoulder arthroscopy performed on Claimant H. The left shoulder surgery was unnecessary and/or not causally related to the alleged accident, because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease,

COMPLAINT                                                                                                           185

which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts irrespective of the initially claimed injury, which was subsequently altered to justify the additional procedures, including the left shoulder surgery. The procedure was further unnecessary since it falsely represented that Claimant H failed conservative treatment despite a significant gap in any conservative treatment allegedly performed prior to the surgery, records of which were available to Ehrlich, such that Ehrlich knew or should have known that the surgery was unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Ehrlich performed the surgery and transmitted the bill to increase the medical services for which OrthoCare Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Ehrlich caused the report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

22.    On or about July 20, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Defendant **Kostin**, or an employee/agent of **Englinton Med**, at the direction of Defendant Kostin, caused to be faxed to the NY WCB a claim form and note of his July 14, 2021 consultation/medical clearance exam which had been requested by Defendant **Ehrlich** for Claimant H's upcoming left knee surgery, including x-rays performed by Englinton Med and blood workup. The recommendation for left knee surgery was unnecessary and unrelated because at the emergency room, the orthopedic consult determined that radiographic imaging showed a likely exacerbation of preexisting Osgood-Schlatter's disease, which was ignored in favor of applying the predetermined fraudulent treatment protocol to various body parts irrespective of the initially claimed injury, which was subsequently

COMPLAINT                                                                                    186

altered to justify the additional procedures, including the left knee surgery. The recommendation for the procedure was further unnecessary since it falsely represented that Claimant H failed conservative treatment despite a lack of conservative treatment provided to the left knee prior to the surgery and a significant gap in any conservative treatment allegedly performed prior to the surgery, records of which were available to Kostin and to Ehrlich, such that Kostin and Ehrlich knew or should have known that the surgery was unnecessary and/or not causally related to the alleged accident, as well as predicated on a false statement regarding an alleged failure of conservative care that did not exist. However, Ehrlich requested and Kostin rubber stamped the referral for surgery in order to increase the medical services for which Englinton Defendants and OrthoCare Defendants received reimbursement and to increase workers' compensation claim and personal injury lawsuit settlement value. Upon information and belief, Kostin caused the report to be transmitted by mail, facsimile or email to Liakas Defendants to support Claimant H's workers' compensation claim and personal injury lawsuit in furtherance of the scheme to defraud.

## IV.    PLAINTIFFS' JUSTIFIABLE RELIANCE

331.    Tradesman's Third-Party Administrator Gallagher Bassett is under a statutory obligation to promptly and fairly pay or object to claims within 45 days. *See* New York Workers' Compensation § 13-5(1).

332.    Nevertheless, supporting medical documentation is often not received by Tradesman until after the 45-day deadline to object.

333.    The invoices and documentation supporting the Fraud Scheme submitted to Tradesman and/or Gallagher Bassett, the New York State Workers' Compensation Board, the New York Unified Court System, and others contained materially false statements and were designed to conceal materially false statements.

334.    As such, Tradesman justifiably and reasonably relied on them as facially valid.

COMPLAINT                                                                                                187

## V.    DAMAGES

335.    Plaintiff Roosevelt is a reinsurer which underwrites policies and provides reinsurance that covers the various workers' compensation claims and personal injury lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme. As such, Roosevelt is a party directly and ultimately damaged by the Fraud Scheme.

336.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred expenses paid as reimbursement to primary insurers providing coverage for the claims and lawsuits filed and/or prosecuted by the Legal Defendants on behalf of Claimants.

337.    But for Defendants' perpetration of the Fraud Scheme, Roosevelt's expenses paid as reimbursement to primary insurers would be less because the Claimants' injuries, if any, would be less severe and the medical services necessary to treat any accident-related injury, if any, would be less significant, resulting in lower settlement value of such claims and lawsuits and thus, less litigation expenses.

338.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred general liability claim adjustment expenses progressively rising from $14,020,890.00 in 2018 to $36,362,147.00 in 2019 (159% increase from 2018), to $58,694,694.00 in 2020 (61% increase from 2019), to $91,334,395.00 in 2021 (56% increase from 2020), and to $142,127,559.00 in 2022 (56% increase from 2021 and 914% increase in four years).

