UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
THOMAS G. DONLON,                      :
                                       :
                    Plaintiff,         :
                                       :     25cv5831 (DLC)
          -v-                          :
                                       :     OPINION AND
CITY OF NEW YORK, et al.,              :        ORDER
                                       :
                    Defendants.        :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiff Thomas G. Donlon:

John Scola
Law Office of John A. Scola, PLLC
90 Broad Street, Suite 1023
New York, New York 10004

For defendants City of New York, et al.:

Eric Eichenholtz
Maxwell Leighton
New York City Law Department, Office of the Corporation Counsel
100 Church Street
New York, New York 10007

DENISE COTE, District Judge:

    The plaintiff Thomas Donlon served as the Interim

Commissioner of the New York Police Department ("NYPD") for two

months in the Fall of 2024.  He has sued the City of New York

("City"), former Mayor Eric Adams, and members of the NYPD for

engaging in a racketeering enterprise and for other violations

of law.  The defendants have moved to dismiss the complaint in

its entirety.  For the following reasons, the motion is granted.

**Background**

The first amended complaint ("FAC") is lengthy, covering 243 pages.  A substantial portion of the FAC is devoted to descriptions of misconduct by the defendants that occurred before Donlon became Interim Police Commissioner and in which he had no participation.  Those allegations are not described below.  The FAC's relevant allegations, which are assumed to be true for purposes of this Opinion, chiefly concern events that occurred during Donlon's tenure as Interim Commissioner.[1]

Donlon was appointed Interim NYPD Commissioner on September 13, 2024.  He served in that role for approximately two months until November 24, when Mayor Eric Adams appointed Jessica Tisch as the NYPD Commissioner and Donlon became a Senior Advisor to the Deputy Mayor for Public Safety.  That position was eliminated on May 9, 2025, and Donlon no longer worked for the City after that date.

Donlon asserts claims against Mayor Adams and senior leadership in the NYPD.  He asserts that the defendants treated him with disrespect, sabotaged him, and blocked investigations

---

[1] This description is an attempt to describe the pertinent allegations in the lengthy FAC.  This task is made more difficult because much of the FAC is devoted to argument, the same events are described more than once in different parts of the FAC, and some events are described only in broad brushstrokes without specified dates.

into police misconduct.  Among other things, one or more of the defendants used Donlon's official Police Commissioner stamp without his approval to promote unqualified, politically-connected officers; blocked his attempts to promote and reward accomplished NYPD personnel; terminated his employment with the City; and arrested his wife in an act of retaliation against him.  In addition to suing Mayor Adams, Donlon brings claims against First Deputy Commissioner Tania Kinsella, Chief of Department Jeffrey Maddrey, Chief of Patrol John Chell, Deputy Commissioner of Operations Kaz Daughtry, Deputy Commissioner of Public Information Tarik Sheppard, Deputy Commissioner of Legal Matters Michael Gerber, Inspector Paul Saraceno, and Deputy Chief Anthony Marino.  The events that the FAC emphasizes are the following.

Based on information received during his lengthy law enforcement career, Donlon began his term as Interim Commissioner with the belief that Kinsella, Maddrey, Chell, Daughtry, and Sheppard should be removed from their positions in the NYPD due to their prior misconduct.  Despite sharing his knowledge of their misconduct with Mayor Adams, the Mayor instructed Donlon to work with these individuals.  It was also true, however, that Donlon desired to develop a close working relationship with Maddrey and all of the NYPD executives.

3

The NYPD was essentially run by Kinsella, Maddrey, Chell, Daughtry, Sheppard, Gerber, Saraceno, and Marino.  They disregarded Donlon's orders and refused to share information with him.  Donlon describes his "job duties" as Interim Commissioner as "virtually non-existent."  Mayor Adams told Donlon that Sheppard would serve as Donlon's temporary Chief of Staff.  Donlon advised Mayor Adams that he had no issue with and no reason not to work cordially with Sheppard.  Nonetheless, Sheppard was hostile to Donlon because of his disappointment that he had not been appointed Police Commissioner.  Sheppard treated Donlon with disrespect and rarely attended the weekly executive meetings the Donlon held on Monday mornings.  Sheppard deliberately avoided direct communication with Donlon.

Donlon felt a certain NYPD Chief ("Chief") was the only person he could trust and wanted that Chief assigned to assist him with his emails, among other tasks.  Maddrey resisted the idea, removed the Chief's access to Donlon's emails, and banned the Chief from the fourteenth floor, where the Commissioner's office is located.  Maddrey told Donlon that the Chief was not good for him.

Donlon had limited access to Mayor Adams.  When Donlon requested formal meetings with Mayor Adams, he was "consistently" informed that Mayor Adams was unavailable.

4

Maddrey did meet with Mayor Adams, however, and offered to deliver any messages from Donlon to the Mayor.  Although Mayor Adams was aware that Daughtry gave Donlon a "hard time", the Mayor failed to intervene.  In addition, Maddrey, Chell, and Daughtry consistently complained to Mayor Adams about Donlon's leadership.

Some of the specific events the FAC describes are the following.  They are presented roughly in chronological order.

Social Media Posts

On his first day in office, Donlon advised Maddrey, Chell, Daughtry, and Sheppard that many of their social media posts regarding NYPD matters were "unprofessional, unauthorized, and controversial."  He instructed them to forward any proposed posts to the NYPD Legal Bureau for review and approval.  Chell, Daughtry, Maddrey and Sheppard complained immediately to Mayor Adams, and Mayor Adams instructed Donlon to "back off these guys" because they are the "best" at "keeping crime down."