339.    Between 2021 and 2022 alone, Roosevelt's net outstanding liability under general liability reinsurance increased from $81,267,474.00 to $119,069,641.00, an increase of nearly 47% notwithstanding the COVID-19 pandemic during 2020, which led to the single largest one-year decline for the construction industry in New York City since 1990. *See* Office of the New York State Comptroller, "The Construction Industry in New York City: Recent Trends and Impact of

COMPLAINT                                                                                    188

COVID-19," March 3, 2022, at 3. *See* https://www.osc.ny.gov/files/reports/osdc/pdf/report-3-2021.pdf, incorporated herein by reference, last accessed January 16, 2025.

340.    Plaintiff Ionian is a reinsurer which underwrites policies and provides reinsurance that covers the personal injury lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme. As such, Ionian is a party directly and ultimately damaged by the Fraud Scheme.

341.    Due to Defendants' perpetration of the Fraud Scheme, Ionian has incurred expenses paid as reimbursement to primary insurers providing coverage for the lawsuits filed and/or prosecuted by the Legal Service Defendants on behalf of Claimants.

342.    But for Defendants' perpetration of the Fraud Scheme, Ionian's expenses paid as reimbursement to primary insurers would be less because the Claimants' injuries, if any, would be less severe and the medical services necessary to treat any accident-related injury, if any, would be less significant, resulting in lower settlement value of such lawsuits and thus, less litigation expenses.

343.    Due to Defendants' perpetration of the Fraud Scheme, Ionian has incurred general liability claim adjustment expenses progressively rising from $3,150,000 in 2018 to $5,150,000 in 2019 (63.49% increase from 2018), to $6,150,000 in 2020 (19.42% increase from 2019), to $14,250,000 in 2021 (131.71% increase from 2020), to $16,250,000 in 2022 (14.04 increase from 2021), to $18,400,000 in 2023 (13.23% increase from 2022). This represents a 484% increase in effectively the three years after the COVID – 19 pandemic during 2020, which led to the single largest one-year decline for the construction industry in New York City since 1990.

344.    Further, during the period of 2021, 2022 and 2023, Ionian's net outstanding liability under general liability increased from $7,150,000 to $33,125,000 to $58,750,000 respectively, an increase of nearly 722%.

345.    The drastically escalating cost of construction-related claims in both the Workers' Compensation and general liability areas stands in marked contrast to the overall decreasing number of workplace injuries, which in New York City reportedly decreased from 759 in 2018 to 554 in 2022 (a 27% decrease). *See e.g.*, "2022 New York City Construction Safety Report," at https://www.nyc.gov/assets/buildings/pdf/con_safe_2022.pdf, incorporated herein by reference, last accessed December 19, 2024. The number of workplace incidents decreased from 1,193 in 2018 to 751 in 2022, a 37% decrease. *Id.*

346.    In an April 2024 study, the New York Civil Justice Institute indicated that insurance costs in New York are higher than any other state and that insurance professionals warn that the market is headed toward a crisis that will have long term implications for consumers." *See* *https://acrobat.adobe.com/id/urn:aaid:sc:us:2de7b5f8-2913-4ed4-8ec4-625d1ca07466*, incorporated herein by reference, last accessed December 19, 2024.

347.    The study goes on to say that construction insurance costs are the highest when compared to nearby states such as Connecticut, New Jersey and Pennsylvania at a rate of 12.5% of a project's costs versus 2.5%, respectively. *Id.*

348.    Further, the study cites information that an average Labor Law 240(1) claim will settle for above $1 million, however, if there is a neck or back surgery involved, the claim value averages between $2 million to $3 million or more. *Id.*

349.    In the face of fraudulent insurance claims, much like the defendants' Fraud Scheme, the New York Legislature has introduced a bill making the staging of a construction accident and

the encouraging and assisting of the same, a Class E Felony in the State of New York. That bill is currently pending.

350.    Plaintiff Tradesman serves as a managing general agent that provides management services to various insurers and reinsurers, including Plaintiff Roosevelt, including general liability and workers' compensation services from underwriting through claims handling and subsequent administrative and legal actions, specifically focusing on safety management and effective handling of claims within the construction industry.

351.    As a direct and foreseeable result of the fraudulent scheme, Tradesman was obligated under the terms of the General Agency Agreement to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business; the exclusive claim adjustment firm Gallagher Bassett could not properly manage the significant numbers of fraudulent claims and specialized personnel were required at Tradesman's expense.

352.    Tradesman made substantial payments and sustained significant damage in connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme.