Security Detail

Donlon selected his own security detail of 18 NYPD personnel.  Sheppard and Saraceno met with the detail unbeknownst to Donlon and without his authorization.  They told the detail "not to follow" Donlon's orders since he "will be gone soon" and to report directly to Sheppard instead.  Sheppard

then told the detail that they would be transferred to undesirable assignments if they reported this to Donlon.  After Donlon learned of the meeting and complained to Saraceno, Saraceno explained that Donlon was an "interim" who will "go."

September 14, 2024 Shooting

On September 14, 2024, Donlon's second day as Interim Police Commissioner, an NYPD officer was shot.  Having witnessed the response to the incident, Donlon came to believe that there was an urgent need for structured communication.  He directed Maddrey and Chell to establish a centralized email communication system and chain of command to provide accurate updates to the Mayor and other key stakeholders.  They did not do so and, instead, responded that they would brief the Mayor when he called them.  Well-structured plans were then created by other commanders at Donlon's request.

Promotions

Marino concealed from Donlon that he possessed a stamp bearing Donlon's official signature.  When Donlon confronted Marino, Marino explained that the use of the stamp was a long-standing practice to "alleviate backlog."  Donlon reviewed the documents on which Marino had utilized the stamp and agreed to this "protocol."

Shortly after Donlon became aware of Marino's unauthorized use of his signature stamp, Donlon noticed that Sheppard began wearing a badge indicating that he had been promoted from Assistant Chief to Bureau Chief, even though Donlon had not promoted him or authorized his promotion.  Either Sheppard stole the signature stamp from Marino or Marino used the stamp to authorize Sheppard's promotion without Donlon's knowledge.  When Donlon confronted Sheppard about the promotion, Sheppard claimed that Mayor Adams had promoted him.  Mayor Adams, however, told Donlon that he had not authorized Sheppard's promotion.

Later, with no warning or explanation, Donlon was ushered into a ceremony for newly promoted Chiefs.  Sheppard presided over the ceremony and Donlon had to extemporize his remarks.  Sheppard had orchestrated Donlon's late notice and arrival to embarrass Donlon.

Sheppard and Marino also used Donlon's signature stamp without authorization to revise a proposed promotion list that Donlon had prepared.  Although they assured Donlon that his promotion list would be submitted directly to Mayor Adams, Maddrey, Sheppard, and Marino replaced names on Donlon's list with their own selections.  Sheppard then stamped the revised list with Donlon's signature.  After Donlon learned of the unauthorized revisions, he demanded a copy of the revised list.

7

Sheppard and Marino refused.  Donlon informed Mayor Adams and Maddrey of what the three defendants had done but the unauthorized promotions were never rescinded.

On another occasion, Gerber vetoed the promotion of two detectives who provided security for Donlon.  Gerber explained that, because the two detectives had also provided security for a former Commissioner, the NYPD didn't know if they were involved in criminal activity with that former Commissioner.

NYPD Roosevelt Avenue Task Force

In October 2024, Daughtry proposed a task force to address quality of life issues in the Roosevelt Avenue area in Corona, Queens.  Mayor Adams and Maddrey appointed Daughtry to lead the task force.  Donlon did not believe Daughtry was qualified to do so.  Daughtry was rude to police officers working on the project.  The project design was flawed.  Donlon made recommendations for how to proceed, which were rejected, and crime soared as a result.

Among other things, Donlon advocated for cooperation with federal law enforcement.  Daughtry, Maddrey, Chell, Sheppard, and Gerber resisted cooperation.  Gerber falsely claimed that he never remembered any discussion at the weekly Monday meetings about federal law enforcement joining this task force.  For example, Donlon instructed Maddrey, Chell, Daughtry, and Gerber

to use a database developed by the FBI, the "Violent Gang and Terrorist Organization File database," as an investigative tool. None of them engaged with the database (or agreed to do so), although Gerber said he would look into it.

October 10 Rumor and October 28, 2024 WPIX Interview

Shortly after Donlon began work, the FBI searched his residence, during which they confiscated old documents related to Donlon's law enforcement career.  On October 10, Sheppard started a false rumor that Donlon would be fired on October 11. This rumor was reported by a local news station, WPIX 11 News. Donlon assured Mayor Adams he was not stepping down.

Sheppard then organized Donlon's participation in an October 28 round table discussion on WPIX 11 News alongside Chell, Daughtry, and Sheppard.  To Donlon's surprise, the reporter requested a one-on-one interview of Donlon prior to the round table discussion.  During that interview, the reporter questioned Donlon about the FBI search.  During the conversation among the four NYPD officers which followed, Chell, Daughtry, and Sheppard repeatedly interrupted Donlon.

When Donlon complained to Mayor Adams about Sheppard's conduct in connection with the interview, the Mayor remarked that the NYPD was in a state of chaos.  The Mayor refused to define chaos despite Donlon's request that he do so.

9

NYPD Drone Program

Daughtry led the NYPD Drone Program and told Donlon he wanted to implement the "latest cutting edge technology." Donlon publicly praised a demonstration of the NYPD's drone technology but privately harbored concerns about the program's leadership.  Daughtry rebuffed Donlon's offers to connect him with drone experts and Donlon's general feedback about the program.  The program suffered as a result.

NYPD Evidence Warehouses

On December 13, 2023, nine months before Donlon became Interim Police Commissioner, one of the NYPD's evidence storage warehouses caught on fire.  When Donlon inspected the NYPD's evidence warehouse facilities, he found "appalling" conditions: unsafe evidence storage, poor labeling, and insufficient documentation.  He spoke to Kinsella, Maddrey, Chell, and Daughtry about what he found and demanded immediate action.  No one addressed his concerns and Donlon learned from an unidentified source that Maddrey was livid about Donlon's inspections.  Maddrey also never provided Donlon a final comprehensive report on the December 2023 fire.  At some point, however, Maddrey told Donlon that he would look into the issue.