353.    Tradesman's ability to earn commissions is also directly attributable to the amount of the reserves maintained by reinsurers to pay claims and expenses. With thousands of fraudulent claims, the ability of the reinsurance carrier to maintain proper reserves becomes impossible. Once that occurs, the program, and thus, Tradesman, would face closure.

354.    Tradesman is further damaged due to artificially inflated loss ratios caused by the fraudulent scheme, since when a loss ratio exceeds a certain percentage, such as 60%, the commission due to the reinsurer will increase and Tradesman has been directly responsible for paying additional commissions resulting in a direct loss.

COMPLAINT                                                                                191

355.    Due to Defendants' perpetration of the Fraud Scheme, numerous insurance carriers have ceased to write Workers' Compensation and/or general liability policies in the State of New York, which has resulted in further damage to Tradesman's business.

356.    Defendants' patterns of fraudulent conduct caused injury to Plaintiffs in their business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Plaintiffs to calculate damages with specificity at this stage in the litigation (whereas Plaintiff's damages continue to accrue), Plaintiffs' injuries include, but are not limited to the following:

a.    Plaintiff Roosevelt – Litigation expenses, as well as any actual and consequential damages for the payments such Plaintiff made as reimbursement for payments made directly to the Defendants or to others due to Defendants' pattern of fraudulent conduct in connection with claims made under New York's Workers' Compensation Law and New York's Labor Law, the exact amount to be determined at trial.

b.    Plaintiff Ionian – Litigation expenses, as well as any actual and consequential damages for the payments such Plaintiff made as reimbursement for payments made directly to the Defendants or to others due to Defendants' pattern of fraudulent conduct in connection with claims made under New York's Labor Law, the exact amount to be determined at trial.

c.    Plaintiff Tradesman – Actual and consequential damages for the damage to Tradesman business including, but not limited to, expenses incurred for the administration of these claims and the retention of additional staff to

perform investigative and support services for claims wherein the Defendants are submitting or causing to be submitted claims/demands for monetary payments in connection with New York's Workers' Compensation Law and New York's Labor Law beyond the normal scope of claims, the exact amount to be determined at trial.

d.    Plaintiff Tradesman – Actual and consequential damages due to artificially high loss ratios incurred as a result of fraudulent claims and expenses incurred due to the meritless claims for which Tradesman itself is responsible for paying under the General Agency Agreement and amendments thereto, the exact amount to be determined at trial.

## VI.    CAUSES OF ACTION

<div align="center">

**COUNT I**
**RICO Violation (§ 1962(c))**
**(Against All Defendants)**

</div>

357.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

358.    At all times relevant herein, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce. Each of the Defendants participated in the operation or management of the enterprise, which Liakas Firm orchestrated, coordinated and led.

359.    In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity carried out by Defendants. *See, supra.*

COMPLAINT                                                                            193

360.    Each of the Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

361.    The pattern of racketeering activity in which the Defendants engaged involved numerous specific acts and conducts as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and bribing a witness under New York law (NY Penal Code § 215) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

362.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

363.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

      a.    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

      b.    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

      c.    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

      d.    Such other relief as the Court deems just and proper.

COMPLAINT                                                                                     194

<u>**COUNT II**</u>
<u>**RICO Violation (§ 1962(d))**</u>
<u>**(Against All Defendants)**</u>

364.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

365.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

366.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and bribing a witness under New York law (NY Penal Code § 215) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

367.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

368.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

d.    Such other relief as the Court deems just and proper.

### COUNT III
### Common Law Fraud
### (Against Legal Service Defendants and Medical Provider Defendants (collectively, "Count III Defendants")

369.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

370.    The Count III Defendants made misrepresentations of facts, deliberately concealed, omitted materials facts that they had a duty to disclose in connection with their claims for reimbursement and/or payment under New York law.

371.    These misrepresentations of fact by the Count III Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries and the necessity of treatment.

372.    The Count III Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

373.    The Count III Defendants made these misrepresentations in furtherance of the scheme to defraud Plaintiffs by submitting claims for payment of workers' compensation and general liability insurance benefits.

COMPLAINT                                                                              196

374.    The Count III Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiffs to make payments for claims that were not legitimate.

375.    Plaintiffs reasonably and justifiably relied, to their detriment, on the truthfulness of the Count III Defendants' representations concerning their eligibility to receive payments of workers' compensation and general liability insurance benefits, and without knowledge of the Count III Defendants' scheme and artifice to defraud them.