10

Sergeant Danielle Venus

Sergeant Danielle Venus was associated with a prior Commissioner, continued to work in the Commissioner's Office, and had access to Donlon's schedule and email.  Gerber refused to allow Donlon to transfer Venus out of the Commissioner's Office.  Donlon later discovered that she was surreptitiously monitoring him and transmitting his calendar and internal information to Maddrey.  Donlon called for an internal investigation of Venus's actions, which Gerber ignored.

Donlon was planning the Police Commissioner's Christmas party, a small event for select guests.  Donlon instructed his staff to send out invitations months in advance but Venus ordered that the invitations not be mailed until she gave further direction.  After Donlon asked Venus who authorized her order, Venus lied and said she made the decision on her own.

When Donlon confronted Venus, she stated that she was trying to assist Donlon and had no nefarious intentions.  She denied any wrongdoing and began crying.  Venus retired from the NYPD within a week.

October 24, 2024 Candidate Trump Rally

On October 24, 2024, presidential candidate Donald Trump held a rally at Madison Square Garden.  Donlon attended for an hour to meet with NYPD personnel.  While Donlon was at the

11

event, Mayor Adams texted him that it was not a smart decision to go to the rally.  Donlon immediately called the Mayor, who was disrespectful.  Chell had attended the rally as well and was interviewed by Newsmax but Donlon does not believe Chell received similar feedback from Mayor Adams.

November 3, 2024 New York City Marathon

Donlon attended the November 3, 2024 New York City Marathon and asked Sheppard to move "a bit" so that Donlon could fit in a group photograph taken at the finish line.  Sheppard refused and, after the photographs were taken, shouted that Donlon had grabbed his arm.  Sheppard then yelled, "I will fucking kill you," while lunging toward Donlon.  Maddrey restrained Sheppard. Donlon walked away and Donlon's daughter began to cry.  Donlon ordered Maddrey to notify the NYPD's Internal Affairs Bureau about the incident.

The next day, Donlon discussed this incident and other issues with Mayor Adams.  Then, in a conference call, Mayor Adams told Sheppard and Donlon to patch up their disagreement. Kinsella and Maddrey met with Donlon and told him that he should not have acted as he did with Sheppard and should not have explained the Marathon incident in detail to the Mayor.  After this incident, Sheppard was demoted.

November 2024 Transfers

Following the incident at the Marathon, Donlon submitted documents to transfer ten NYPD officers in recognition of their stellar work.  Donlon was told that Sheppard subverted the transfers.  Since Donlon had already told the employees about the transfers, this was devastating to morale and created logistical havoc.  Donlon complained to Maddrey, who said he would take care of it.

November 2024 Promotion of Saraceno

Later in November, Maddrey had Saraceno promoted to Deputy Chief by manipulating the promotion list.  Marino was necessarily involved in this addition and also added the name of his paramour to the promotion list.

Abuse of Overtime

Several individuals who worked for and were promoted by Maddrey received unwarranted overtime benefits.  Kinsella had responsibility for the overtime program and failed to monitor it adequately.  Saraceno signed the overtime slips for three of the individuals.  The money to pay for overtime, which amounted to hundreds of thousands of dollars, was allegedly diverted from FEMA money.

When the overtime abuse became a public scandal, Mayor Adams told Maddrey to retire.  Maddrey ignored him.

13

November 25, 2024 Termination as Commissioner

On November 25, 2024, Mayor Adams removed Donlon as Interim Commissioner.  Donlon was replaced by Jessica Tisch, who was named Police Commissioner.  Donlon was not invited to Tisch's swearing-in ceremony but attended anyway and was not given a place to sit.

After his termination as Interim Commissioner, Donlon was given a new position as Senior Advisor within the Mayor's Office of Public Safety.  In this position, which he viewed as a demotion, Donlon was responsible for coordinating and managing grant applications for city agencies related to public safety. Donlon was only given two analysts to assist him in the new position.

December 16, 2024 Arrest of Spouse

On December 16, 2024, Donlon's wife, Deirdre O'Connor-Donlon, was in a minor traffic accident in Manhattan.  NYPD officers responded to the scene, and Donlon came as well in response to a call from his wife.  After Donlon departed, a Sergeant accused Donlon's wife of having a suspended license and lapsed insurance.  He refused to look at the proof of insurance on her cell phone.  She was cuffed, placed in a police vehicle, searched, and held in custody for two hours.  She was then given a summons for a lapse of insurance.

Shortly after she was released, Donlon's wife received multiple phone calls from local news sources.  The <u>New York Post</u> published a story about the incident later that night, which contained personal information about the Donlons "only known to the NYPD."  The FAC alleges, upon information and belief, that Sheppard, Daughtry, and Gerber ordered the arrest and leaked it to the media.  In February of 2025, Donlon's wife filed a notice of claim informing the City of her intent to sue.

<u>April 24, 2025 Termination of City Employment</u>

On April 24, 2025, Donlon was told that his last day working for the City would be May 9 because his position was "being eliminated."  The FAC asserts that Daughtry, who was recently appointed Deputy Mayor of Public Safety, was responsible for the decision.