376.    The Count III Defendants knew, or should have known, that Plaintiffs would so rely on and intended that they so rely on their truthfulness.

377.    But for the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiffs would not have paid workers' compensation and general liability insurance benefits.

378.    Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count III Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

379.    As a direct and proximate cause of the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count III Defendants, Plaintiffs have been damaged. Plaintiffs' damages include, but are not necessarily limited to, benefit payments, administration costs, investigative and defense costs paid by Plaintiffs to the Count III Defendants or caused by the Count III Defendants.

380.    Because the Count III Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiffs are entitled to an award of punitive damages.

COMPLAINT                                                                                            197

WHEREFORE, Plaintiffs demand judgment against the Count III Defendants, and each of them, jointly and severally, for:

      a.    An award of Plaintiffs' actual and consequential damages to be established at trial;

      b.    Plaintiffs' costs, including, but not limited to, investigative costs incurred in the detection of the Count III Defendants' illegal conduct; and

      c.    Such other relief as the Court deems just and proper.

### COUNT IV
### Unjust Enrichment
### (Against Legal Service Defendants and Medical Provider Defendants
### (collectively, "Count IV Defendants")

381. Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

382. As described above, the Count IV Defendants conspired to induce Plaintiffs to make or expend numerous and substantial payments to them or others.

383. The Count IV Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

384. When Plaintiffs paid the Count IV Defendants and others, Plaintiffs reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count IV Defendants, or those persons working under their control, made concerning the Count IV Defendants' eligibility to make claims or seek reimbursement under New York law.

COMPLAINT                                                                198

385.    Each and every payment that Plaintiffs made or were caused to make to the Count IV Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Count IV Defendants sought and voluntarily accepted.

386.    Throughout the course of their scheme, the Count IV Defendants wrongfully obtained from Plaintiffs benefit payments as a direct and proximate result of the unlawful conduct detailed above.

387.    Retention of those benefits by the Count IV Defendants would violate fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiffs demand judgment against the Count IV Defendants, and each of them, jointly and severally, for:

    a.    An award of Plaintiffs' actual and consequential damages to be established at trial; and

    b.    Such other relief as the Court deems just and proper.

<div align="center">

**COUNT V**
**Declaratory Relief Pursuant to 28 U.S.C. § 2201**
**(Against Legal Service Defendants and Medical Provider**
**Defendants (collectively, "Count V Defendants"))**

</div>

388.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

389.    Pursuant to 18 U.S.C. § 2201(a), the Court may determine the rights and legal obligations of the parties.

390.    There is an actual case and controversy between Plaintiffs on the one hand, and the Count V Defendants on the other hand, as to all charges for examinations, treatments, testing, injections, surgeries, and physical therapy that have not been paid to date and through the pendency

COMPLAINT                                                                                    199

of this litigation. Plaintiffs contend these Count V Defendants are not entitled to reimbursement for any of these charges.

391.    Because these Count V Defendants have made false and fraudulent statements and otherwise engaged in the fraudulent conduct described above with the intent to conceal, mislead and misrepresent material facts and circumstances regarding each claim submitted, these Count V Defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue.

WHEREFORE, Plaintiffs demand judgment against Defendants for:

a.    A declaration that the Count V Defendants, at all times relevant, have submitted claims and bills to Plaintiffs for staged accidents and unnecessary healthcare services in violation of New York law;

b.    Declare that the Count V Defendants' activities are unlawful;

c.    Declare that Plaintiffs have no obligation to pay any pending, previously denied, and/or future workers' compensation or general liability insurance claims submitted by the Count V Defendants; and

d.    Such other relief as the Court deems just and proper.

## VII.    JURY TRIAL DEMAND

392.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

Dated: January 17, 2025

COMPLAINT                                                                                          200

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By:  */s/ William J. Clay*
      **WILLIAM J. CLAY**
      **MICHAEL A. GRAVES**
      **AARON E. MEYER**
      **KIRK D. WILLIS** *(pro hac admission pending)*
      1985 Forest Lane
      Garland, Texas 75042
      Telephone: 214-736-9433
      Facsimile:  214-736-9994
      Service Email: service@thewillislawgroup.com

      *ATTORNEYS FOR THE PLAINTIFFS*
      ROOSEVELT ROAD RE, LTD.;
      TRADESMAN PROGRAM MANAGERS, LLC;
      and IONIAN RE, LLC.

COMPLAINT