<u>Procedural History</u>

Donlon filed this lawsuit on July 16, 2025, and filed the FAC on July 28.  The FAC pleads seven claims.  The first two claims are brought against the individual defendants under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c) and (d).  The FAC also brings four claims for violation of 42 U.S.C. § 1983, specifically: a claim that Donlon's employment was terminated in retaliation for his exercise of his First Amendment rights; a <u>Monell</u> claim based on

the City's customs and policies; a substantive due process claim
based on the termination of his employment without proper
notice; and a claim for interference with his freedom of
intimate association when Donlon's wife was arrested and his
City employment was terminated.  Finally, the FAC asserts that
New York State Civil Service Law § 75-B was violated when his
employment was terminated in retaliation for his complaints
about corruption within the NYPD.  Donlon seeks an award of
damages and an injunction ordering the appointment of an
independent federal monitor over the NYPD.

The City of New York, Eric Adams, Tania Kinsella, John
Chell, Michael Gerber, and Anthony Marino filed a motion to
dismiss the FAC on September 4.  It does not appear that Donlon
has served the remaining defendants: Jeffrey Maddrey, Kaz
Daughtry, Tarik Sheppard, and Paul Saraceno.[2]  The appearing
defendants' motion to dismiss became fully submitted on October
6.  This action was reassigned to this Court on December 5.

---

[2] Maddrey, Daughtry, Sheppard, and Saraceno have not entered
appearances in this matter or filed a motion to dismiss, but
because the grounds for dismissal apply to all of the individual
defendants, the amended complaint is dismissed in full.

## Discussion

The defendants' motion to dismiss argues that the FAC fails to state any violation of federal law or comply with Rule 8's "short and plain statement" requirement.  They are correct.

To defeat a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Doe v. Franklin Square Union Free School Dist., 100 F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678).  In determining if a claim is sufficiently plausible to withstand dismissal, a court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party."  Doe, 100 F.4th at 94 (citation omitted).

Where, as here, a RICO claim rests on alleged violations of the wire fraud statute, a complaint must satisfy the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b).  Lundy v. Catholic Health System of Long Island, Inc., 711 F.3d 106, 119 (2d Cir. 2013).  Under Rule 9(b), parties alleging

fraud "must state with particularity the circumstances
constituting fraud or mistake." Fed. R. Civ. P. 9(b). This
requirement is satisfied if the complaint "adequately
specif[ies] the statements it claims were false or misleading,
give[s] particulars as to the respect in which plaintiff
contends the statements were fraudulent, state[s] when and where
the statements were made, and identif[ies] those responsible for
the statements." Lundy, 711 F.3d at 119 (citation omitted).

I.    Rule 8

Before moving to dismiss the FAC for failure to state a
claim, the defendants argue that the FAC fails to comply with
Rule 8(a)(2), Fed. R. Civ. P.  Rule 8(a)(2) requires that a
pleading contain "a short and plain statement of the claim
showing that the pleader is entitled to relief." There is no
doubt that the FAC fails to meet this pleading standard.

The FAC spans 243 pages and contains 1,375 paragraphs.  At
least 55 pages containing almost 300 paragraphs are irrelevant
because they describe events that predate Donlon's appointment
as Interim Commissioner and do not involve him.  And, as already
noted, much of the FAC is devoted to argument, the same events
are described more than once in different parts of the FAC, and
some events are described only in broad brushstrokes without
specified dates.  This "places an unjustified burden on the

18

court and the party who must respond to it because they are
forced to select the relevant material from a mass of verbiage."
Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citation
omitted).  In these cases, a district court has "the power, on
its own initiative or in response to a motion by the defendant,
to strike any portions that are redundant or immaterial, or to
dismiss the complaint."  Id. (citing Rule 12(f), Fed. R. Civ.
P.).  This Court, however, chooses to wade through the FAC's
hundreds of pages and dismisses the complaint in full on the
merits.

II.  Civil RICO Claims

     The FAC pleads two civil RICO claims: a substantive claim
and a conspiracy claim, in violation of 18 U.S.C. §§ 1962(c) and
(d) respectively.  It asserts that the individual defendants
working at the NYPD and City Hall formed an enterprise within
the meaning of § 1961(4) and conducted its affairs through a
pattern of racketeering activity.  That pattern includes the
following predicate acts: wire fraud through the use of email
and telecommunications to misrepresent Donlon's authority,
conceal material facts, and coordinate a scheme to marginalize
Donlon (18 U.S.C. § 1343); obstruction of justice by interfering
with potential or actual investigations triggered by Donlon's
whistleblowing, including efforts to isolate Donlon (id. at §

19

1503); retaliation against a witness or informant, Donlon, for
his whistleblowing, by terminating his employment (id. at §
1513); tampering with a witness or informant, Donlon, by
exerting pressure to prevent him from reporting criminal conduct
(id. at § 1512); bribery of others to secure loyalty, suppress
dissent, and shield individuals from exposure (id. at § 201);
and using official authority to intimidate Donlon into silence
(id. at § 1951).

Section 1962(c) makes it

> unlawful for any person employed by or
> associated with any enterprise engaged in,
> or the activities of which affect,
> interstate or foreign commerce, to conduct
> or participate, directly or indirectly, in
> the conduct of such enterprise's affairs
> through a pattern of racketeering activity
> or collection of unlawful debt.

18 U.S.C. § 1962(c).  To establish a violation of § 1962(c),
i.e., a substantive violation of the RICO statute, a civil
plaintiff must show that he was injured by defendants' "(1)
conduct (2) of an enterprise (3) through a pattern (4) of
racketeering activity."  Kim v. Kimm, 884 F.3d 98, 103 (2d Cir.
2018) (citation omitted).  Here, Donlon alleges an "association-
in-fact" as the RICO enterprise at issue, which the Supreme
Court defined as "a group of persons associated together for the
common purpose of engaging in a course of conduct."  Boyle v.
United States, 556 U.S. 938, 946 (2009) (quoting United States

v. Turkette, 452 U.S. 576, 583 (1981)).  To prove an

"association-in-fact," he must establish "at least three

structural features: a purpose, relationships among those

associated with the enterprise, and longevity sufficient to

permit these associates to pursue the enterprise's purpose."

Id.  Lastly, "racketeering activity" is defined to include any

"act" that may be indicted under a list of enumerated statutes,

including those cited above.  A "pattern of racketeering

activity" is defined as "at least two acts of racketeering

activity" within a ten-year period.  18 U.S.C. § 1961(1), (5).

Section 1962(d) makes conspiring to violate § 1962(c)

unlawful.  To establish a violation of § 1962(d), i.e., a RICO

conspiracy, a civil plaintiff must show that the alleged

coconspirators "knew about and agreed to facilitate" a pattern

of racketeering activity.  Baisch v. Gallina, 346 F.3d 366, 377

(2d Cir. 2003) (citation omitted).

The defendants argue that the RICO claims must be dismissed

for several reasons.  First, they contend the FAC fails to plead

the existence of an "association-in-fact" enterprise because it

does not plead that the defendants shared a common purpose.

Next, they claim that it fails to allege a pattern of

racketeering activity, and that its claims of fraud are not

pleaded with the particularity required by Rule 9.  Finally,

they argue that the FAC fails to plead that Donlon was harmed by the alleged racketeering activity since he had the power under the law to address any criminality.

The RICO claims must be dismissed.  The fraud claims are not pleaded with the particularity required by Rule 9(b). Purported violations of law are not plausibly plead as violations of the particular statutes.  But the most fundamental defect concerns the FAC's failure to plead that the defendants acted with a common purpose, as required for members of an association-in-fact enterprise.  Thus, this Opinion need only address the failure to allege a common purpose and dismisses the RICO claims on that ground.

In order "for an association of individuals to constitute an enterprise, [they] must share a common purpose to engage in a particular <u>fraudulent</u> course of conduct and work together to achieve such purposes."  <u>First Capital Asset Mgmt., Inc. v.</u> <u>Satinwood, Inc.</u>, 385 F.3d 159, 174 (2d Cir. 2004) (emphasis added) (citation omitted).  The FAC alleges that the individual defendants, working together in an alleged enterprise, shared a common purpose of "consolidat[ing] political power, obstruct[ing] justice, and punish[ing] dissent."  But such a statement is conclusory and merely summarizes some of the alleged predicate acts.  The FAC does not allege any facts

indicating that the defendants had a common purpose to violate the law.  In fact, the FAC repeatedly alleges that the individual defendants had different motivations that shaped their interactions with Donlon and drove their alleged misconduct, rather than a single desire to further their criminal enterprise or otherwise commit a crime.  For example, the FAC alleges that Gerber's "resistance" to Donlon was "personal -- rooted in ego and control," whereas other defendants acted out of a desire not to "work with federal law enforcement authorities."  The only defendants that allegedly shared a common purpose were Daughtry and Sheppard.  The FAC claims that both acted out of envy that Donlon was selected as Commissioner over them and a desire to "curry further favor" with Mayor Adams.  Such an intent, however, is not <u>per se</u> unlawful and, thus, those allegations do not establish the common unlawful purpose necessary for a RICO enterprise.

In opposition to the motion, Donlon argues that the FAC adequately pleads an association-in-fact enterprise engaging in a pattern of racketeering activity to "subvert oversight, enrich insiders and eliminate Donlon as an obstacle."  He identifies the fraud claims as committed by Maddrey, Kinsella, Marino, and Sheppard when they used his signature on the Commissioner's stamp without authorization to promote unqualified individuals.

He identifies Saraceno, Maddrey, and Gerber as committing obstruction of justice and witness tampering when they embedded spies in his office.  He identifies Sheppard and Saraceno as committing an "obstruction" to his safety when they interfered with his security detail.  He identifies Gerber as obstructing justice by insulating members of the enterprise from scrutiny. He identifies Sheppard as engaging in witness intimidation when he threatened to kill Donlon during their altercation at the Marathon.  He asserts that Sheppard, Gerber, and Daughtry orchestrated the false arrest of Donlon's wife, which constitutes retaliation and an obstruction of justice.

Donlon's opposition brief does not succeed in salvaging the FAC's RICO claims.  If anything, its recitation underscores that the defendants lacked a common purpose and were instead motivated by their own personal interests and resentments. Donlon also relies on U.S. v. Angelilli, 660 F.2d 23 (2d Cir. 1981), to support the proposition that a RICO claim may be brought against municipal bodies.  While it is true that the Second Circuit held in Angelilli that governmental bodies may be considered "enterprises" for RICO purposes, see id. at 33, the decision also demonstrates the coherence in purpose required to find a RICO enterprise.  In Angelilli, the Court of Appeals affirmed RICO convictions for four marshals of the Civil Court

of the City of New York who worked together to fix auctions of debtors' property and pocket side payments from the buyers.  See id. at 26-27.  Evidence was admitted at trial of 46 such transactions, and that the practice was a "common topic of conversation among marshals" on which "experienced marshals routinely 'educated' newly appointed marshals."  Id. at 28.  The common purpose uniting the Angelilli defendants was undisputed and clear: working together to commit fraud and repeatedly profit.  No such common purpose unites the individual defendants here.

Lastly, the FAC also fails to plead a RICO conspiracy. "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."  Hecht v. Com. Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990). The FAC's RICO conspiracy allegations are entirely derivative of its allegations of a substantive RICO violation.  The FAC does not contain any allegations specific to the RICO conspiracy claim in particular -- e.g., allegations of an agreement to commit predicate acts.  Thus, for the same reasons the substantive RICO claim fails, the RICO conspiracy claim fails as well.  See Satinwood, 385 F.3d at 164 ("[B]ecause Plaintiffs' RICO conspiracy claims are entirely dependent on their

substantive RICO claims, we also concur in the District Court's
dismissal of the RICO conspiracy claims.").

III. Section 1983 Claims

Donlon asserts four claims as violations of various rights
protected in 18 U.S.C. § 1983.  To prevail on a § 1983 claim, a
plaintiff must show "the violation of a right secured by the
Constitution and laws of the United States" and that "the
alleged deprivation was committed by a person acting under color
of state law."  Jones v. Cty. of Suffolk, 936 F.3d 108, 114 (2d
Cir. 2019) (citation omitted).  Individual defendants can only
be liable under § 1983 if they were "personally involved" in the
violation.  Brandon v. Kinter, 938 F.3d 21, 36 (2d Cir. 2019).
The FAC fails to adequately plead any of the four § 1983 claims
because it fails to plausibly plead any violation of federal
law.

A.    First Amendment

The FAC pleads that Donlon engaged in protected speech as a
private citizen on matters of public concern when he reported
the unlawful conduct of the defendants to Mayor Adams.  It then
contends that he suffered retaliation for exercising that right
when, among other things, he was removed as Interim Commissioner
and his employment with the Mayor's Office was terminated.  The
FAC does not specify which defendants are charged in this claim.

26

A plaintiff asserting a First Amendment retaliation claim
must establish that: "(1) his or her speech or conduct was
protected by the First Amendment; (2) the defendant took an
adverse action against him or her; and (3) there was a causal
connection between this adverse action and the protected
speech." Montero v. City of Yonkers, N.Y., 890 F.3d 386, 394
(2d Cir. 2018) (citation omitted).  The Supreme Court defined a
two-step inquiry to determine whether the speech of a public
employee like Donlon is protected speech.  First, courts ask
"whether the employee spoke as a citizen" (rather than as an
employee) on "a matter of public concern." Id. at 395 (quoting
Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).  If the answer
is yes, then the court conducts a Pickering analysis to
determine whether the government entity "had an adequate
justification for treating the employee differently based on his
or her speech from any other member of the public." Id.
(quoting Garcetti, 547 U.S. at 418).  If the court determines
that the government entity did not have an adequate
justification for treating the employee differently from a
member of the public, then the employee's speech is protected.

The Supreme Court established an exception to this test for
protecting speech by a public employee in Elrod v. Burns, 427
U.S. 347 (1976).  There, the Court held that dismissing

27

employees in "policymaking" positions due to their political
affiliation does not violate the First Amendment because public
employers have a "vital" interest in ensuring the "political
loyalty of employees" who are "in a position to thwart the goals
of the in-party."  Id. at 363, 367.  The Second Circuit has
identified eight factors to be considered in determining whether
a public employee is a policymaker.  They include whether the
employee:

> (1) is exempt from civil service protection,
> (2) has some technical competence or
> expertise, (3) controls others, (4) is
> authorized to speak in the name of
> policymakers, (5) is perceived as a
> policymaker by the public, (6) influences
> government programs, (7) has contact with
> elected officials, and (8) is responsive to
> partisan politics and political leaders.

Vezzetti v. Pellegrini, 22 F.3d 483, 486 (2d Cir. 1994).  "The
proper approach is to assess all the factors in order to
determine whether there is a rational connection between shared
ideology and job performance" -- no individual factor is
dispositive, nor is the list exhaustive.  Id. (citation
omitted).

    The defendants move to dismiss the First Amendment claim on
several grounds.  They contend that Donlon's whistleblowing
activity, in which he reported the defendants' alleged
wrongdoing to the Mayor, was not protected speech for two

independent reasons: first, because he spoke as an employee, not a citizen, and second, because his speech and termination fell within the policymaker exception.  They also argue that the FAC does not plausibly plead that his reports to the Mayor caused the termination of his employment because a Mayor lacks authority to correct insubordinate behavior in the NYPD.

The NYPD Commissioner is the quintessential policymaker. Because this Opinion also concludes that Donlon's First Amendment claims fail because he spoke to the Mayor as an employee, however, it is only necessary to address the defendants' first argument in any detail.

As explained earlier, a public employee's speech is only protected if "the employee spoke as a citizen rather than solely as an employee" on "a matter of public concern." Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (citation omitted).  It is undisputed that Donlon spoke on a matter of public concern, so the only remaining issue is whether he spoke as a citizen, not an employee.  In making that determination, the Second Circuit has identified "the critical question under Garcetti" (the key Supreme Court opinion on this issue) as "whether the speech at issue is itself ordinarily within the scope of an employee's duties." Montero, 890 F.3d at 397-98 (citation omitted).  Stated another way, the ultimate question

"is whether the employee's speech was part-and-parcel of that person's concerns about his ability to properly execute his duties." Id. at 398 (citation omitted). The Second Circuit also acknowledged that another factor, "the presence or lack of a civilian analogue," "may be of some help in determining whether one spoke as a citizen," but is "not dispositive." Id. at 394, 397.

Donlon argues that his disclosures of wrongdoing within the NYPD to Mayor Adams were not part of his ordinary duties and, instead, made as an ordinary citizen whistleblower. In particular, Donlon contends that he "was not hired to expose the Mayor's inner circle or denounce forged documents bearing his own falsified signature." But these arguments that the reports to Mayor Adams were not part of his job duties are squarely in conflict with the FAC's allegations. The FAC repeatedly states that Donlon's "mission" and "mandate" when starting as Interim Commissioner (and his reason for staying after suffering the indignities described above) was to expose the defendants' wrongdoing. More specifically, it alleges that:

- "Donlon accepted the role of interim Police Commissioner with full knowledge of the sordid records of many top officials . . . . The mission of Donlon was clear: restore administrative and operational integrity . . . ."

30

- Donlon "entered the administration of [Mayor Adams] with a <u>mandate</u> to <u>ensure the NYPD operated at its highest level</u>.

- "Donlon stayed not out of self-interest, but out of <u>duty to</u> <u>expose</u> and combat <u>the rampant corruption</u> and destructive leadership that threatened to dismantle the greatest police force in the world."

- Donlon stayed not for power or self-aggrandizement, but to . . . <u>resist</u> those who sought to destroy it from within.

(Emphasis added.)  Even without these allegations regarding his duties and mandate as Interim Commissioner, however, Donlon's argument that his reports to Mayor Adams were not "part-and-parcel of [his] concerns about his ability to properly execute his duties" is clearly wrong.  Donlon spoke to Mayor Adams about the defendants' unauthorized use of his signature stamp, covert revisions of the promotional lists, and placement of spies in his staff precisely because he was "concern[ed] about his ability to properly execute his duties."  <u>Montero</u>, 890 F.3d at 398 (citation omitted).  Donlon's speech and its direct relationship to his work stands in stark contrast to the speech in recent cases where the Second Circuit held that NYPD officers were speaking as citizens, not employees, when raising concerns.

31

See, e.g., Matthews, 779 F.3d at 174 (police officer's criticism
of a "precinct-wide policy" was "neither part of his job
description nor part of the practical reality of his everyday
work"); Montero, 890 F.3d at 398 (police officer's criticism of
other officers during a union meeting "did not fall within his
employment responsibilities" since he spoke "as union vice
president, a role in which he was not required to serve").

As for the additional factor to consider in determining
whether a public employee's speech was made as a civilian or
employee, "the presence or lack of a civilian analogue," it is
true that there is likely a civilian analogue to Donlon's
reports to Mayor Adams.  After all, the Second Circuit listed "a
complaint to an elected representative" as an example of a "form
or channel of discourse available to non-employee citizens."
Matthews, 779 F.3d at 176 (citation omitted).  But, as mentioned
above, "existence of a civilian analogue is not dispositive of
whether a public employee spoke as a private citizen."  Montero,
890 F.3d at 394.  "[I]t is merely a factor the court could
consider as part of the inquiry into whether the public
employee's speech was made pursuant to his ordinary employment-
related responsibilities."  Id.  And, here, for the reasons
already explained, the FAC's allegations make clear that
Donlon's reports to Mayor Adams were made pursuant to his

32

employment duties and "part-and-parcel of his concerns about his ability to properly execute [those] duties." Id. at 398 (citation omitted). Thus, Donlon's speech was made as an employee and is not protected by the First Amendment.[3]

    B.   Fourteenth Amendment & Substantive Due Process Claim

    The FAC asserts violations of the Fourteenth Amendment in two of its claims. First, it asserts that all the defendants violated Donlon's substantive due process "right to employment" when they failed to give him proper notice of his termination as Interim Police Commissioner or as Senior Advisor to the Mayor on Public Safety. Then, it asserts a violation of the Fourteen Amendment against the defendants collectively for the violation of his "right[] to the freedom of intimate association." In this claim, the FAC asserts that this right was violated (1) when, to harm him, his wife was arrested on December 11, 2024, and (2) when his employment with the City was terminated after his wife filed a lawsuit concerning her December 11 arrest.[4]

_____

[3] Donlon also argues that "the fact-intensive nature" of the civilian vs. employee speech inquiry "precludes dismissal at this stage" and cites a single case, McKenna v. Wright, 386 F.3d 432 (2d Cir. 2004), for the proposition that "questions of motive and scope of duties are ill-suited to resolution at the pleading stage." But McKenna addressed the issue of qualified immunity. It does not mention "motive" or "duty" anywhere in the opinion.

[4] In his opposition brief, Donlon characterizes many more incidents as violations of his substantive due process rights,

The defendants raise two arguments for dismissal.  They first contend that a constitutional claim must be asserted as a violation of the particular right at issue (whether a right to speech or a right of association as protected by the First Amendment) and not brought under the Fourteenth Amendment.  They also argue, with respect to Donlon's claim that his right to intimate association was violated when his City position was terminated in retaliation for his wife filing a notice that she will sue the City, the FAC does not plausibly allege that any of the defendants <u>knew</u> Donlon's wife filed the notice such that the filing could have caused the termination of his employment.  They are correct on both counts.

As Donlon acknowledges, a substantive due process claim can only survive a Rule 12(b)(6) motion if it "allege[s] governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." <u>Velez v. Levy</u>, 401 F.3d 75, 93 (2d Cir. 2005) (citation omitted).  The Second Circuit has clarified, however, that if

---

including: Sheppard's threat to kill him, Maddrey and Gerber's placement of spies in his office, and the defendants' leak of Donlon and his wife's personal information after her arrest. Because the FAC does not identify those incidents as violations of Donlon's Fourteenth Amendment rights (and, instead, only cites Donlon's wife's arrest and the termination of Donlon's employment), the Opinion does not evaluate whether they were sufficiently pled.

"what would serve to raise defendant's actions beyond the
wrongful to the unconscionable and shocking are facts which, if
proven, would constitute in themselves, specific constitutional
violations," then "plaintiffs seeking redress for that
prohibited conduct in a § 1983 suit cannot make reference to the
broad notion of substantive due process." Id. at 94.  Instead,
the alleged substantive due process claim is "subsumed" by the
"more particularized" constitutional claim in the complaint.
Id.; see also Kia P. v. McIntyre, 235 F.3d 749, 757–58 (2d Cir.
2000) ("[W]here another provision of the Constitution provides
an explicit textual source of constitutional protection, a court
must assess a plaintiff's claims under that explicit provision
and not the more generalized notion of substantive due process."
(citation omitted)).

    Here, both of Donlon's substantive due process claims, if
proven, would fall under more specific constitutional
provisions, so they cannot be evaluated under the broader
"conscience-shocking" standard that Donlon asserts.  Donlon's
first claim, that the defendants violated his "right to
employment" when they failed to give him proper notice of his
termination as Interim Commissioner or as Senior Advisor, sounds
in procedural due process, see, e.g., Locurto v. Safir, 264 F.3d
154, 171 (2d Cir. 2001), and Donlon's second claim regarding his

35

"freedom of intimate association" is subsumed by the First
Amendment.  See, e.g., Adler v. Pataki, 185 F.3d 35, 44 (2d Cir.
1999).  After applying the more specific constitutional law,
however, neither claim survives.

As an initial matter, the defendants are correct that the
FAC fails to adequately plead a First Amendment claim based on
the elimination of Donlon's Senior Advisor position because it
does not plausibly allege causation -- i.e., that any of the
defendants knew Donlon's wife filed a notice of claim and, thus,
that the filing caused Donlon's termination.  The FAC also fails
to plead the remaining two claims.  To begin, for a procedural
due process claim based on an adverse employment outcome to
survive dismissal, a plaintiff must plead that he (1) "possessed
a liberty or property interest" in employment under state law
and (2) was not given the "process he was due" under federal law
before the deprivation.  Ciambriello v. Cnty. of Nassau, 292
F.3d 307, 313 (2d Cir. 2002).  The FAC does not identify any
source of Donlon's asserted "property right to employment" nor
allege any facts indicating why the notice he received of his
termination was not "proper."

This leaves Donlon's claim that his wife was unduly
arrested on December 11, 2024 in retaliation for his speech,
violating his right to intimate association.  Although the

36

Supreme Court has "provided little guidance as to how to
determine whether the right of intimate association has been
infringed," Matsuck v. Eric Cnty. Water Auth., 757 F.3d 31, 59
(2d Cir. 2014), the Second Circuit has noted, in the context of
a First Amendment claim in which the plaintiffs alleged that
they were threatened with administrative disciplinary charges in
retaliation for their decision to speak out against their
employer's discriminatory practices:

> To state a prima facie case of retaliation
> under § 1983, a plaintiff must demonstrate
> that: (1) his or her speech was
> constitutionally protected; (2) he or she
> suffered an adverse employment action; and
> (3) a causal connection exists between the
> speech and the adverse employment action so
> that it can be said that the speech was a
> motivating factor in the determination.

Washington v. Cnty. of Rockland, 373 F.3d 310, 320 (2d Cir.
2004) (Sotomayor, J.).  For the reasons already explained,
Donlon's speech is not constitutionally protected by the First
Amendment.  Thus, this intimate association claim alleging
retaliation against Donlon's wife on account of Donlon's speech
must also be dismissed.

    C.    Monell Claim

    The FAC also asserts a Monell claim against the City.
Donlon contends that the City and the NYPD had a custom or
practice of "retaliating against whistleblowers" and

"manipulating promotions for political ends" and that, pursuant to the practice, he was harassed, demoted, and fired.

The elements of a <u>Monell</u> claim are "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." <u>Friend v. Gasparino</u>, 61 F.4th 77, 93 (2d Cir. 2023). Because the FAC has not plausibly stated a claim for any deprivation of a constitutional right, it follows that the FAC has not plausibly stated a claim that a City policy or custom caused such a deprivation. Thus, Donlon's <u>Monell</u> claim is dismissed.

IV. Supplemental Jurisdiction

Having dismissed all of the federal claims in the FAC, this Court must determine whether to exercise supplemental jurisdiction over the remaining state law claim brought under N.Y. Civil Service Law § 75-b. The FAC contends that all defendants violated the state statute by retaliating against Donlon when he engaged in protected activity.

A district court may decline to exercise supplemental jurisdiction over a state-law claim if it "has dismissed all claims over which it has original jurisdiction." 8 U.S.C. § 1367(c)(3). Once a court has dismissed all federal claims, it must decide whether the traditional values of "economy, convenience, fairness, and comity" counsel against the exercise

38

of supplemental jurisdiction.  Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 85 (2d Cir. 2018) (citation omitted).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (citation omitted).  Thus, "[i]t is well settled that where . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."  Whiteside v. Hover-Davis, Inc., 995 F.3d 315, 325 (2d Cir. 2021) (citation omitted).

There is no reason to depart from the ordinary practice of dismissing the remaining state law claim.  The federal claims have been dismissed and discovery has not begun.  Donlon does not advance any argument why this Court should exercise supplemental jurisdiction.  Both judicial economy and comity favor dismissal.

## Conclusion

The defendants' September 4, 2025 motion to dismiss is granted.  All federal claims having been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claim.  This action is dismissed without

prejudice to filing the state law claim in state court.  The Clerk of Court shall enter judgment for the defendants on the federal claims and close the case.

Dated:     New York, New York
           February 18, 2026


                              _____
                                    DENISE COTE
                         United States District Judge